UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| NOEL C. ALLEN, Individually | § | |
| and on behalf of the Estate of | § | |
| TRAVIS O'NEILL ALLEN, AND | § | |
| REBECCA O'NEILL ALLEN | § | |
| | § | |
| *v.* | § | **C.A. NO. H-96-0030** |
| | § | |
| MICHAEL LEAL, CARLE UPSHAW | § | |
| DANIEL SHELOR, BELLAIRE POLICE | § | |
| DEPARTMENT AND CITY OF | § | |
| BELLAIRE, TEXAS | § | |

## MEMORANDUM OF LAW IN SUPPORT OF
## MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE UNITED STATES DISTRICT COURT:

Defendants, THE CITY OF BELLAIRE, TEXAS,[1] MICHAEL LEAL, and CARLE

UPSHAW, named as Defendants in the above entitled and numbered cause would, in support

of their motion for summary judgment filed contemporaneously herewith, submit the following

argument, authorities, and evidence in support of their motion for summary judgment:

### FACTUAL BACKGROUND

1.     Plaintiffs, the surviving parents of Travis O'Neil Allen (Decedent) have sued the City

of Bellaire and three police officers under 42 U.S.C. § 1983 based upon the shooting of the

Decedent by Officer Leal in the early morning hours on July 15, 1995.  It is undisputed that the

Decedent's death was caused by two gun shot wounds fired by Officer Leal while in the course

and scope of his employment and authority as a police officer of the City of Bellaire, Texas.

Although the Plaintiffs may claim that other evidence is disputed, they have not identified, either

---

[1]     Sued both by being named individually and by naming its Police Department (discussed more fully *infra*.)



in disclosure or in discovery, any witnesses or tangible evidence who or which disputes the operative facts of the incident of the shooting itself.

## EVIDENCE

2.      The evidence in support of this motion for summary judgment, and attached to this memorandum of law consists of the following: the investigative report of the Bellaire Police Department related to this shooting (Ex. "A"); the affidavit testimony of Officer Michael Leal (Ex "B"); the affidavit testimony of Officer Carle Upshaw (Ex. "C"); the affidavit testimony of Officer Daniel Shelor (Ex. "D"); the affidavit testimony of Chief Randall Mack (Ex. "E"); the policies of the Bellaire Police Department regarding the use of force, including the use of deadly force (Ex. "F"); the affidavit testimony of Deputy Chief Medical Examiner for Harris County Texas Eduardo Bellas (Ex. G"); the affidavit testimony and report of David Grossi (Ex. "H"); and the deposition testimony of Massad Ayoob, the Plaintiffs' designated expert on police training and procedures (Ex. "I"). This evidence establishes that the Decedent's death was not the result of a constitutional violation, either on behalf of the individual Defendants or the City of Bellaire, that the Decedent's death was not the result of actionable negligence, and that the individual Defendants, sued in their individual capacity, are entitled to qualified immunity from the Plaintiffs' claims. Indeed, the Plaintiffs' own law enforcement expert's testimony supports each element advanced on behalf of each Defendant. Specifically, the evidence establishes the following:

3.      At 1:35 a.m. on July 15, 1995, a dispatcher of the Bellaire Police Department received a "911" emergency call from the residence of 4407 Acacia in Bellaire, Texas. The call was initiated by the owner of the residence, Edgar Jackson Deal, Jr. Deal reported to the dispatcher

that there was an unknown individual in his home and that he had heard glass breaking downstairs. While one dispatcher kept Deal on the telephone to obtain additional information, a second dispatcher dispatched Officer Shelor to the Deal residence using the department's highest priority code, code "3." Senior Patrol Officer Michael Leal and Officer Carle Upshaw, having heard the call, also advised the dispatcher that they would respond to the home to provide backup to Officer Shelor. The call was dispatched at 1:35 a.m. and Officer Shelor advised the departmental dispatcher that he arrived at the location of the home at 1:36 a.m. Upon Officer Shelor's arrival, he parked several houses away and walked up to the residence where he observed glass broken out of the front door. Leal arrived at the residence at 1:37 a.m. and Officer Upshaw arrived at 1:38 a.m. Both Leal and Shelor were in a position from which they could see the front of the house from outside of the home. Both officers observed a white male (later identified as the Decedent) come to the broken-out front window and start to crawl through it from inside the home to the outside. As the suspect began to exit the home, Officer Shelor called to the suspect and the suspect, upon seeing Officer Shelor, reentered the home. The officers then positioned themselves at various locations around the home so that they could observe the residence from different perspectives. While observing the residence from the outside, Officer Leal heard the sound of breaking glass and then observed a bicycle come crashing through a window directly next to the front door. Officer Shelor also observed the suspect throw the bicycle through the window from inside the house and Shelor again called to the suspect who then fled to another part of the house. Almost immediately, Officers Leal and Shelor heard Officer Upshaw giving verbal commands to the suspect from his position in the backyard of the house. Officer Leal went to the backyard from the east side of the home in an

3

attempt to assist Officer Upshaw. Officer Shelor remained in the front in case the suspect returned.

4.     When Officer Upshaw saw the suspect from his position at the back of the house, he drew his pistol and commanded the suspect to show his hands and move to a sliding glass door. The suspect walked quickly to the glass door but, instead of trying to open it, he walked into it although it was already opened. The suspect then attempted to open the glass door but, when he couldn't, left the area and went to another part of the house. From his position in the backyard, Officer Leal could see into the house, since most of the southeast side of the house was made up of glass windows. Officer Leal observed a large window that had been broken out, and he saw the suspect inside the residence. Officer Leal could see the hands and arms of the suspect, and he noticed that they were very bloody. Leal could see that the suspect was attempting to hide behind a portion of a wall in the house, and he was not responding to commands to surrender which were being given by Officer Upshaw. Leal also tried, through the use of verbal commands, to get the suspect to surrender in an open area. When the suspect refused to comply with verbal commands, Officer Leal entered the house through the broken window with Officer Upshaw following directly behind him. By this time, Officer Shelor had also come to the back of the house and entered the house behind Leal and Upshaw.

5.     When the officers entered the home they observed that the suspect had lowered himself to the floor, but not completely. Officer Leal continued to give commands to the suspect to lay on the ground while "covering him" at a short distance with his pistol drawn. Officer Upshaw holstered his pistol and attempted to handcuff the suspect whose hands were under his stomach. Officer Upshaw observed a significant amount of blood on the suspect and, because the officers

4

were hopeful that the suspect would not make any further attempts to resist arrest, and in order to protect themselves, they requested that Officer Shelor obtain rubber gloves from his vehicle. During the short time that Office Shelor was attempting to obtain rubber gloves, both Leal and Upshaw observed the suspect raise up off of the floor with his hands under his chest, obscured from the officers' vision. Officer Upshaw placed one of his feet on the suspect's back and attempted to push him back to the ground. As Upshaw did so, the suspect resisted and continued to raise himself up by pushing his hands, from underneath his body, against the floor. Upshaw attempted to stand on the suspect's back with both of his feet but the suspect continued to raise himself upward. As Upshaw began to lose his balance, he stepped away from the suspect and the suspect again laid down with his hands underneath his torso. All during this time, a matter of less than two minutes, Leal was telling the suspect to extend his arms in front of him where Leal could see them. At this point, the suspect, while laying on the floor, was observed by Officer Upshaw to reach under his body with both hands as though he was reaching for something. He immediately attempted to push up again with both hands and then quickly returned to a prone position then again quickly reaching toward his waist with his hands. Officer Leal observed the suspect place his right hand in his waistband. The suspect then quickly removed his hand from his waistband and then almost immediately reached into his pocket while, at the same time, attempting to roll over to his left side while staring directly at Officer Leal. Officer Leal, fearing that the suspect was attempting to obtain a weapon ordered him to move his hand. When the Decedent began removing his hand, Officer Leal, fearful that the Decedent was withdrawing a weapon fired his pistol twice striking the suspect in the back.

5

6.     Practically contemporaneously with Officer Leal's discharge of his weapon Officer Shelor returned to the location where the suspect was laying on the floor and Officer Leal directed Shelor to handcuff the suspect, since it was unknown whether the suspect was still alive. Leal also directed Shelor to immediately contact the dispatcher to request that an ambulance be dispatched to the location of the home. The dispatch tape reveals that the Officers were in the home for less than a total of three minutes and it appears from the objective evidence, from the point at which the suspect was initially partially subdued and on the floor, until Officer Leal feared for his life and that of Officer Upshaw, and discharged his weapon, was less than two minutes.

7.     After the shooting, an investigation revealed that the Decedent had attended a party and, as reported by his companions, had consumed both marijuana and Lysergic Acid Diethylamide (LSD) shortly prior to the shooting. As the autopsy results and affidavit of Dr. Bellas establish, the Decedent was under the influence of both marijuana and LSD at the time of his death. Medically these drugs are classified as psycho-active drugs which, when they are present in the body at the same time, produce synergistic effects. LSD is recognized as causing intense and varied psychic effects and have a significant effect on the visual area, often causing blurred vision and hallucinations. Detachment of the ego is a commonly recognized symptom associated with the use of LSD and, as Dr. Bellas' testimony establishes, the Decedent was not likely capable of perceiving the reality of the events and circumstances occurring around him or responding to the commands of the police officers prior to his death. Of course, at the time of the incident of the Decedent's shooting, although the officers observed the Decedent to physically resist attempts to arrest him, and to act strangely, they did not know, and could not

6

have known, that the Decedent was likely under the influence of a combination of psychotropic drugs.

## ARGUMENT AND AUTHORITIES

**I.     Plaintiffs' Claims Under 42 U.S.C. § 1983**

**A.     The Evidence Establishes That No Constitutional Violation Occurred.**

8.      The Supreme Court has held that claims of use of excessive force, including deadly force, if actionable under 42 U.S.C. § 1983, are based upon an alleged violation of the Fourth Amendment to the United States Constitution. *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865 (1989).  In its opinion in *Graham*, the Supreme Court held that, in order to sustain a cause of action for use of excessive force, the evidence must establish that the use of force was "objectively unreasonable." *Id.* at 109 S. Ct. 1872.  Consistent with Supreme Court authority, the Fifth Circuit Court of Appeals has established a three part test for consideration of a claim of excessive force brought under § 1983.  In order to prevail upon a claim under § 1983, alleging a use of excessive force by a law enforcement officer, the plaintiff must show (1) an injury; which (2) resulted directly and only from a use of force that was clearly excessive to the need; and (3) the excessiveness of which was objectively unreasonable. *Johnson v. Morel*, 876 F.2d 477, 480 (5th Cir. 1989).  The Fifth Circuit has further held that, if any of the elements of a claim under this test fail, so too does the Plaintiff's claim.  *Id.*  "There can be a constitutional violation only if injuries resulted from the officer's use of excessive force. Injuries which result from, for example, an officer's justified use of force to overcome resistance to arrest do not implicate constitutionally protected interests." *Johnson v. Morel*, 876 F.2d at 479-480.

7

9.     It is not, however, only actual resistance which justifies an officer's use of force when executing an arrest. The Fifth Circuit and other appellate courts have recognized the propriety of use of force, and in some instances deadly force, to respond to a perceived threat. In fact, it is often in the instance of a use of deadly force that a response to a perceived threat by a suspect necessitates the use of deadly force by the officer before the officer can be fully aware of whether the perceived threat is real. Accordingly, in its opinion in *Young v. City of Killeen, Texas*, 775 F.2d 1349 (5th Cir. 1985), the Court expressly held that an officer's reasonably mistaken belief that an individual was reaching for a weapon, which prompted the officer to shoot and kill the suspect, was not an unconstitutional act on behalf of the officer, even though it was later determined that the suspect was not in possession of a deadly weapon. "No right is guaranteed by federal law that one will be free from circumstances where he will be endangered by the misinterpretations of his acts." *Young v. Killeen*, 775 F.2d at 1353.

10.     In following the lead of the Fifth Circuit in *Young v. City of Killeen*, the Seventh Circuit, *en banc*, in its opinion in *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) (*en banc*) came to a similar conclusion, under factual circumstances similar to those in the instant case, and explained its reasoning as follows:

> W*hen an officer believes that a suspect's actions places him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force.*

*Sherrod*, 865 F.2d at 805 (emphasis in original).

> *It is not necessary that the danger which gave rise to the belief actually existed*; it is sufficient that the person resorting to self defense at the time involved reasonably believed in the existence of such a danger, and *such reasonable belief is sufficient even where it is mistaken. In forming such reasonable belief a person may act upon appearances.* In other words, it is sufficient that the danger was reasonably apparent.

8

*Sherrod*, 865 F.2d at 807 (citing *Davis v. Freels*, 583 F.2d 337 (7th Cir. 1978) (emphasis in original)).[2]  Since its opinion in *Young*, the Fifth Circuit has maintained its position that a use of deadly force in response to a reasonably perceived threat of serious bodily harm or death to the officer or others in the area justifies the use of deadly force, even if it is later determined that the suspect was not attempting to use deadly force.  Compare *Fraire v. City of Arlington*, 957 F.2d 1268, 1275-76 (5th Cir. 1992).  Other circuits, in considering factual circumstances similar to those presented in the instant case, have also come to the conclusion that conduct similar to that of Officer Leal in this instance is a reasonable use of deadly force.  See *Wilson v. Meeks*, 52 F.3d 1547, 1554 (10th Cir. 1995) and *Drewitt v. Pratt*, 999 F.2d 774, 779 (4th Cir. 1993).

11.     Jurisprudence with respect to this issue is not in dispute within the circuits.  The law recognizes, as it must, that the application of the Supreme Court's opinions of *Graham v. Connor* and *Tennessee v. Garner* must allow for the reasonable exercise of the discretion of the officer involved in the shooting in making the determination as to the need for the use of force, even deadly force.  In the absence of any evidence controverting the testimony of Officers Leal and Upshaw regarding the conduct of the suspect at the instant of the shooting, as strengthened by the testimony of Officer Shelor, Dr. Bellas, and the objective evidence, there cannot be a successful assertion, in order to avoid summary judgment, that Officer Leal's response was not objectively reasonable, based upon what the officers knew and observed at the time of the shooting.  Plaintiffs' own expert agrees that at the moment he shot, Leal's reaction to the

---

[2]  In so holding, the *Sherrod* court found that its holding was also consistent with the Supreme Court's decision in *Tennessee v. Garner*, 471 U.S. 1, 105 S. Ct. 1694 (1985).

9

situation presented was not unreasonable, and therefore, constitutional. Exhibit "I," p. 78, ll. 4-20; p. 81, ll. 6-13; and p. 87, ll. 4-22. Because all of the evidence, including the testimony of the Plaintiffs' own expert witness, establishes facts sufficient to demonstrate a reasonably perceived threat by Officer Leal at the time of the shooting, as a matter of law the evidence establishes that the Decedent was not the victim of an unconstitutional act, even if the evidence or argument establishes that Leal's response was later shown to have been mistaken.

12.    The issue is simply whether, at the time that Officer Leal perceived a threat, his perception was not unreasonable under the circumstances known to him at the time and, in response to such a perceived threat, his conduct was that which any reasonable officer might have taken under the same circumstances. Compare *Young, supra* and *Greenridge v. Ruffin*, 927 F.2d 789 (4th Cir. 1991); see also *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996) (collecting cases), and *Menuel v. City of Atlanta,* 25 F.3d 990, 997 (11th Cir. 1994), in which the Court recognized that "police must pursue crime and constrain violence, even if the undertaking itself causes violence from time to time" and holding that no responsible officer may disregard palpable indications of imminent violence.    The Supreme Court has expressly cautioned that the objective reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on a scene, rather than with the 20/20 vision of hindsight" and that "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. at 396-97. In light of the Supreme Court's opinion in *Graham,* the Sixth Circuit, like other circuits, has held that a court;

10

> must avoid substituting our personal notions of proper police procedure for the
> instantaneous decision of the officer at the scene. We must never allow the
> theoretical, sanitized world of our imagination to replace the dangerous and
> complex world that policemen face every day. What constitutes "reasonable"
> action may seem quite different to someone facing a possible assailant that to
> someone analyzing the question at leisure.

*Smith v. Freeland*, 954 F.2d 343, 347 (6th Cir.), *cert. denied*, 504 U.S. 915 (1992). Again,

Plaintiffs' expert's testimony on this issue, particularly at p. 81, proves constitutional limitations.

**B.    The City of Bellaire is Not Liable**

13.    In addition to suing Officer Leal for his application of deadly force and Officer Upshaw

for allegedly failing to interfere with Leal's use of deadly force, the Plaintiff has sued the City

of Bellaire claiming that the City is liable under § 1983 as well, based upon the proposition that

a policy of the City, by its operation, caused the allegedly unconstitutional conduct of its

officers. Because the evidence establishes that there was no constitutional deprivation and,

furthermore, establishes, alternatively, that even if the individual officers' conduct constituted

a violation of 42 U.S.C. § 1983, the City is not liable because the conduct of the officers was

not *caused* by the operation of a policy of the City of Bellaire. For three separate and distinct

reasons, the City cannot be held liable for Plaintiff's claim under 42 U.S.C. § 1983.

**1.    The City Cannot be Liable in the Absence of a Constitutional Deprivation**

14.    First, since the evidence establishes that no constitutional deprivation occurred, the City

is not liable. If the Decedent was not the victim of a constitutional deprivation, it is irrelevant

whether the City's policies would have authorized the conduct of which the Plaintiffs complain.

See *City of Los Angeles v. Heller*, 475 U.S. 796, 106 S. Ct. 1571, 1573 (1986). Accord,

*McKee v. City of Rockwall*, 877 F.2d 409 (5th Cir.), *cert. denied*, 493 U.S. 1023 (1990). Since

11

the evidence establishes no constitutional deprivation by the individual officers, the City may not be held liable under 42 U.S.C. § 1983, as a matter of law.

### 2. There Is No Evidence of a City Policy Causing a Constitutional Deprivation

15.    Even if the Court were to find that the Plaintiffs have presented evidence of a colorable claim against either or both of the officers individually, the City is still entitled to summary judgment with respect to the Plaintiffs' claims against it because the City may not be liable merely because it employed one or more officers who allegedly caused a constitutional deprivation.  Indeed, the Supreme Court has recognized very narrow circumstances in which a municipality may be held liable for the conduct of its employees, even if unconstitutional. Accordingly, in order to impose liability upon a governmental unit, a plaintiff must demonstrate the existence of a formally adopted and promulgated policy which leads to an alleged constitutional deprivation. *Monell v. Dept. of Social Svcs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-38 (1978).  Under the Supreme Court's holding in *Monell*, a plaintiff must identify the existence of a policy and show how the policy, *by its operation*, caused the allegedly unconstitutional conduct.  In applying the Supreme Court's holding in *Monell*, the Fifth Circuit has held that; "to establish municipal liability under § 1983, the plaintiff must *demonstrate* a policy or custom which causes or occasions a constitutional deprivation."    *Burns v. City of Galveston*, 905 F.2d 100, 102 (5th Cir. 1990) (emphasis added).

16.    In light of Supreme Court and Fifth Circuit authority, even if this Court finds a colorable claim with respect to allegedly unconstitutional conduct of either or both of the officers, therefore, the Plaintiffs, in order to overcome summary judgment must: (1) identify the policy or custom of which they complain; (2) connect the policy or custom to the governmental entity

12

itself; and (3) show that the particular injury was incurred because of the execution of that particular policy or custom. *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir.) *(en banc) cert. denied*, 472 U.S. 1016 (1985). "Custom" has been defined as a "persistent, widespread practice of city officials or employees which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that it fairly represents municipal policy." *Campbell v. City of San Antonio*, 43 F.3d 973, 977 (5th Cir. 1995). Whereas, "[a]n official policy is 'a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's law making officers or by an official to whom the law makers have delegated policymaking authority.'" *Colle v. Brazos County,* 981 F.2d 237, 244-45 (5th Cir. 1993) (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984) *(en banc)).* "[A] municipal 'policy' must be a deliberate and conscious choice" by the City's policymaker." *Rhyne v. Henderson County*, 973 F.2d 386, 392 (5th Cir. 1992) (citations omitted). A policy cannot be inferred "merely because harm resulted from some interaction with a government entity." *Colle*, 981 F.2d at 245. Moreover, a single incident of constitutional deprivation is not enough to constitute a policy or custom for the purposes of a § 1983 claim. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427 (1985). Accord, *Fraire v. City of Arlington, supra*.

17.     The evidence in this case establishes that the City of Bellaire's policies regarding use of force are consistent with constitutional mandates and there is no basis to the suggestion that a policy of the City of Bellaire would permit or cause a constitutional deprivation in the use of force, deadly or otherwise. Plaintiffs' police liability expert has expressly agreed that the City's policies are appropriate. Exhibit "I," P. 55, ll. 9-22. Furthermore, the testimony of Chief

CHIPDF - www.fasio.com

Randall Mack establishes that there is not, to the City's knowledge, any deviation from the required adherence to the City's stated policies regarding the use of any force, including deadly force. Indeed, Chief Mack's testimony establishes, undisputedly, that a use of excessive force beyond that permitted by the City's written policies would be in direct derogation of the City's prohibition of unjustified use of force which is not, under the circumstances presented, reasonably necessary. Compare, *City of Oklahoma v. Tuttle*, 471 U.S. 808, 105 S. Ct. 2427 (1985), and *Fraire v. City of Arlington*, 957 F.2d 1268 (5th Cir. 1992). Since the City's policy, custom, and practices are that no officer may ever use excessive force, non-lethal or lethal, in effecting an arrest, search, or seizure, and because the Plaintiffs have provided no evidence sufficient to show that the complained of conduct of any Bellaire Police Department officer involved in the incident made the basis of Plaintiffs' claims was *caused* by any policy or custom of the City, summary judgment in favor of the City is required, even if the Court believes that there is a colorable claim of unconstitutional conduct by any individual Defendant. Indeed, the Plaintiffs' claims against the City fail on all three elements of the test required under *Bennett v. City of Slidell*. The Plaintiffs cannot articulate the existence of a policy created or promulgated by the City's policymaker which, by its operation, would have caused the constitutional deprivation which the Plaintiffs have alleged.

### 3. There Is No Liability for a Failure to Train or Discipline

18.     Lastly, to the extent that the Plaintiffs attempt to impose liability upon the City based upon a theory of a failure to train or supervise individual officers, the City is entitled to summary judgment with respect to this allegation as well. In its opinion in *City of Canton v. Harris*, 109 S. Ct. 1197, 489 U.S. 378 (1989), the Supreme Court defined the very narrow

14

circumstances under which a claim of inadequate training may form the basis of an alleged constitutional deprivation against a governmental unit. "Inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 109 S. Ct. at 1204. In its application of the Fifth Circuit's opinion in *City of Canton v. Harris*, the Court has held that, in order to hold a municipality liable under § 1983 for allegedly inadequate training, a plaintiff must present evidence which establishes:

1. that training or hiring procedures of the municipality's policymaker are inadequate;

2. that the municipality's policymaker was deliberately indifferent in adopting the hiring or training policy; and

3. that the inadequate hiring or training policy directly caused the plaintiff's injury.

*Baker v. Putnal*, 75 F.3d 190, 200 (5th Cir. 1996) (citation omitted). In cautioning against a widespread argument of a lack of training in connection with claims under § 1983, generally, the Supreme Court held that it will not "suffice to prove that an injury or accident could have been avoided if an officer had better or more training, sufficient to equip him to avoid the particular injury-causing conduct [since]. . . [s]uch a claim could be made about almost any encounter resulting in an injury." *City of Canton*, 109 S. Ct. at 1206.

19.  Indeed, the Fifth Circuit, even before the Supreme Court's opinion in *City of Canton v. Harris*, rejected the contention that a City could be liable under 42 U.S.C. § 1983 based upon a single incident of a use of deadly force by one of its police officers. In *Languirand v. Hayden*, 717 F.2d 220 (5th Cir.), *cert. denied*, 467 U.S. 1215 (1984), the Fifth Circuit concluded that municipal liability could not, as a matter of law, be derived from a single incident

15

of allegedly improvident discharge of a firearm by a police officer. The Fifth Circuit cautioned

that, in order to impose liability upon a governmental unit for the acts of its police officers, a

plaintiff would have to show;

> at least a pattern of similar incidents in which citizens were injured or endangered
> by intentional or negligent police misconduct and/or that serious incompetence or
> misbehavior was general or wide-spread throughout the police force.

*Languirand v. Hayden*, 717 F.2d at 227.[3]  Since the Supreme Court's opinion in *City of Canton*

*v. Harris*, the Fifth Circuit has only strengthened its position with respect to the requirement of

proof in order to establish governmental liability based upon a claim of failure to train.

Accordingly, in its opinion in *Rodriguez v. Avita*, 871 F.2d 552 (5th Cir.), *cert. denied*, 493

U.S. 854 (1989) (quoting *Languirand v. Hayden*), the Court again held that the description of

a single incident of arguably excessive force is insufficient, as a matter of law, to impose

liability upon a governmental employer, even if the constitutional violation occurred.    In

applying the Fifth Circuit's opinions in *Rodriguez* and *Languirand*, at least one court has

expressly held that "[a] single incident, standing alone, is insufficient as a matter of law to

establish a failure to train violation." *Craig v. St. Martin Parish Sheriff*, 861 F. Supp. 1290,

1302 (W.D. LA 1994) (citations omitted).  Again, the Fifth Circuit's position in rejecting

claims, such as in the instant case, of a single, isolated, incident as the basis of a claim for

municipal liability, either generally or as a claim for failure to train, is supported not only by

Supreme Court precedent but is in accord with other circuits which have considered the same

---

[3]  Of course, since the *Languirand* court's opinion, the Supreme Court, in *Graham v. Connor*, rejected
the suggestion of negligent police misconduct forming the basis of a claim of excessive force.  Since the Supreme
Court decided  *Graham v. Connor*, it is clear that only intentional acts by a police officer may form the basis of
a claim of the Forth Amendment violation, alleging excessive use of force, under 42 U.S.C. § 1983.  Of course,
the Plaintiffs make no claim of negligence in the instant case.

issue. "Mere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability on the [municipality]." *Merritt v. County of Los Angeles*, 875 F.2d 765, 770 (9th Cir. 1989); see also *Rodriguez v. Furtado*, 950 F.2d 805, 813 (1st Cir. 1991); *Parker v. District of Columbia*, 850 F.2d 708 at 712 (D.C. Circuit), *cert. den'd.,* 489 U.S. 1065 (1989) (collecting cases); and *Milligan v. City of Newport News*, 743 F.2d 227 (4th Cir. 1984).

20.     Again, the affidavit testimony of Chief Randle Mack establishes that each of the officers involved had completed, when hired, all of the minimum training requirements set forth by the State of Texas and had, since being hired, undergone significant continuing legal education in various areas of law enforcement, particularly those where the City perceived or identified a need for additional training. The Plaintiffs cannot show that the City did anything less than that which was required by law. Indeed, the evidence establishes that the City did even more than that which the law regarding training of police officers within the State of Texas required. As well, Plaintiffs' own expert called Leal a "highly trained officer." Exhibit "I," p.55, l. 23 - p. 56, l. 14. Plaintiffs' expert also agreed that the City's officers were generally well trained and that they had not disregarded any *"known need for training."* Exhibit "I," p. 56, l. 15 - p. 57, l.8. Of course, the Plaintiffs cannot demonstrate, even if they can show a lack of training, how a lack of training caused the conduct of the individual officers of which they complain, as *City of Canton* would require. Equally the Plaintiffs' own expert refutes the Plaintiffs' otherwise unsupported contentions that the City failed to supervise or discipline its officers. Exhibit "B," p. 57, ll. 13-25; p. 58, l. 25 to p. 59, l. 24; p. 60, ll. 7-14. Lastly, the Plaintiffs' expert agreed that there is no evidence to support the Plaintiffs' bald allegation that Leal or Upshaw were "dangerous" or "prone to violence," as the Plaintiffs alleged. Exhibit "I," p. 65, ll. 9-22.

17

21.     In sum, it is clear that the Plaintiffs' complaint against the City is not that a policy of the City caused a constitutional deprivation, even if one occurred, but, rather, that the City might have, or could have, in the opinion of the Plaintiffs, done more and that, had the City done more, the Plaintiffs speculate that this incident might not have occurred.  The Fifth Circuit has consistently rejected argument that a governmental unit may be liable because it could have, but did not, create policies which protected against an alleged constitutional deprivation.  Compare *Palmer v. City of San Antonio*, 810 F.2d 510 at 514 (5th Cir. 1987).

## C.     The Bellaire Police Department Is Not Separately Subject to Suit

22.     In addition to the fact that the evidence and law establish that the City of Bellaire is entitled to judgment as a matter of law in its favor for each of the three reasons previously set forth, the City of Bellaire's Police Department is not separately liable to suit.  As noted in the Defendants' memorandum of law in support of its motion to dismiss, filed shortly after the inception of this case, this Court, the Honorable Chief Judge Norman Black presiding, has held that a police department is a department within a city and is not an individual, corporation, partnership, or unincorporated association.  Accordingly, police departments, separate and apart from the city of which they are a department, are not subject to suit.  *Maxwell v. Henry*, 815 F. Supp. 213, 215 (S.D. TX 1993).  As Judge Black observed in *Maxwell*, amenability to suit in federal court requires that the court defer to state law, consistent with Rule 17(b) of the Federal Rules of Civil Procedure.  Accordingly, not only this court, but other courts of this circuit, and, indeed, the Fifth Circuit, have recognized the impropriety of attempts to sue a department of a city as a separate juridical city or county.  *Cf., Jacobs v. Port Neches Police Dept.*, 915 F. Supp. 842 (E.D. TX 1996) (citing *Darby v. Pasadena Police Dept.*, 939 F.2d

18

311, 313 (5th Cir. 1991), *inter alia*.)[4] Because the City is not liable under 42 U.S.C. § 1983, and further because its police department cannot separately be subject to suit, the entry of judgment in favor of the City should include judgment in favor of the police department as well.

## II.     The Officers Are Entitled to Qualified Immunity

## A.     Standard of Proof

23.     The Supreme Court has developed an objective-reasonableness test for evaluating the actions of a governmental official claiming qualified immunity. That test requires that an official's action be evaluated against "clearly established law," which consist of statutory or constitutional rights of which a reasonable individual would have known at the time of the occurrence of the incident forming the basis of the complaint. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 102 S. Ct. 2727, 2738 (1982). The Supreme Court's objective-reasonableness test requires that the court grant summary judgment, based upon qualified immunity, to "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096 (1986). Unless no reasonable, similarly situated, police officer could have considered the conduct of the individual Defendants to be lawful, under the circumstances known to them at the time, qualified immunity applies and dismissal of the Defendants, in their individual capacities, is mandated. *Anderson v. Creighton*, 483 U.S. 635, 640-41, 107 S. Ct. 3034, 3039-40 (1987). In light of Supreme Court precedent, the Fifth Circuit has held that, where an officer raises qualified immunity as a defense, the plaintiff must

---

[4] Defendants are somewhat surprised that the Plaintiffs are adamantly opposed to voluntary dismissal of a nonjuridical unit in the form of the Bellaire Police Department, even though the holdings in this Court and others have been brought to their counsel's attention on more than one occasion. However, the Plaintiffs seem resolute in their intent to create some exception to the well-settled law with respect to this issue to the extent that they remain unwilling to dismiss this contention and, moreover, have, on more than one occasion, attempted to obtain the deposition testimony of the Bellaire Police Department, separate and apart from the City of Bellaire.

19

"come forward with evidence sufficient to create a genuine issue as to whether [the officers']
conduct was objectively reasonable in light of the clearly established law." *Salas v. Carpenter*,
980 F.2d 299, 305 (5th Cir. 1992). As previously set forth, the "clearly established law"
applicable to this case is set forth by the Supreme Court's opinions in *Graham v. Connor* and
*Tennessee v. Garner*, as well as the Fifth Circuit's opinions in *Young v. City of Killeen* and
*Fraire v. City of Arlington*. Similarly, the Fifth Circuit has recognized that "the qualified
immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly
incompetent or those who knowingly violate the law.'" *Mangieri v. Clifton*, 29 F.2d 1012, 1017
(5th Cir. 1994) (quoting *Hunter v. Bryant*, 502 U.S. 224, ___, 112 S. Ct. 534, 536 (1991)).

24.     Additionally, this Court has held, and the Fifth Circuit has agreed, that the burden of
overcoming the defense of qualified immunity rests with the Plaintiff. *Cf., Burns-Toole v.
Byrne*, 11 F.3d 1270 (5th Cir.), *cert. denied*, ___ U.S. ___, 114 S. Ct. 2680 (1994).
Accordingly, in order to overcome a motion for summary judgment based upon qualified
immunity, the Plaintiffs must present evidence sufficient to show that no reasonable police
officer, under the circumstances known to officers Leal and Upshaw, could have believed that
the actions for which the Plaintiffs attempt to hold them liable were constitutional.     The
objective-reasonableness test of a claim of qualified immunity is met if "officers of reasonable
competence could disagree" on the legality of the officer's actions. *Malley v. Briggs*, 475 U.S.
at 341, 106 S. Ct. at 1096.

## B.     Qualified Immunity of Officer Leal

25.     In reviewing a claim of qualified immunity based upon the use of deadly force, the
Court's consideration of the reasonableness of the officer's action is, in many ways, similar to

20

CVxPDF - www.fastio.com

the test of whether the use of force was reasonable and, therefore, not violative of constitutionally protected civil rights. Compare *Reynolds v. County of San Diego*, 84 F.2d 1162, (9th Cir. 1996), and *Salimb v. Proulx*, 93 F.3d 86 (2nd Cir. 1996). Inextricably intertwined with the question of the reasonableness of the use of force under the circumstances is, quite obviously, the first element of a claim of qualified immunity: whether Officer Leal's conduct violated clearly established law.

26.    However, even if the Court finds that there is a colorable question as to whether, objectively, it may be said that Officer Leal's response was excessive, Officer Leal may still be entitled to qualified immunity under the facts and circumstances of this case. Specifically, as the Supreme Court has recognized in its opinion in *Mitchell v. Forsyth*, 72 U.S. 511, 105 S. Ct. 2806 (1985), the decisive question is not "that [the officer's] position turned out to be incorrect, but that the question was open at the time he acted." *Id*. at 535, 105 S. Ct. at 2820. Because the evidence establishes that, at the very least, other reasonable officers could have believed, knowing only what was known to Leal at the time, Leal's actions to be within the confines of the Forth Amendment, Leal is entitled to qualified immunity. Again, the Plaintiffs' own expert agrees, not only that Leal's decision to shoot was reasonable but that Leal would be reasonable in so believing. See particularly, Exhibit "I," p. 87, ll. 4-22 and p. 81, ll. 6-13. This is especially true in the absence of any evidence suggesting that no real threat of harm could have been perceived by Leal at the time that he shot since, in order to defeat a claim of qualified immunity, the Plaintiffs must present such evidence. *Burnes-Toole v. Byrne, supra.*

21

**B.**     **Officer Upshaw's Qualified Immunity**

27.     Officer Upshaw is entitled to qualified immunity from the claims against him, individually, for two reasons. First, the evidence establishes that Officer Leal did not engage in an unconstitutional use of excessive force. Accordingly, to the extent that the Plaintiff contended that Upshaw's failure to act to preclude Leal's actions, such claims must fail as, Leal's actions were not unconstitutional. Regardless of the constitutionality of Leal's acts, however, Upshaw is entitled to the entry of an order granting summary judgment in his favor because there is no evidence to establish that Upshaw reasonably perceived, but disregarded, a need to intervene prior to Leal's decision to shoot.

28.     As this Court observed, in denying Upshaw's motion to dismiss, the Plaintiffs state a claim upon which relief may be granted as against Officer Upshaw based upon the proposition that Upshaw failed to prevent Leal from shooting the Decedent. However, in the case cited by the Court in denying the motion to dismiss, *Hale v. Townley*, 45 F.3d 914 (5th Cir. 1995), the Fifth Circuit recognized such liability only where the other officer's use of force was "excessive." *Id.* at 919. Accordingly, Upshaw's liability for a claim of a failure to intercede to protect the Decedent, like the Plaintiffs' claims of liability against the City, turn upon the requirement that the Plaintiffs first demonstrate an unconstitutional act by Leal. Clearly, under the Fifth Circuit's opinion in *Hale v. Townley*, Upshaw cannot be liable for failure to intercede unless and until the Court is satisfied that Leal's actions were unconstitutional.

29.     However, even if there is a question of fact as to the constitutionality of Leal's actions, there is no question but that Upshaw is entitled, as matter of law, to judgment in his favor. This is due to the fact that, again, in *Hale v. Townley*, the Fifth Circuit expressly held that the test

22

of liability of a law enforcement officer, for failure to intercede, turns upon whether the officer accused of failing to intercede "had a reasonable opportunity to realize the excessive nature of the force and to intervene to stop it." *Id.* at 919. In this case, the Plaintiffs complain that Upshaw's purported unconstitutional action was the failure to preclude Leal from shooting prior to the discharge of Leal's weapon. However, both Upshaw's affidavit and the deposition testimony of the Plaintiffs' own expert witness, Massad Ayoob, confirm that Upshaw did not perceive Leal's intent to shoot prior to the discharge of Leal's weapon. Indeed, the undisputed evidence establishes that Upshaw not only did not perceive the intent of Leal to use deadly force at the time that he did, but, rather, that Upshaw was not even aware of the fact that Leal's gun had been discharged until Leal told him of the event. According to Massad Ayoob, there is no evidence to support the contention that Upshaw perceived Leal's intent to shoot, prior to the shooting and, indeed, Ayoob agrees that Upshaw's testimony - that he was not aware of Leal's discharge of his weapon, until advised by Leal afterwards - is not at all unusual in such situations. See deposition testimony of Plaintiffs' expert witness, Massad Ayoob, Ex. "I" at p. 66, l. 25 - p. 68, l. 3.

30.     Because the evidence establishes that Leal's use of force was not "excessive" in order to impose liability upon another Officer, such as Upshaw, for failing to intercede to prevent such use of force, Upshaw is entitled to the entry of judgment in his favor as a matter of law. Even if there is some question of fact as to the propriety of the use of force, because the evidence, including the Plaintiffs' own expert testimony, establishes that Upshaw did not perceive, and would not be expected to perceive, Leal's intent to utilize deadly force, until after it had been used, Upshaw is entitled to summary judgment. The only means by which Upshaw could be

23

liable for the failure to prevent Leal from utilizing force would be if there were any evidence in the record sufficient to show that Upshaw knew, or had reason to know, of Leal's use of force prior to being used. There is no evidence to support this contention.[5]

## CONCLUSION

31. The evidence establishes that Leal's use of force, under the circumstances presented, was in accordance with constitutional limitations. Regardless of whether, in reviewing at length the actions of the officers in question, an individual, or even the Court, might question that such use of force was the only means available to protect Officers Leal and Upshaw, the parties and the Court must confine themselves to the information known to the officers as they proceeded in the dark, with a bloody suspect who refused to comply with their instructions, and who, undisputedly, acted in a manner which caused these officers, as it would any officer, to believe that there was a risk of imminent death or serious bodily harm. While the Defendants recognize the sympathetic circumstances which ultimately became known after the occurrence of the incident which forms the basis of this lawsuit, they do not factor into an analysis on the constitutionality of the use of force, at the moment that it was used. Because the evidence establishes a use of force in accordance with the limitations imposed by the Fourth Amendment to the United States Constitution, there is no evidence sufficient to warrant a trial on the Plaintiffs' claims under 42 U.S.C. § 1983 based upon an alleged constitutional deprivation in connection with this use of force.

---

[5] Although Plaintiffs' liability expert questions Upshaw's use of his feet to attempt to restrain the Plaintiff prior to Officer Leal's shooting, the Plaintiffs' Complaint in this case does not allege an unconstitutional use of force by Upshaw personally, and there is no evidence that Upshaw's use of his feet was, in any way, the proximate cause of Decedent's death, the only injury for which the Plaintiffs herein sue.

24

32.     Even if the Court believes that there is a question regarding the constitutionality of the use of force, there is no basis for the imposition of liability under 42 U.S.C. § 1983 against the City of Bellaire.  The elements of proof of a claim against a governmental unit, such as the City, are distinctly different from, but certainly dependent upon, proof of a constitutional violation. However, even if Plaintiffs establish the existence of a constitutional violation, they must show that violation was caused directly pursuant to the operation of a policy of the governmental unit. All of the evidence submitted to the Court, including the deposition of the Plaintiffs' own expert witness, is to the contrary.  The evidence establishes, undisputedly, that a use of force that would not be in compliance with the Fourth Amendment to the United States Constitution would also violate the City of Bellaire Police Department's policies.    Additionally, the evidence establishes that this is a single, isolated incident and the precedent of this circuit precludes the imposition of liability against a governmental unit, even if there has been a constitutional violation, for such a single, isolated incident.

33.     Both of the officers are entitled to qualified immunity.  Leal's immunity is based upon the fact that the evidence, including the admissions of the Plaintiffs' own law enforcement liability expert, establishes that Leal could reasonably have believed that force was necessary under the circumstances presented by the Decedent at the moment that Leal decided to use force. Accordingly, the Plaintiffs' own liability expert has admitted to those facts necessary to show that Leal is entitled to qualified immunity.  Similarly, Upshaw is entitled to qualified immunity as well.  Upshaw's immunity is based initially upon the fact that there is no evidence of a constitutional deprivation.  Regardless, Upshaw is entitled to qualified immunity because there is no evidence to show that Upshaw knew, or could have known, of Leal's intent to use deadly

25

force, until after Leal discharged his weapon. Under the circumstances presented, there is no basis for the imposition of liability against Upshaw based upon an allegation of a failure to protect the Decedent.

For each of the foregoing reasons, the Defendants are entitled, as a matter of law, to judgment in their favor under Rule 56 of the Federal Rules of Civil Procedure.

Respectfully submitted,

WILLIAM S. HELFAND
SBOT: 09388250
ATTORNEY FOR DEFENDANTS

OF COUNSEL:

MAGENHEIM, BATEMAN, ROBINSON
 WROTENBERY & HELFAND, P.L.L.C.
3600 One Houston Center
1221 McKinney
Houston, Texas 77010
(713) 609-7881
(713) 609-7777 (Fax)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been forwarded to the following counsel of record by certified mail, return receipt requested, hand-delivery, and/or facsimile transmission, on this 10th day of May, 1997, as follows:

Graydon Wilson
Richard Haynes & Associates
4300 Scotland
Houston, TX 77007-7394
**CM/RRR Nº Z 160 801 507**

WILLIAM S. HELFAND

27

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **NOEL C. ALLEN, Individually** | § | |
| **and on behalf of the Estate of** | § | |
| **TRAVIS O'NEILL ALLEN, AND** | § | |
| **REBECCA O'NEILL ALLEN** | § | |
| | § | |
| ***v.*** | § | **C.A. NO. H-96-0030** |
| | § | |
| **MICHAEL LEAL, CARLE UPSHAW** | § | |
| **DANIEL SHELOR, BELLAIRE POLICE** | § | |
| **DEPARTMENT AND CITY OF** | § | |
| **BELLAIRE, TEXAS** | § | |

## AFFIDAVIT

| | |
|---|---|
| **STATE OF TEXAS** | § |
| | § |
| **COUNTY OF HARRIS** | § |

BEFORE ME, the undersigned Notary Public, on this day personally appeared William S. Helfand, who being by me duly sworn on his oath, deposed and stated as follows:

My name is William S. Helfand. I am over the age of 21 and fully competent and authorized to make this Affidavit. I am an attorney for the Defendants in the above-referenced and numbered cause. I certify that all attached documents and affidavits attached herein are true and correct copies of the originals on file in my office or at the Bellaire Police Department.

Further Affiant sayeth not.

_____
WILLIAM S. HELFAND

SUBSCRIBED AND SWORN TO BEFORE ME on this 9th day of May, 1997.

_____
NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS
Printed Name: Dawn Carroll
MY COMMISSION EXPIRES: 5.28.2000

DAWN CARROLL
Notary Public, State of Texas
My Commission Expires 03-28-2000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| NOEL C. ALLEN, Individually<br>and on behalf of the Estate of<br>TRAVIS O'NEILL ALLEN, AND<br>REBECCA O'NEILL ALLEN<br><br>v.<br><br>MICHAEL LEAL, CARLE UPSHAW<br>DANIEL SHELOR, BELLAIRE POLICE<br>DEPARTMENT AND CITY OF<br>BELLAIRE, TEXAS | §<br>§<br>§<br>§<br>§<br>§       C.A. NO. H-96-0030<br>§<br>§<br>§<br>§<br>§ |

**AFFIDAVIT**

STATE OF TEXAS     §
                  §
COUNTY OF HARRIS   §

BEFORE ME, the undersigned Notary Public, on this day personally appeared D.L. Oglesby, who being by me duly sworn on his oath, deposed and stated as follows:

My name is D.L. Oglesby. I am over the age of 21 and fully competent and authorized to make this Affidavit. I am a Detective for the Bellaire Police Department. I certify that the affidavits of Officers Michael Leal and Carle Upshaw attached hereto are true and correct copies of the originals that are on file at the Bellaire Police Department.

Further Affiant sayeth not.

D. L. OGLESBY

SUBSCRIBED AND SWORN TO BEFORE ME on this 9th day of May, 1997.

D. J. HAZELWOOD SR.
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 6-28-97

NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS
Printed Name: Donald James Hazelwood
MY COMMISSION EXPIRES: 6-28-97

# BELLAIRE POLICE DEPARTMENT OFFICER'S FIELD NOTES

**CASE #** 9508788

| offense | | CASE # 9508788 |
|---|---|---|

**offense**
Burglary of a habitation
Shooting Investigation

**D.A. Log #**

| | occurred earliest: | date July 15, 1995 | time 0135 |
|---|---|---|---|

| location 4407 Acacia | type F | ( ) Hate Crime ( ) Fam. Violence | occurred latest: | date | time |
|---|---|---|---|---|---|

| report date 7-15-95 | stolen property amount $ | damage property amount $ | no. victims 2 | disposition date: | adult ( ) arrest ( ) charged | juvenile ( ) arrest ( ) charged |
|---|---|---|---|---|---|---|

| reporting officer D.L. Oglesby | emp. # | reporting officer | emp. # | related cases | weather 2 |
|---|---|---|---|---|---|

## REPORTEE/VICTIM/WITNESS

| #1 | ( ) reportee (X) victim ( ) witness name Deal, Edgar Jackson | address 4407 Acacia | city Bellaire | state Tx | zip 77401 |
|---|---|---|---|---|---|

| h. phone 666-7527 | employer: name of company Jack Deal Consultants | w. phone 667-1158 | d.o.b. 3-25-33 | race W | sex M | juvenile ( ) y (x) n |
|---|---|---|---|---|---|---|

| relation to suspect none | condition code ( ) possible ( ) incap. ( ) deceased ( ) non-incap. | if injured taken to | by ( ) ambulance ( ) police ( ) other |
|---|---|---|---|

| #2 | ( ) reportee (X) victim ( ) witness name Deal, Carolyn Ryan | address 4407 Acacia | city Bellaire | state Tx | zip 77401 |
|---|---|---|---|---|---|

| h. phone 666-7527 | employer: name of company Jack Deal Consultants | w. phone 667-1158 | d.o.b. 3-22-45 | race W | sex F | juvenile ( ) y (X) n |
|---|---|---|---|---|---|---|

| relation to suspect None | condition code ( ) possible ( ) incap. ( ) deceased ( ) non-incap. | if injured taken to | by ( ) ambulance ( ) police ( ) other |
|---|---|---|---|

| #3 | ( ) reportee ( ) victim ( ) witness name | address | city | state | zip |
|---|---|---|---|---|---|

| h. phone | employer: name of company | w. phone | d.o.b. | race | sex | juvenile ( ) y ( ) n |
|---|---|---|---|---|---|---|

| relation to suspect | condition code ( ) possible ( ) incap. ( ) deceased ( ) non-incap. | if injured taken to | by ( ) ambulance ( ) police ( ) other |
|---|---|---|---|

| #4 | ( ) reportee ( ) victim ( ) witness name | address | city | state | zip |
|---|---|---|---|---|---|

| h. phone | employer: name of company | w. phone | d.o.b. | race | sex | juvenile ( ) y ( ) n |
|---|---|---|---|---|---|---|

| relation to suspect | condition code ( ) possible ( ) incap. ( ) deceased ( ) non-incap. | if injured taken to | by ( ) ambulance ( ) police ( ) other |
|---|---|---|---|

| #5 | ( ) reportee ( ) victim ( ) witness name | address | city | state | zip |
|---|---|---|---|---|---|

| h. phone | employer: name of company | w. phone | d.o.b. | race | sex | juvenile ( ) y ( ) n |
|---|---|---|---|---|---|---|

| relation to suspect | condition code ( ) possible ( ) incap. ( ) deceased ( ) non-incap. | if injured taken to | by ( ) ambulance ( ) police ( ) other |
|---|---|---|---|

## VEHICLES   Caution Codes:

P-Assaulted P.O.   W-Known to carry weapon   N-Narcotics related   B-C.D.   R-Escape risk   M-Mentally impaired   S-Sex offender

| #1 | ( ) stolen ( ) recovered ( ) damaged ( ) acc. ( ) burglarized ( ) theft from ( ) suspect's vehicle | caution | person type: ( ) victim ( ) suspect | no. | value/dmg. $ | owner notify ( ) y ( ) n | ncic # |
|---|---|---|---|---|---|---|---|

| type | make | model | year to | license # | type st. | yr. | color(s) |
|---|---|---|---|---|---|---|---|

| vin # | | description/features/damage | | impounded ( ) y ( ) n |
|---|---|---|---|---|

| #2 | ( ) stolen ( ) recovered ( ) damaged ( ) acc. ( ) burglarized ( ) theft from ( ) suspect's vehicle | caution | person type: ( ) victim ( ) suspect | no. | value/dmg. $ | owner notify ( ) y ( ) n | ncic # |
|---|---|---|---|---|---|---|---|

| type | make | model | year to | license # | type st. | yr. | color(s) |
|---|---|---|---|---|---|---|---|

| vin # | | description/features/damage | | impounded ( ) y ( ) n |
|---|---|---|---|---|

| #3 | ( ) stolen ( ) recovered ( ) damaged ( ) acc. ( ) burglarized ( ) theft from ( ) suspect's vehicle | caution | person type: ( ) victim ( ) suspect | no. | value/dmg. $ | owner ( ) y |
|---|---|---|---|---|---|---|

| type | make | model | year to | license # | typ |
|---|---|---|---|---|---|

| vin # | | description/features/damage |
|---|---|---|

EXHIBIT A

## SUSPECTS   Race Codes:   W-White   Hispanic  I-Indian/Alaskan   B-Black   A-Asian   U-Unknown

| #1 | name Allen, Travis Oneill | address 4401 Rose | city Houston | state Tx. | zip 77007 |
|---|---|---|---|---|---|

| h. phone | employer: name of company | w. phone | race W | sex M | d.o.b. (age) 2-28-78 | p.o.b | juvenile ( ) y (x) n |
|---|---|---|---|---|---|---|---|

| arrested ( ) y (x) n | m.s. S | d.l. state TX | d.l. number 12860053 | height 5-10 to | weight 140 to | eyes Grn | hair Blnd | comp. med | speech |
|---|---|---|---|---|---|---|---|---|---|

| facial hair | ssn | alias(s) | arrest no. |
|---|---|---|---|

| clothing white T shirt, white long pants, sandles. | SID | FBI | SPN | caution code |
|---|---|---|---|---|

| weapon(s) | scars, marks, tattoos | gang relation ( ) y (x) n |
|---|---|---|

| #2 | name | address | city | state | zip |
|---|---|---|---|---|---|

| h. phone | employer: name of company | w. phone | race | sex | d.o.b. (age) | p.o.b | juvenile ( ) y ( ) n |
|---|---|---|---|---|---|---|---|

| arrested ( ) y ( ) n | m.s. | d.l. state | d.l. number | height to | weight to | eyes | hair | comp. | speech |
|---|---|---|---|---|---|---|---|---|---|

| facial hair | ssn | alias(s) | arrest no. |
|---|---|---|---|

| clothing | SID | FBI | SPN | caution code |
|---|---|---|---|---|

| weapon(s) | scars, marks, tattoos | gang relation ( ) y ( ) n |
|---|---|---|

## PROPERTY   Status Codes:   V-Damaged   F-Found   R-Recovered   E-Evidence   L-Lost   S-Stolen

| #1 | status | property type | brand | model | serial # |
|---|---|---|---|---|---|
| | value | quantity | size/caliber | color(s) | description | ncic # |

| #2 | status | property type | brand | model | serial # |
|---|---|---|---|---|---|
| | value $ | quantity | size/caliber | color(s) | description | ncic # |

| #3 | status | property type | brand | model | serial # |
|---|---|---|---|---|---|
| | value $ | quantity | size/caliber | color(s) | description | ncic # |

| #4 | status | property type | brand | model | serial # |
|---|---|---|---|---|---|
| | value $ | quantity | size/caliber | color(s) | description | ncic # |

| #5 | status | property type | brand | model | serial # |
|---|---|---|---|---|---|
| | value $ | quantity | size/caliber | color(s) | description | ncic # |

| #6 | status | property type | brand | model | serial # |
|---|---|---|---|---|---|
| | value $ | quantity | size/caliber | color(s) | description | ncic # |

| #7 | status | property type | brand | model | serial # |
|---|---|---|---|---|---|
| | value $ | quantity | size/caliber | color(s) | description | ncic # |

| | status | property type | brand | model | serial # |
|---|---|---|---|---|---|
| | value $ | quantity | size/caliber | color(s) | description | ncic # |

WEATHER (List on Front) 1-Clear  2-Cloudy  3-Rain  4-Snow  5-Sleet  6-Wet  7-Day  8-Fog  9-Other

LOCATION TYPE: A-Street/Alley  B-Open field  C-Parking lot/garage  D-Apt./Condo  E-Townhouse  F-Single Dwelling  G-Conv. store  H-Drug/Medical  I-Financial  J-Gas station  K-Grocery  L-School  M-Liquor  N-Construction site  O-Office bldg  P-Public bkfg.  Q-Restaurant/Bar  R-Other  S-Business  T-Park  U-Church  (List on Front)

## Bellaire Police Department          Case No. 9508788

**Location:**    4407 Acacia
                 Bellaire, Texas 77401

               Private residence

**Introduction:**          Three (3) patrol officers responded to a burglary in progress

at 4407 Acacia on Saturday, July 15, 1995 at 0135 hours. During

their investigation of the incident, two of the officers confronted a

suspect, Travis Allen, inside the residence.  After making contact

with Allen, he refused to cooperate and resisted officers commands.

Corporal Leal saw Allen with his hand in his pocket and after

repeated commands to remove it failed, Corporal Leal fired his pistol

two times, killing Allen.

**Scene Summary:**          The incident occurred in a residential neighborhood at 4407

Acacia, in Bellaire, Harris County Texas.  The house is on the south

side of the street and the front door faces north.  The residence is a

two story, single family dwelling that is occupied by the listed

victims, Edgar Jackson Deal and his wife, Carolyn Ryan Deal.

          The incident occurred at 0135 hours in the morning.  There

are no street lights in the immediate area but there were several

1

**Bellaire Police Department      Case No.   9508788**

lights on outside the victims residence.  There are two mercury vapor style lights mounted

on the gable area on the east and west side of the residence.  Two smaller lamps are

mounted on two separate 6 foot poles in front of the residence, directly to the east and

west side of the driveway.  The backyard is illuminated by two flood style lights mounted

in the southeast corner eave of the roof pointing towards the backyard.  See Figure 1.



**Figure 1**
4407 Acacia

Upon first entering the residence through the front door, all the lights on the first

floor were off.  Light was seen coming through the many large windows that face the

southeast side where the flood lights are directed towards the backyard.

2

**Bellaire Police Department          Case No. 9508788**

A temperature reading was taken that indicated 78 degrees.  The weather was cloudy and a brief thunderstorm passed while officers were investigating.

The dining area, directly next to the kitchen was the point of entry.  A large piece of concrete ( 3"x12"x18", weight is approximately 55 to 60 lbs) that is used as a step on the outside path had been thrown through a window (49"x84") in the dining room.   See Figure 2.



**Figure 2**
Entry was made by throwing a concrete block through the dining room window.
Window size: 49"x84".  Concrete block size & weight: 3"x12"x18", 55 to 60 lbs.

3

Case 4:96-cv-00030  Document 89  Filed in TXSD on 05/09/97  Page 35 of 124

On the middle, south window in the dining room, a blood smear could be seen on the window.  A blood smear was also seen on the, inside portion, of the sliding glass door that leads from the living room to the east, outside deck.

At the front door of the residence, two glass panes on the front door (12" x 23") were shattered from the inside.  A large window (27"x74") directly next to the front door, east side, was broken out by throwing a bicycle that had been in the entry way, (inside the house), through the window.  See Figure 3



**Figure 3**

4

In the kitchen, blood drops and a smear were found on the kitchen sink and counter top directly by the window, on the east wall. A blood smear was also seen on the inside of the window just above the blood smear on the counter top. A decorative framed leaded glass panel that had been hanging in the kitchen window had been knocked down. Blood drops could be seen on the large white built-in table and floor just below the table. A blood smear was found on the carpet just before the kitchen. This was found upon entering the kitchen area from the front hall. See Figure 4, page 6.

In the dining room, the center window on the south side of the room had a blood smear approximately 48" high from the floor. On a corner of the south dining room wall that meets the west living room wall, blood smears could be seen on both walls, approximately 48" high. This is the same area where officers had seen the suspect trying to hide from them. On this same west living room wall, a set of sliding patio doors had a blood smear approximately 72" high. This is the same door that Officer Upshaw had confronted the suspect at and tried to get him to open the door. The suspect walked into the glass door as if it were open. Leaving the living room to the hall, a large blood smear was found on the carpet. The smear appeared to be from the suspect when he was on the floor at one time. The smear showed individual finger marks that appeared as though the suspect was lying on the floor, pulling himself across. See Figure 4, page 6. Allen went upstairs and a blood smear was found on the corner of the wall in the hall.

5



**Figure 4**

6

The body of Allen was found in a prone position, lying on his back, head pointing south and feet pointing north. He was on the floor in the living room between the end of the couch and a small table located next to the east wall. Corporal Leal and Officer Upshaw had a brief struggle with Allen at this location just before the shooting. See Figure 6.



**Figure 6**

**Bellaire Police Department          Case No. 9508788**

**Evidence:**   1.     Numerous photographs taken at the scene and medical examiners office. Photographs were taken by Det.. D.L. Oglesby with a Nikon N8008S camera using a Nikon SB24 flash unit. Automatic settings were used on the camera. The photographs were processed at JOBAR Cameras. This business processes all film for the Bellaire Police Department.

            2.     Video tape. The scene was video taped by Det. Oglesby using a G.E. , model CG9808SE, VHS camera.

            3.     VHS tape from Officer Shelor's patrol car.

                This was recovered by Lt. Holloway and given to Det. Woods. Det. Woods later gave the tape to Det.. Oglesby, July 15. See page 35 of this report for a review of the tape.

            4.     Two (2) .45 caliber, WW cases.

                These were recovered by Det. Hazelwood who gave it to Det. Oglesby at 0620 hours, July 15.

                On August 8th, Sgt. Harris delivered this item to the Pasadena Police Department Laboratory for examination purposes.

            5.     Four blood samples taken from:   a. Glass sliding door in living room.
                b. Painted wall in living room.
                c. Painted wall in hall, upstairs.
                d. White table in hall, upstairs.

                These were recovered by Det. Hazelwood who gave it to Det. Oglesby at 0620 hours, July 15.

                Item 5 was taken to the Harris County Medical Examiners Offices by Det. Oglesby on Monday July 24 at 0847 hours.

9

Item 5 was picked up from the Harris County Medical Examiners Office by Lt. Brady on Thursday August 10 at 1000 hours. Lt. Brady turned the evidence over to Det. Oglesby. The evidence was placed with other evidence in this case.

6.    Smith & Wesson, model 4506-1, .45 caliber, semiautomatic pistol, serial number: TVBI852. One (1) live round that was in barrel. Six (6) live rounds in clip.

This was recovered by Det. Hazelwood who gave it to Det. Oglesby at 0620 hours, July 15.

On August 8th, Sgt. Harris delivered this item to the Pasadena Police Department Laboratory for examination purposes.

On August 31st, Det. Oglesby and Sgt. Harris met with Bob Lyon at the Pasadena Police Department Laboratory and recovered the pistol and clip only. The recovered evidence was placed with other evidence in this case.

7.    Clothing of Travis Allen consisting of:    a. White T-shirt.
    b. Gray slacks with brown belt.
    c. Red underwear.
    d. Brown sandals.

These items were recovered from the medical examiners office on July 18 at 0934 hours by Det. Oglesby.

On Monday, August 14 at 1000 hours, Det. Oglesby delivered item 7a, (white T-shirt) to the Pasadena Police Department Laboratory for examination purposes.

8.    Two (2) bullets recovered from body of Travis Allen. Recovered by Dr. Bellas with the medical examiners offices.

**Bellaire Police Department          Case No.  9508788**

These items were recovered from the medical examiners office on July 18 at 0934 hours by Det. Oglesby.

On August 8th, Sgt.  Harris delivered these two bullets to the Pasadena Police Department Laboratory for examination purposes.

9.    Blood sample taken from Travis Allen.  Blood sample is currently at the medical examiners office.

10.    Original tape recording of the incoming call on 911 and radio transmission of the dispatched call and conversations between officers responding to the call.

Received copies on July 15 and received original tape on July 17 at 1030 hours.

11.    Clothing from Michael Morgan:    a.  White T-shirt
b.  Cut off blue jean shorts.
c.  Pair of white socks.
d.  Green tennis shoes.
e.  White paper that Morgan was standing on while undressing.

These items were recovered by Det. Oglesby at the Bellaire Police Department on July 15.

Item 11a and 11b were taken to the Harris County Medical Examiners Offices by Det. Oglesby on Monday July 24 at 0847 hours.

On July 27, Pam McInnis, with the Harris County Medical Examiners called Det. Oglesby and stated that the blood on Morgan's white T-shirt, item 11a was not of the same type as Travis Allen's.

11

Item 11a and 11b were picked up from the Harris County Medical Examiners Office by Lt. Brady on Thursday August 10 at 1000 hours.  Lt. Brady turned the evidence over to Det. Oglesby.  The evidence was placed with other evidence in this case.

12.     Blue address book, twenty one dollars ($21.00) and handwritten note.

This was originally recovered by Michael Morgan.  Morgan gave the items to Travis Allen's father.  Mr. Allen gave the items to Det. Woods who gave them to Det. Oglesby.  Recovered July 15 at 0900 hours

13.     Bush beer can

This can was located by Det. Woods at the base of a tree in the front yard of the Deals residence.  Michael Morgan had told detectives that he had been drinking a Bush beer when Travis ran away.  The can was processed for latent prints, but no prints were found.

12

**Bellaire Police Department**          **Case No.  9508788**

**Witnesses:** Statements have been taken from the following witnesses.

1.  Deal, Carolyn Ryan ("Carol")
    W/F, DOB: 3-22-45
    4407 Acacia, Bellaire, Texas 77401
    Home #   666-7527

2.  Deal Jr., Edgar Jackson ("Jack")
    W/M, DOB: 3-25-33
    4407 Acacia, Bellaire, Texas 77401
    Home # 666-7527
    Work # 667-1158

3.  Corporal Michael Leal
    Bellaire Police Department
    Work # 668-0487

4.  Officer Carle Upshaw
    Bellaire Police Department
    Work # 668-0487

5.  Officer Dan Shelor
    Bellaire Police Department
    Work # 668-0487

6.  Morgan, Michael Allen
    W/M, DOB: 1-21-77
    1918 Peppermill #B, Houston, Texas 77027
    Home # 464-4011
    Work # 681-2414
    Employer:    Post Oak Paint & Body, 1201 ½ N. Post Oak, Houston
                 Texas

13

**Bellaire Police Department**     **Case No.  9508788**

7.    Reed, Allison Sarah
W/F, DOB: 8-2-82
502 Mulberry Lane, Bellaire, Texas 77401
Home # 665-0490
Has moved to Springfield Virginia, Fairfax County

8.    McCracken, Jessica
W/F DOB: 8-22-78
2302 Sunset, Houston, Texas 77005
Home #
Work # 522-3983
Employer: Eckerds, 6011 Kirby, Houston, Texas 77005
Attends, Lamar High School

9.    Ayer, Jordan Trevor ("Trevor")
W/M, DOB: 11-21-78
3330 Mid Lane, Houston, Texas
Home # 622-5368

10.    Martin, Bethany Robin ("Beth")
W/M, DOB: 7-30-79
3940 West Alabama #6, Houston, Texas 77027
Home # 963-9623
Attends, Lamar High School

11.    Burns, James Michael
W/M, DOB: 7-27-78
2919 Bissonnet, Houston, Texas 77005
Home # 526-2197 or # 526-5502
Attends, Lamar High School

12.    Patt, Nathan Anthony ("Tony")
W/M, DOB: 8-26-79
1820 Lexington, Houston, Texas 77098
Home # 520-8345
Employer: Haagen-dazs Ice Cream Parlor
Work # 524-8857 (Also attends, Foley's Academy)

14

**Bellaire Police Department**      **Case No. 9508788**

13.    Avalos, Amber Michelle
       W/F, DOB: 5-21-83
       4405 Holt, Bellaire, Texas 77401
       Home # 432-0175
       Attends Pershing Middle School

14.    Hamilton, Dona
       W/F, DOB: 10-2-55
       4409 Acacia, Bellaire, Texas 77401
       Home # 666-8727

15.    Hamilton, Roger
       W/M, DOB: 4-22-55
       4409 Acacia, Bellaire, Texas 77401
       Home # 666-8727
       Work # 751-2344
       Employer: John Hancock Funds

16.    Steinberg, Ben
       W/M, DOB: 8-20-77
       109 Birdsall #9
       Houston, Texas 77007
       Home # 802-1409
       Attends the Art Institute of Houston, 623-2040

15

CitiPDF - www.fastio.com

**Details of Offense:**

At 0135 hours dispatchers at the Bellaire Police Department received a 911 call
from Edgar Jackson ("Jack") Deal Jr.. Jack indicated that he could hear someone in his
house and he did not know who it was. While one dispatcher kept Jack on the telephone
to obtain additional information, the second dispatcher dispatched Officer Dan Shelor to
the Deal's residence at 4407 Acacia. The call was dispatched at the highest priority, code
3. Immediately Corporal Michael Leal, unit # 319 and Officer Carle Upshaw, unit # 311
advised the dispatcher that they would be en route for backup on the call. The call was
dispatched at 0135 hours and Officer Shelor arrived on Acacia at 0136 hours.

Upon Officer Shelors arrival, he parked several houses away and walked up to the
residence and observed the glass broken out on the front door as well as a large window
to the left of the front door. Corporal Leal arrived at the residence at 0137 hours and
Officer Upshaw arrived at 0138 hours. Corporal Leal and Officer Shelor were in a
position where they could see the front of the house. Both officers saw a W/M come to
the broken out front window and start to crawl through it. Officer Shelor called to the
suspect and the suspect looked at Officer Shelor and went back into the house. The
dispatchers were still obtaining information and relaying this to the officers. Corporal
Leal directed Officer Upshaw to the backyard while he and Officer Shelor observed the
front of the residence from two different perspectives. While observing the residence,

16

Corporal Leal heard the sound of breaking glass and looked over at the front door and saw a bicycle come crashing through a window directly next to the front door. See Figure 3, page 4. Officer Shelor also seeing the incident, now observed a white male inside the house and called to him, but the suspect fled to another part of the house. This is the same suspect, Officer Shelor had seen just a short time ago trying to come out of the same window. Corporal Leal now hearing Officer Upshaw giving commands to the suspect, proceeded to the backyard from the east side in an attempt to assist him. Officer Shelor remained in the front in case the suspect returned.

Officers at the scene had been in contact with the police dispatcher and knew that the Deals were the only two people in the house. During the conversation with the dispatcher, the Deals advised they wanted to exit the house by means of a door that would lead them from their room to the roof of the residence. After dispatchers advised Corporal Leal what the Deals could do, he advised them to leave the house. Officer Upshaw who had stationed himself in the back yard observed the Deals on the roof and told them to remain where they were. A very short time later, Officer Upshaw saw the suspect in the south part of the house.

When Officer Upshaw saw the suspect, he drew his pistol and commanded the suspect to show his hands and move to a sliding glass door. This glass door is a patio door that leads from the south part of the living room to a wooden deck outside. The

17

suspect immediately walked quickly to the glass door, but instead of trying to open it, he walked into it as though it was already open.  The suspect attempted to open the door but when he couldn't, he left the area and went to another part of the house.

At the same time Officer Upshaw was giving commands to the suspect, Corporal Leal entered the backyard.  Corporal Leal could see inside the house with an unrestricted view, due to much of the southeast side of the house being glass.  The entire house was dark and the only time he was able to see the suspect was from his flashlight or Officer Upshaws flashlight.  As Corporal Leal continued on, he observed a large window that had been broken out and saw the suspect inside the residence.  Corporal Leal could see the hands and arms of the suspect and noticed they were very bloody.  The suspect could be seen attempting to hide behind a portion of a wall in the house and not responding to commands being given by Officer Upshaw.  Corporal Leal then began to give commands to the suspect again with no apparent effect.  Corporal Leal entered the house through the broken window with Officer Upshaw directly behind him making entry.  Officer Shelor hearing the yelling in the rear of the residence went around to the side of the house just as both officers were entering the house through the broken window.  Officer Shelor also entered the house behind the officers.  At this time the suspect had lowered himself down to the floor, but not completely.  Corporal Leal continued to give commands to the suspect to lay down and not to move.  The suspect

18

was between the couch and east wall of the living room. A small table was between the
wall and suspect. While Corporal Leal continued to give commands to the suspect,
Officer Upshaw holstered his pistol and started to handcuff the suspect when he too
observed the suspect to have large amounts of blood on him. Corporal Leal instructed
Officer Shelor to get some gloves so he left the house through the front door. The suspect
continued to raise up from the floor in a style officers described as a "push up position"
and was still not obeying to Corporal Leal's commands. Officer Upshaw placed his foot
on the back of the suspect and attempted to push him to the ground. As he did so, the
suspect resisted this and continued to raise up. Officer Upshaw then stood on the
suspect's back with both feet and he continued to raise upward. Officer Upshaw called to
Officer Shelor by radio and requested latex gloves be brought to them. When Officer
Upshaw started to lose his balance, he stepped slightly away from the suspect and the
suspect laid down. During the time Officer Upshaw was trying to force the suspect to
comply, Corporal Leal continued to give commands for the suspect lay flat on the floor
and extend his arms in front of him. When the suspect finally laid on the floor, Officer
Upshaw saw him reach under his body with both hands as though he was reaching for
something. The suspect attempted to push up again with both hands, then returned to the
prone position and immediately reached towards his waist with his hands. Corporal Leal
saw the suspect place his right hand in his waistband. Officer Upshaw had again placed

19

**Bellaire Police Department**     **Case No. 9508788**

his foot on the suspects back and Corporal Leal attempted to gain control of the suspect's

hand while it was in his waistband.  The suspect was very tensed up and Corporal Leal

was not able to remove his hand.  The suspect removed his hand from his waistband then

immediately reached into his pocket.  As the suspect made this action, he was trying to

roll over to his left side and was looking at Corporal Leal.  Corporal Leal fired his pistol

twice (2) striking the suspect in the back.  Officer Shelor had just returned and Corporal

Leal directed him to handcuff the suspect and attend to his medical needs.  Officer Shelor

is also an emergency medical technician, EMT.  Corporal Leal then requested an

ambulance and supervisors at the scene.

At the time the ambulance arrived, 0149 hours, two medical technicians check the

suspect and determined he was dead.  When they were attended to his medical needs, the

suspect had to be moved around and in doing so, the scene was disturbed and was  not

exactly in the same state as it was at the time of the shooting.

The dispatcher contacted the following people immediately after being advised of

the shooting.

| Contact | Time Contacted | Arrival Time |
|---|---|---|
| Ambulance | 0144 | 0149 |
| Lt. Holloway | 0145 | 0200 |
| Det. Woods | 0152 | 0208 |
| Det. Hazelwood | 0152 | 0200 |
| DA's Office | 0153 | 0237 |
| Medical Examiner | 0210 | 0251 |

20

Other administrative officials from the police department were contacted such as Chief Loftin, Assistant Chief Mack, Lt. Brady and Sgt. Harris. They were at the scene at the time Det. Oglesby arrived at 0248 hours, but were not listed on the radio log at the time of their notice or arrival.

Det. Oglesby, the writer of this report, was at home and received a call from Det. Hazelwood who was already at the scene. Det. Hazelwood gave Oglesby a brief synopsis of what had taken place. Upon arrival at the scene, Det. Oglesby and Hazelwood walked the perimeter of the scene and was met by Investigator H. Jordan with the Harris County Medical Examiners Office. Investigator Jordan stated that he was going to do his investigation and leave the scene since he had another call holding. Investigator Jordan left a personal effects bag and toe tag with officers to give to the funeral attendants to complete when they were ready to leave with the body.

Detectives on the scene discussed the case and Sgt. Harris took Michael Morgan who was at the scene and the last person to be with the suspect before he was killed, to the station to obtain a statement. Det. Oglesby, Hazelwood and Woods processed the scene. Detectives began processing the scene at 0315 hours by taking photographs and video of the outside of the house and then the inside. Det. Hazelwood took custody of Corporal Leal's pistol and locked it in the truck of his car. Det. Hazelwood took blood

21

samples from four different areas of the residence; 1. glass sliding door in the living room, 2. painted wall in living room, 3. painted wall in hall, upstairs, and 4. white table in hall, upstairs. Two empty shell casings were recovered near the body. One case was located under a rug and the second case was on top of the same rug. It is possible the case under the rug was kicked there by paramedics attending to the suspect. An examination was made of Officer Upshaw's and Shelor's pistol. Both officers carried semi automatic pistols. Neither appeared to have been recently fired and each magazine was inspected and found to have all rounds accounted for.

Belinda Hill and Dave Cott from the Harris County District Attorney's Office Civil Rights Division, along with Lt. Brady, Detectives Oglesby, Hazelwood and Woods as well as Corporal Leal and his attorney from the Bellaire Police Officers Association, Burton Springer, all met together. Mr. Springer told everyone present that he would allow Corporal Leal to do a "walk thru" on the scene. A "walk thru" consists of the officer involved to lead other officials present, through the scene while describing the actions he took and observations he made. At the time the walk thru was conducted, it was recorded by Det. Hazelwood with the knowledge of Springer and Corporal Leal. This was later reviewed with the statement that the three officers had given. The statement and walk thru were very similar in content. There were no discrepancies found between the statements and recorded statement.

22

**Bellaire Police Department**     **Case No. 9508788**

At 0522 hours after just completing the walk thru, Ricardo Ramirez and Arturo Flores with the Guillen Funeral Home collected the contents of the suspect's pockets and took the suspect's body to the Harris County Medical Examiners Office.

At approximately 0620 hours, detectives left the scene and returned and met with Sgt. Harris at the station. The case was discussed and it was agreed that Sgt. Harris and Lt. Brady would go to 502 Mulberry and attempt to locate Allison Reed. Allison is the 12 year old juvenile that had the beer party that the suspect had attended before he broke into the Deals residence. Detectives Oglesby, Hazelwood and Woods would attend the autopsy that would be conducted later in the morning.

The Deals came to the station at detectives request and statements were taken from Jack and Carol. Sgt. Harris met with Carol and Det. Woods met with Jack. Carol had stayed up to watch TV in the den and fell asleep. Jack had gone to bed earlier. Carol woke up at 11:15 pm, turned off the lights downstairs, set the alarm, and went to bed upstairs with Jack. At the time she set the alarm, the motion detector was not activated, but the door detectors were. Carol was later awakened by the sound of breaking glass. After waking Jack and telling him what she heard, he told her to lock the bedroom door. Jack then called the police on 911. As Carol went to the bedroom door to lock it, she heard someone just outside the door, coughing. She immediately locked the door and returned to the area where Jack was. While Jack was on the phone with police, Carol

23

continued to hear someone walking around inside the house as well as loud banging on the front door. The Deals had requested to leave the house by means of an upstairs door that leads to the roof from their bedroom. After they left their bedroom, and saw an officer, (Officer Upshaw), in the backyard, they both heard the police yelling at someone in their house. Carol could hear someone yelling: "Open the door, come out, drop it!" Jack heard the same commands being given and also heard one of the officers give several warnings to the effect of: "We will have to shoot, we will shoot!" A short time after the yelling and warnings, they heard two gun shots. Just a short time after the shots, an officer advised them to leave the roof.

Det. Oglesby had the suspects Texas drivers license and showed this to the Deals. Neither knew the suspect by sight or name.

Det. Oglesby, Hazelwood and Woods met with Dr. Eduardo Bellas at the Harris County Medical Examiners Office. Dr. Bellas collected the clothing of the suspect and removed two bullets from the body. Dr. Bellas stated that either bullet would have been fatal. He also pointed out to Detectives two (2) visible bruises on the left side of the chest just below clavicle. These bruises were the bullets that did not exit the body. The suspect's hands, wrists, and legs had cuts that Dr. Bellas feels were made at the time of entry or during the time he attempted to break out the windows on the front door and window. Detectives were advised that the evidence could be collected during the week of

24

**Bellaire Police Department**      **Case No. 9508788**

July 17, after it had been processed by his office.

Upon returning to the station, Sgt. Harris had located Allison Reed. Reed is a 12 year old W/F that gave the beer party at her house. This is the party where the suspect, Travis Allen, had been before he broke into the Deals house. Sgt. Harris took a statement from her. Allison's father and two sisters are currently in Virginia and Allison and her mother will be joining them by the end of July. Allison stated that she wanted to have a party at her house before she moved and had her mother stay with Allison's grandmother so she could have the party. People started arriving at the party around 2100 hours on Friday evening. She thinks about fifty (50) people showed up and she knew maybe fifteen (15) of them. Allison heard people referring to "hits" and she knew this to mean hits of acid, (LSD). One of the partiers ran in the house and indicated that the police were coming, and many of the people immediately ran away or left in their cars. Allison had overheard someone say that Travis, the suspect, had taken two hits of acid and got messed up. Allison had not met Travis before that night.

Det. Hazelwood and Woods left the station and went to several different residences attempting to locate other people that were at the party. They were able to locate five (5) witness, Jessica McCracken, Trevor Ayer, Beth Martin, James Burns, and Amber Avalos. All came to the station and gave statements. The following information is a brief synopsis of all the statements that were taken from these witnesses as well as

25

Michael Morgan's statement that Sgt. Harris had taken.

Det. Oglesby interviewed Jessica McCracken. After leaving work around 2200 hours, McCracken met with her friends to see what they were going to do for the night. After meeting at Trevor Ayer's house, Mike Morgan had directions for a party and they all decided to go. Travis Allen was one of the people at Ayer's house, but Jessica did not talk with him at that time. After arriving at the party and having some beer, she saw Travis and indicated he was acting weird. She asked him what was wrong and he indicated, "bugs". Jessica had some bug repellant with her and offered it to him which he used. Jessica stated that while they were talking, she noticed that his eyes were very dilated and she knew that he had taken some kind of drugs, but did not know exactly what it was. Travis kept acting very scared. When Mike saw the condition Travis was in, he knew something was wrong, but didn't know exactly what it was. Mike took Travis for a walk and came back a short time later without Travis. Mike told her that as they were walking back to the house, Travis ran off and went to someone's house. A short time later, the alarm on the house went off. Mike left the party again to see if he could find Travis, but when he got back over there, he now saw police at the same house Travis had gone to. When Mike returned, he told Jessica about the police at the house and was worried about Travis. Jessica left the party with several others and she spent the night at Beth's house after taking several other people home.

26

Sgt. Harris brought Michael Morgan from the scene to the station at approximately 0330 hours. Mike told Sgt. Harris about his knowledge of the incident. Mike had been told about a free keg party at 502 Mulberry on Friday night and he later met with several of his friends to go the party. Several people rode with Mike to the party including Travis. They arrived at the party around 2315 hours and there were maybe 10 to 15 people there. Sometime after 0100 hours, Mike stated that he and Travis walked away from the party and walked to Bellaire Blvd and were talking. Mike did not mention the mental or physical state of Travis at the time of the walk. As they were walking back to the party, a friend of Mike's drove up and they started talking. Travis started to empty his pockets and then ran away without saying anything. After Mike picked up the items Travis had dropped, Travis stopped and looked back at Mike. Mike asked him again what he was doing and Travis turned and ran away through someone's yard. Mike looked for Travis, but could not find him. Mike heard some noise coming from a house and then an alarm went off. Mike returned to the party and told several people what had happened. Mike returned to the area a short time later to see if he could locate Travis. When he returned, he saw two officers at the house where the alarm was going off. Mike could hear the officer calling to someone now, but could not see the officers or the person they were calling to. Mike heard the officers yelling to someone to get down and stay still as they were shining their flashlights into the house. After Mike

27

Case 4:96-cv-00030 Document 69 Filed in TXSD on 05/09/97 Page 58 of 124

heard sirens in the distance, he ran back to the party and told people there what had happened and everyone started to leave. Mike left with some others and stopped at Trevors house to call Travis's parents. Mike told Travis' mother that he had gotten into some kind of trouble and had been picked up by the police. Travis' dad picked him up and took him over to the area where he had last seen Travis. Mike indicated that he had known Travis for about 2 years and during this time period they have used narcotics together, including ecstasy, acid (LSD), marijuana and alcohol.

Sgt. Harris interviewed Beth Martin. Beth gives the same basic account of originally meeting up with friends that Jessica gave. Beth stated that after arriving at the party and getting a beer, they went to the back yard and sat on the grass and talked. Beth saw many people she did not know and saw them smoking marijuana. Beth stated that when she saw Travis, he was acting real paranoid and was physically shaking. She knew that Travis had taken LSD in the past and his actions in the past were the same as he was acting then. Beth heard someone joking with Travis and told him there were bears in the backyard and Travis acted as though he believed them. Beth then related the same account of the events that took place when Mike and Travis went for a walk and when they all later left the party, as Jessica did.

Det. Woods interviewed James Burns. James gives the same basic account of originally meeting up his friends that the others have given. James said that when they

Case 4:96-cv-00030  Document 69  Filed in TXSD on 05/09/97  Page 59 of 124

were driving to the party, Travis had told him that he had acid with him and James knew

that he meant LSD.  James did not actually see Travis take LSD that particularly night but

has seen him take it in the past.  During the party James spoke with Travis before Mike

and him went for a walk.  Travis was acting very nervous, but he did not know why.

Another friend, Trevor, told James that Travis thought someone was going to try and take

his money.  When Mike returned from the walk without Travis, James and Trevor were

going to help Mike look for him until they heard someone say the police were coming.

After hearing this they both left the party and walked to Trevor's house.

Sgt. Harris interviewed Tony Patt on July 17.  Tony refused to discuss the case

and would not come to the station to give a statement.  Sgt. Harris obtained a grand jury

subpoena for Tony and served it to him.  Tony then spoke with his mother who is an

attorney and they came to the station on July 17 at 1430 hours and Tony was interviewed.

Tony was not cooperative but did give a brief statement.  Tony basically says that he

never knew Travis to use drugs other than marijuana in the 2 ½ years that he has known

him.  He did not see Travis smoking , drinking or take any kind of drugs at the party.

Tony and a person by the name of Ben were together and Tony claims that he never saw

Travis and Mike walking together, empty his pockets or run off.

Det. Hazelwood interviewed Trevor Ayer.  Travis was going to spend the night at

Trevor's house along with James when they heard about a party.  Travis wrote down the

29

directions and they tried to find the party along with Kate, Megan and Candace, some

other friends, but when they could not find it they went back to Trevor's house. Mike

Morgan and Trina Jones later came over to Trevor's and they talked about the party.

Mike knew where the party was, so they left again and this time found it. They broke up

in their private groups and were talking and drinking. Trevor did not see Travis take any

drugs, but someone told him that he had taken two hits of LSD. After awhile, they heard

sirens and someone said the police were coming. Trevor and James could not find a ride

home so they walked.

Sgt. Harris interviewed Amber Avalos. Amber and Allison are friends and Amber

knew about the party that Allison was giving. While Amber was at the party, she saw

other people drinking beer, smoking marijuana and taking LSD. Amber did not know

Travis and did not know if he was one of the people that she saw take LSD.

On July 18 at 0934 hours, Det. Oglesby and Sgt. Harris met with Dr. Bellas at the

Harris County Medical Examiners Office. Det. Oglesby showed Dr. Bellas several

photographs that had been taken of Travis during the autopsy. At the point of the bullet

entry on the back there was bruising to the immediate left of the entry wounds. Dr.

Bellas was told about the struggle that Officer Upshaw had with the suspect while he was

trying to keep the suspect on the floor by pushing him back to the floor with his foot. Dr.

Bellas said that could have caused the bruising seen on the back if a struggle took place,

but would not have caused any bruising if there had been no struggle.  Detectives asked if

Dr. Bellas would send out the blood sample for a test to be conducted for LSD.  Dr.

Bellas ordered the test while detectives were there.  It will take 10 to 15 days for the test

results.  Travis' clothing along with the two bullets were recovered by Det. Oglesby and

returned to the station and placed in the detectives evidence lock up with other evidence

in this case.

On July 21st, Chief Loftin sent a letter to Chief Nuchia with the Houston Police

Department requesting assistance with firearms examination.  It was requested that shell

casings recovered and bullets from the body be examined to Corporal Leal's pistol.  It

was also requested that a test be conducted to determine the distance at which the pistol

was fired.

On August 3rd., Belinda Hill with the Harris County District Attorney's office

called and told Det. Oglesby that a next door neighbor of the Deals by the name of

Hamilton had called her and stated that they heard what was going the night of the

incident.  Contact will be made with the Hamiltons and statements will be taken.

Contact was made with the Harris County Medical Examiners Office on August

3rd but the toxicology report on was not completed.

Contact was made with Chief Nuchia office on August 7th by Det. Oglesby since a

reply to the letter sent on July 21 had not yet been received.  It was found that the letter is

31

currently on Chief Nuchia desk waiting for review.

On August 9th, Chief Loftin received a letter from Chief Nuchia that stated the Houston Police Department would not be able to assist in the requested laboratory analysis. Chief Nuchia had a staff member contact the Pasadena Police Department and they indicated they would be able to assist in the investigation. On August 8th, Sgt. Harris took the pistol and bullets that is listed as Item 6 along with the two recovered cases listed as Item 4 to the Pasadena Police Department and released the items to them. The laboratory number for Pasadena Police is: L95-387. The shirt was not taken at this time, but will be submitted at a later date. A box of Winchester, .45 caliber silver tip bullets that was received from Lt. Holloway on August 7th, was also given to the laboratory.

Contact was made with the Hamiltons on August 10 that live at 4409 Acacia. Dona Hamilton was at home when Det. Oglesby and Hazelwood went to the residence. Dona stated that she had gone to bed at approximately 1230 hours on July 15 in the master bedroom of their house. Dona had been packing for a trip on that day and her husband, Roger, had gone to bed in the guest room. Dona stated that Roger came into the room and woke her up and told her that he had heard glass breaking. Roger attempted to call the police, but called the wrong number. Dona then called and was told that the police were going next door to her. The dispatcher did not tell the Hamiltons what was

32

wrong and at the time she was talking to them, they observed an officer run from the end of their street at Newcastle and Acacia, across their front yard, to a tree. The officer was standing behind the tree, had his pistol out and was looking at the Deal's house. Dona and Roger went to different parts of their house, upstairs, trying to see what the problem was. During this time period, two of the Hamilton's children woke up when they heard the outside commotion. They became frightened and locked themselves in an upstairs bathroom. At one point, the Hamiltons went back into the room where Roger had been sleeping and heard glass breaking again and the Deal's alarm went off. Dona heard someone yell: " Get down!", but could not see who said it or who it was directed to. The Hamiltons went to their bedroom and Dona said that could hear some type of struggle coming from inside the Deal's residence and additional yelling of: "Get down, get down, put it down!" A very short time later, they heard two gun shots. At the time the Hamilton's were hearing commands, struggle and guns shots, the windows in their house were closed. After the gun shots, they then heard an officer telling the Deal's they could come out of their house. When they came out, the Hamiltons met the Deals and invited them in their house.

Roger Hamilton was contacted later in the afternoon on August 10 by Det. Oglesby and he related the same basic story. Roger was not as detailed as Dona and stated that he was very scared at the time the incident occurred.

33

Case 4:96-cv-00030 Document 69 Filed in TXSD on 05/09/97 Page 64 of 124

On Friday August 18, Det. Oglesby received a call from Belinda Hill with the district attorney's office. Belinda stated that she had received a call from Ben Steinberg. Ben was in the with car Tony Patt on Mulberry street and saw Travis run away. Belinda advised Ben to contact Det. Oglesby about giving a statement in the case. At the time the statements were being taken, Ben had not been contacted. A subpoena for subscriber information on his phone number was obtained on July 28 and the information was received on July 31. Detectives will make contact with Ben and obtain a statement from him.

On Monday 8-21, Det. Oglesby received a fax copy of the medical examiners report from Belinda Hill. A review of the report indicated the same information that detectives received verbally from Dr. Bellas. Laboratory results of the blood indicated that no alcohol was present, however, marijuana, lysergic acid diethylamide (LSD), and caffeine were present.

On Tuesday 8-22, Det. Oglesby had a message from Ben Steinberg. A return call was made to Ben at 1000 hours. This case was discussed with Ben by telephone and he was found to be very cooperative. After the statement was typed, Det. Oglesby and Hazelwood met with Ben at his apartment. Ben read the statement and signed it.

Ben and Tony Patt had gone to the party together in Ben's car. While at the party, Ben spoke to Travis, but Travis walked away. Ben later noticed that Travis walked away

34

**Bellaire Police Department**          **Case No. 9508788**

from other people during a conversation, but did not question the reasoning. Ben and Tony left the party together around 0130 hours. As they were leaving, Ben saw Michael Morgan and Travis walking together on the side of the street. Ben pulled over towards them to tell them goodbye and for no apparent reason, Ben saw Travis reach into his pockets and take everything out and throw on the ground, then run away. Mike walked over to the car and asked Tony to pick up the items and Mike went to find Travis. After Tony picked up the items, he sat on the hood of Ben's car and Ben stayed inside the car. A short time later, Ben saw Mike and Travis walking back towards his car. Just before they got back to the car, Travis ran away again. Mike walked over to Tony and took the items from him that he had picked up. Mike then left to look for Travis again. Ben and Tony left the area.

The statement that Tony gave states that he left the party with Ben, but never saw Travis empty his pockets, or run away two different times. Tony also stated that he talked with Travis at the party and he was acting normal.

On Tuesday August 29, Det. Oglesby reviewed the video tape that had been in Officers Shelors patrol car. Bellaire patrol cars have video tape units with audio, installed that can be activated in different ways. When an officer stops someone on traffic the tape records the traffic stop. This is used later in court if needed. Officer Shelor turned his tape unit on at 0130 hours. The tape shows officers arriving,

35

positioning themselves in the front yard and Officer Shelor leaving the house to obtain

latex gloves and then returning to the house. There is no audio on this particular tape.

The audio is controlled by the officer and must be turned on manually. Officer Upshaw

was driving a new patrol car and the video tape unit had not been installed. The car

Corporal Leal was driving had a video tape recorder installed, however, it was not

working at the time. In the "Memo" section of this case is a repair order for the unit.

After reviewing this completed case an issue of perjury should be considered

against Tony Patt. In Tony's statement, he states; **" Ben and I left the party sometime**

**after midnight. When we left the party I did not see Mike or Travis up the street**

**from the party, and did not see Travis empty his pockets and run off after we left the**

**party."**

On August 22, when detectives met with Ben Steinberg about this case, he gave a

statement that sharply contradicts Tony's statement. In Ben's statement, he states; **"Tony**

**and I were leaving the party and we saw Travis and Mike on the left hand side of the**

**road walking down the street. We decided to pull up to them to say good bye. When**

**we pulled up, Travis pulled everything out of his pockets and threw it on the ground**

**and ran off. Mike came up to us and asked Tony if he would pick up the stuff Travis**

**had thrown down. Tony got out of the car and went over and got Travis's stuff and**

**then sat on the hood of my car. I was driving and stayed in the car. We sat there for**

a minute and waited to see if they were going to come back.  Mike left to look for

Travis.  A short time later, Mike and Travis started to walk back, but before they got

to the car, Travis ran off again.  Mike came over and got Travis's stuff from Tony

and we left.  Mike left to look for Travis again."

At the time Michael Morgan gave his statement on July 15, he stated; **"We walked**

**to the barricade and turned around and started walking back when Tony Patt and**

**Ben Steinberg drove up.  As soon as they drove up Travis started emptying his**

**pockets on the ground and turned around and started running down a side street and**

**into someone's yard.  I do not know why Travis emptied his pockets or why he ran**

**off."**

On August 30, Det. Oglesby and Hazelwood went to Michael Morgan's residence

to interview him again about his meeting with Ben and Tony.  Michael refused to talk

with officers and said he would come to the station by appointment and with an attorney.

Det. Oglesby gave Michael a business card with a date of August 31 and a time of 9:00

am to be present.  Michael did not say he would or would not make the appointment.  On

August 31, Michael Morgan did not show up for the meeting or call.

Charges should also be considered on Sharon Reed, the mother of Allison Reed,

for Contributing to Delinquency of a Child, and/or Abandoning or Endangering a Child.

In Allison's statement, she states: **"I wanted to have a party before I left so I told my**

37

mother to go spend some time with her mother before we had to move." Sharon told

Sgt. Harris that Allison told her to stay at her mothers house and she did not know a party

was going to be given. Sharon left Allison, a 12 year old alone without any type of adult

supervision.

On August 31, Det. Oglesby and Sgt. Harris met with Bob Lyon at the Pasadena

Police Department. Several photographs requested by Bob for his examination were

given to him. From the all the evidence that had been given him, Bob was able to state

the two (2) bullets recovered from the body of Travis during the autopsy by Dr. Bellas

were fired from the pistol that Corporal Leal's was carrying. The two (2) shell casings

recovered at the scene were also determined to be fired from Corporal Leal's pistol.

There was no blood found on the pistol or inside the barrel. A test was conducted by Bob

to determine the distance from the body at the time the pistol was fired. It is his opinion

that the pistol was a minimum distance of 24 inches but less than 36 inches. Bob released

the pistol and clip back to officers, but retained the other evidence that had been

submitted. The pistol was returned to the station and placed with other evidence in this

case.

This investigation has been completed and has been forwarded to Belinda Hill

with the Harris County District Attorney's Office. After Belinda reviews the case and

completes her investigation, the case will be reviewed by the Harris County Grand Jury.

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 69 of 124

A copy of this report has also been requested and sent to Special Agent Chris Smith with the Federal Bureau of Investigation.

Detective Oglesby was assisted in this investigation by, Sergeant Jim Harris, Detective Zell Woods and Detective Don Hazelwood.

Investigation complete.

D.L. Oglesby 9-6-95

CMPDF - www.fastio.com

On September 26, Belinda Hill presented this case to the Harris County Grand Jury.  Corporal Leal was no billed by the jury.  Belinda stated the only witnesses called to testify before the jury were the officers.  The Deals, Tony Patt and Ben Steinberg were present but were not called to testify.

Belinda stated that she spoke with Tony Patt about his statement.  Tony told Belinda that he had been drinking that night and did not remember exactly what had taken place.  He stated that Ben was in better condition that he was and what ever Ben had written in his statement was probably correct since he could not remember what had happened.

As far as charges being filed against Sharon Reed, Belinda stated that when the Texas Alcohol Beverage Commission completes their investigation, charges could possibly be filed by that agency.   Since Sharon Reed no longer lives in Texas, it is doubtful that the charges would be filed since they would be misdemeanor charges only.  Case Closed.

D.L. Oglesby

# SWORN AFFIDAVIT

Case No. 9508788

Date: July 15, 1995

Time: 0500

Page 1 of 3

Before me , the undersigned authority, appeared Michael A. Leal.  Who after being duly sworn on their oath deposes and says:

My name is Michael A. Leal and I am 30 years old having been born on 5/13/65.

I have been informed that under the Penal Code of the State of Texas, section 37.02: A person commits the offense of perjury if, with intent to deceive and with knowledge of the statements meanings;  he makes a false statement under oath or swears to the truth of a false statement previously made; and the statement is required or authorized by law to be made under oath. Further, that under Section 37.03 a person commits aggravated perjury if they commit perjury as defined in Section 37.02 of this code, and the false statement is made during or in connection with an official proceeding and is material.

**Beginning of Statement:**

On July 15, 1995, I was assigned to unit number 319 with the Bellaire Police Department. As a corporal on the 11:00 p.m. to 7:00 a.m. shift I am charged with the supervision of at least three patrol officers during the duty hours.  At approx. 0130 hrs. I responded to a burglary in progress at 4407 Acacia, in Bellaire, Texas.  Upon arrival I observed Officer D. Shelor to have already arrived at the scene and was standing in front of the house at that address.  I approached the residence and was told by Officer Shelor that a lot of glass had been broken out of the windows of the residence.  The dispatcher advised me that the residents of the house are leaving via the second story.  Officer T.C. Upshaw had arrived and I assigned him to the rear of the residence in order to secure that area.  I observed a light as if from a flashlight inside the house and it appeared to be coming from the upstairs area.  I confirmed that noone else is supposed to have been in the house and I then proceeded toward the east side of the residence.

As I moved across the front of the residence I stopped at a large tree in the front



northeast, corner of the lot. I heard glass breaking in the area of the front door of the house and I observed a bicycle crashing through glass, from the inside, and land on the front porch. I observed a white male inside the house and I heard Officer Shelor yelling at the male suspect. I lost sight of the suspect and I began to hear a banging sound on the east side of the house. I then hear Officer Upshaw, who was at the rear, southside, of the house yelling at the suspect. Officer Upshaw began to yell commands at the suspect and I thought he would need assistance, so I began moving toward the rear of the house along the east side. As I approached a large window I saw Officer Upshaw's flashlight shining through the rear windows of the house. The majority of the side and rear of the house is windows and my view into the interior of the residence was unrestricted. Just past an air conditioning unit I observed a large amount of glass on the ground and a broken rear window which extended to a wooden deck on the ground. I saw a white male inside the residence and I immediately noticed that he was very bloody. He appeared to be cut on his hands and arms.

The suspect ignores Officer Upshaw's constant commands and appeared to attempt to hide behind a portion of the wall inside the house. The area of the house where the suspect was standing appeared to be a portion of the living room. I began to yell commands toward the suspect with no apparent effect. Eventually the suspect lowered his body toward the floor, but not completely. He appeared to be complying, less than totally, in an effort to stall the proceedings. At one point I was unable to see the upper part of the suspect's body and I decided to enter the residence in order to gain access of the suspect. I entered the house, with Officer Upshaw behind me, and continued to yell commands toward the suspect. I was telling him to "lay down" and "don't move". I stood to the right, west, of the suspect and stood next to a couch in the living area. Officer Upshaw approached the suspect from the eastside, or the suspect's left. The suspect was prone and facing the floor but was not laying on the floor. He appeared to be in a pushup position and constantly attempted to rise up off the floor. Officer Upshaw placed his foot on the suspect back in an effort to keep him on the ground. Officer Shelor entered the room and I asked him to put on some latex gloves ( He is an E.M.T. and usually caries gloves with him). Apparently he didn't have the gloves with him and he left the room to get some. Officer Upshaw appeared to be having great difficulty keeping the suspect on the ground and was in fact almost standing on him with both feet. The suspect began placing his hands under his body and we yelled



at him not to do this. I yelled for him to place his hands in front of him. He eventually placed his hands back in front of him and began attempting to pushup again. Officer was attempting to hold him down but was frequently loosing his balance and was leaning on a table next to the suspect as if to balance himself. The suspect reached down again, toward his waist, with his right hand. He appeared to be digging in his waist band and continued to do so despite my commands not to do so. I yelled commands toward the suspect in order toget him to stop reaching into his waist. I reached down and attempted to pull the suspects hand and arm away from his body and immediately noticed that the muscles were tight and flexed. Although I continued to command the suspect not to move he pulled his hand away from his waist and in the same movement reached into his right pocket. The suspect appeared to roll onto his left side and fixed his gaze on me. While continuing to stare at me he groped in his right pocket. The suspect seemed intent on fixing his gaze on me for the express purpose of whatever was going to happen when he removed his hand from his pocket. Although I continued to command him not to remove his hand from his pocket, the suspect began doing so. I saw the hand coming out of the pocket and, knowing the suspects prior acts, I feared that the suspect was removing a weapon from his clothing and was focused on my person. I fired at the suspect to stop him. I stepped back and away from the suspect. I ordered Officer Shelor to handcuff the suspect, who was now laying face forward on the floor. I told Officer Shelor to attend to the suspect's medical needs. Officer Upshaw and Officer Bohannon, who has arrived by this time, searched the house for additional suspects while I remained with Officer Shelor and the suspect.

**End of Statement**
I can read and write the English language and have read and fully understand each and every part of this statement. I do hereby swear that this statement is true and correct to the best of my knowledge. I have given this statement to Detective D.L. Oglesby of the Bellaire Police Department of my own free will.

MICHAEL LEAL

SWORN TO AND SUBSCRIBED BEFORE ME THIS 15TH, DAY OF JULY, 1995

NOTARY PUBLIC



JAMES A. HARRIS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 3-20-98

# SWORN AFFIDAVIT

Case No. 9508788

Date: July 15, 1995

Time: 0700

Page 1 of 3


Before me , the undersigned authority, appeared Carle Upshaw.  Who after being duly sworn on their oath deposes and says:

My name is Carle Upshaw and I am 27 years old having been born on 12/22/67.

I have been informed that under the Penal Code of the State of Texas, section 37.02: A person commits the offense of perjury if, with intent to deceive and with knowledge of the statements meanings;  he makes a false statement under oath or swears to the truth of a false statement previously made; and the statement is required or authorized by law to be made under oath. Further, that under Section 37.03 a person commits aggravated perjury if they commit perjury as defined in Section 37.02 of this code, and the false statement is made during or in connection with an official proceeding and is material.

**Beginning of Statement:**

On July 15, 1995 I was assigned to unit 311 of the Bellaire Police Department. At approx. 0130 I responded to a burglary in progress call at 4407 Acacia, in Bellaire, Texas.  Officer D. Shelor was the primary unit and I was checking by with him.  Upon arrival at the house I observed a window in the front door to be broken out.  I went to the rear of the house and observed the home owners to be on the roof, one male and one female. I advised them to stay on the roof for the time being. They told me that no one else belonged in the house. I heard the other officers who were at the location to be yelling at someone apparently inside the residence, to get on the ground. I was advised by the the other Officers that the suspect was back in the house. I remained at the rear, south side of the residence. I moved toward the south east corner of the location and as I did so I observed a white male running toward the rear of the home. I drew my weapon and commanded the suspect to show me his hands.  The suspect moved in and out of my



*C. U.*

view through the rear of the house. I ordered the suspect toward a sliding glass door in an effort to have him open it and be taken into custody. The suspect then ran into the door at a fast pace as if he thought it was open. The suspect then attempted to open the door and turned and ran back into the center of the house. The suspect appeared to lay down on the ground and at that point I entered the house behind Corporal M. Leal, through a broken window which extended to the ground. I approached the suspect while holstering my weapon, as Corporal Leal had the suspect covered at gun point. I was attempting to handcuff the suspect when I noticed that he was covered with blood. I called for some latex gloves on the radio. The suspect continued to move his arms and hands around and attempted to get up off the floor. I placed my right foot on the suspect's back and attempted to hold him on the ground. This was unsuccessful and I placed both feet on his back in an effort to hold him on the ground. He was still able to lift me off the ground. The suspect continued to attempt to get up and moved his arms around. Both Corporal Leal and I continued to command him to place his arms out in front of him. The suspect reached under his body with his both hands. It appeared as if he was attempting to remove something from his clothing. Corporal Leal continued to yell at the suspect to show his hands. My foot remained on the suspect's back. The suspect began rolling onto his left side and was actually lifting my foot off of his back. I could not see his hands. I never really realized that a shot had been fired. Corporal Leal then told me to step back and I did so. I then unholstered my weapon in an effort to protect myself from the suspect's actions. I again called for some gloves. Officer Shelor then arrived with gloves. Officer Shelor then handcuffed the suspect. I heard Corporal Leal call for an ambulance. I then got the homeowners out of the house.

**End of Statement**

I can read and write the English language and have read and fully understand each and every part of this statement. I do hereby swear that this statement is true and correct to the best of my knowledge. I have given this statement to Detective D.L. Oglesby of the Bellaire Police Department of my own free will.

CARLE UPSHAW

Carle Upshaw

SWORN TO AND SUBSCRIBED BEFORE ME THIS 15TH DAY OF JULY, 1995

NOTARY PUBLIC



JAMES A. HARRIS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 3-20-98

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 77 of 124

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| NOEL C. ALLEN, Individually | § | |
| and on behalf of the Estate of | § | |
| TRAVIS O'NEILL ALLEN, AND | § | |
| REBECCA O'NEILL ALLEN | § | |
| | § | |
| v. | § | C.A. NO. H-96-0030 |
| | § | |
| MICHAEL LEAL, CARLE UPSHAW | § | |
| DANIEL SHELOR, BELLAIRE POLICE | § | |
| DEPARTMENT AND CITY OF | § | |
| BELLAIRE, TEXAS | § | |

## A F F I D A V I T

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

BEFORE ME, the undersigned notary public, on this day personally appeared Daniel

M. Shelor, who being by me duly sworn on his oath, deposed and stated as follows:

My name is Daniel M. Shelor. I am over the age of twenty-one and am in all other ways qualified and competent to give this affidavit. The statement in this affidavit is true and correct and, as a police officer for the City of Bellaire, I am authorized to make the statements contained within this affidavit. The statements herein are made of my own personal knowledge because they relate to my own actions or things which I personally observed.

On July 15, 1995, I was dispatched to a burglary in progress call at 4407 Acacia Street, in Bellaire, Texas. I was advised that the homeowner was stating that someone was banging on the front door of the house. I arrived in the area of the home within 45 seconds of receiving the call from the dispatcher and I parked my patrol vehicle a few houses down. I ran to the subject address and could hear an audible alarm emanating from the home. I could see that a glass panel of the front door and a window next to the door had been broken. As I waited outside the home for backup, I observed Officers Leal and Upshaw arrive shortly after I did. I also heard a call from the dispatcher that the residents of the home stated somwone was now inside the home and the residents wanted to evacuate the home through a roof access door or window. I advised the dispatcher that this would be acceptable.

EXHIBIT
D

Case 4:96-cv-00030  Document 89  Filed in TXSD on 05/09/97  Page 78 of 124

Officer Upshaw began to move to the back of the house in order to secure a perimeter. About that time, I observed an individual who I later learned was Travis Allen begin to crawl through one of the broken openings at the front of the house. I called to Allen to get on the ground several times but Allen stopped, backed into the house and disappeared. I then moved from the Northeast (front) corner to the Northwest (front) and observed Allen return to the front door area of the house. At this point, I observed Allen throw a bicycle through another front window of the house. I again called to Allen to lay down on the ground. Allen looked at me and then ran back into the house in disregard of my instructions.

Within a few seconds, I could hear Officer Upshaw from the rear of the house, yelling to the suspect to lay down. I saw Officer Leal leave the front of the house and go along the side of the house toward the back of the home. I then heard similar verbal commands from either Officer Upshaw and Leal. I decided at that point to leave my position and go to the rear of the home to assist Officers Upshaw and Leal, since I believed that they were confronting the subject. As I approached, I saw Officers Leal and Upshaw entering the residence through another broken out window. I followed shortly behind Leal and Upshaw through the same window and into the home. When I entered the home, I saw the suspect kneeling on his hands and knees. The suspect was moving around quite a bit, in spite of verbal commands from Leal and Upshaw to stop moving and show his hands. I could see Officer Upshaw use his foot on the suspect's back in what appeared to be an attempt to control the suspect. The entire interior of the home was barely lit and the area in which the suspect was on the floor was quite dark. I could however see that the suspect was very bloody and I assumed that this was caused by cuts from all of the broken glass. Officer Leal asked for gloves and I immediately ran out of the house, through the front door, and to the my police car in search of gloves. I could not quickly find gloves in my car so I ran to another patrol vehicle located close by and obtained gloves.

By this point, I heard Leal ask over the radio for gloves, and I later learned that, by the time Leal asked for gloves over the radio, he had already discharged his weapon. I was not out of the house for more than thirty seconds before I heard Leal call for gloves over the radio. When I ran back into the house, Leal advised me that shots had been fired. Officer Leal asked me to handcuff the suspect while Leal covered me. As I attempted to handcuff the suspect, I first took hold of his left arm which was on his left side, extended over his head, and handcuffed it. I then had to pull his right arm from underneath his body to gain control of his right hand which appeared to be near his waistline, to apply that handcuff. I handcuffed the suspect and then attempted to assess his medical condition. I asked Officer Leal to hold a flashlight since it was very difficult to see in the darkness. I rolled the suspect onto his back to maintain an open airway and then attempted to check his vital signs.

2

I am aware that it has been alleged in this lawsuit that I and the other officers who responded to this call were not trained to handle this type of call and I expressly reject such a suggestion. To the contrary, I received training in handling situations such as those presented by this call in both my initial and continuing education. I am not aware of any situation in which the City has disregarded a known need for training. As well, I reject the allegation that either Officer Upshaw or Leal were known, or could have been believed, have violent propensities. My experience in working with and around these officers is directly contrary to such a suggestion. Both Officers Leal and Upshaw have always been professional, courteous, and patient in their conduct toward other officers and citizens. Lastly, I expressly reject the allegation that the City of Bellaire's policies would cause or permit any unjustified use of force. To the contrary, although I firmly believe that no inappropriate use of force occurred in connection with this call, departmental policies permit a use of deadly force only when a suspect's actions suggest a risk of death or serious bodily injury to an officer or another person. I know of no basis for the assertion that the City of Bellaire permits or would tolerate a use of force except as authorized by law and departmental policy consistent with that law.

Further Affiant sayeth not.

DANIEL M. SHELOR

SUBSCRIBED AND SWORN TO BEFORE ME on this ___ day of _May_, 1997.

NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

DAWN CARROLL
Notary Public, State of Texas
My Commission Expires 03-28-2000

3

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 80 of 124

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

NOEL C. ALLEN, Individually §
and on behalf of the Estate of §
TRAVIS O'NEILL ALLEN, AND §
REBECCA O'NEILL ALLEN §
§
v. §                              C.A. NO. H-96-0030
§
MICHAEL LEAL, CARLE UPSHAW §
DANIEL SHELOR, BELLAIRE POLICE §
DEPARTMENT AND CITY OF §
BELLAIRE, TEXAS §

## A F F I D A V I T

STATE OF TEXAS §
§
COUNTY OF HARRIS §

BEFORE ME, the undersigned notary public, on this day personally appeared Randall

Mack, who being by me duly sworn on his oath, deposed and stated as follows:

My name is Randall Mack. I am over the age of twenty-one and in all other ways
qualified to make the statements contained herein. The statements are true and
correct to the best of my knowledge and, as the former Assistant Chief of Police
of the Bellaire Police Department and as the current Chief of Police, I am
authorized to make the statements contained herein. The statements made within
this affidavit are of my own personal knowledge as they are based upon my own
personal observation, knowledge of departmental records, and my own supervision
of the officers in question. Prior to making this affidavit, I have reviewed the
allegations made by the Plaintiffs in this lawsuit.

The City of Bellaire Police Department, like all other governmental agencies that
commission peace officers in Texas, complies with Texas statutes and the
regulations of the Texas Commission on Law Enforcement Standards on Education
(TCLEOSE). Specifically, the City does not commission any officer until after
that officer has successfully completed a TCLEOSE approved basic training
academy program. The City, like small and mid-sized cities in Texas, does not
maintain its own training academy. Accordingly, its officers are trained at State
approved academies throughout Texas. Each of the officers who responded to the



Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 81 of 124

call which related to this lawsuit, as well as all other officers of the Bellaire Police Department, were trained and certified in accordance State training requirements before serving as a commissioned officer for the City. As well, each of these officers have participated in, and completed, more than the State's minimum continuing education requirements. In addition to the other officers who responded to this particular call, Senior Officer Leal had completed significantly greater training than that required by TCLEOSE regulations. There is simply no truth to the suggestion that any of the officers who responded to this call were untrained or insufficiently trained. In fact, they were trained quite well from a number of well respected sources approved by the State of Texas for law enforcement training throughout the State. Further, the Bellaire Police Department has never disregarded a known or suggested need for training of its officers. Further, with respect to this incident, the training mandated by the State of Texas, and which the officers who responded to this call had previously received, was related to the type of events faced by officers faced on such a call as well as reasonably anticipated circumstances presented by such a call.

Prior to the occurrence of the incident which forms the basis of this suit, the City of Bellaire has never had an instance in which a police officer has shot and killed a suspect. None of the officers involved in the incident which forms the basis of this suit had, prior to this incident, been the subject of any complaint which, in any way, alleged an improper or excessive use of force. To the contrary, each of the officers had exemplary service records with the Department. Officer Leal, in particular, had, and has had since this incident, an exemplary service record. He has received numerous commendatory references from citizens, supervisors, and other officers. He has not been the subject of any complaint or negative reference at all. I am not aware of any source of information, anywhere, which would support an allegation that any of the officers who responded to this call were, or should have been, known to have a propensity for violence or to otherwise be likely to commit any unconstitutional act. In fact, all of the information regarding these officers would suggest to the contrary. There is simply no truth to this allegation.

It is equally wrong to assert that the City of Bellaire does not supervise or discipline its officers. The Department requires that each officer work under the supervision of a field training officer until they reach a point at which they show an ability to work safely and appropriately without such direct supervision. Even after that point, however, officers are supervised by a shift supervisor assigned to each shift. This mechanism of supervision is prevalent in law enforcement throughout the country, and certainly within Texas. The City of Bellaire disciplines its officers both proactively and in response to complaints received from outside of the Department. In each case, an investigation is conducted and the results of that investigation are provided to the Chief of Police who makes an ultimate determination on the disposition of the complaint and what discipline,

2

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 82 of 124

if any, is appropriate. In the past, the Department has investigated and disciplined its officers when it has observed or received verifiable information of the occurrence of violation of Departmental regulations, and/or State law. Under appropriate circumstances, the Department has referred incidents to the attention of the Harris County Attorney's Office. This includes, but is not limited to, facts establishing an use of excessive force. The Bellaire Police Department supervises and, where appropriate, disciplines its police officers. A suggestion or allegation to the contrary is simply untrue.

Attached to this affidavit are the Bellaire Police Department's policies regarding use of force, including deadly force, in effect on the night of the occurrence of the incident which forms the basis of this suit. These policies prohibit the use of deadly force by an officer except under circumstances in which the officer perceives a present threat of death or serious bodily injury to himself or another person. I believe that this policy is consistent with both the United States and Texas Constitutions as well as federal and Texas law. Accordingly, there is simply no factual support for the suggestion or allegation that the City's policies would cause, or even permit, an unreasonable or unconstitutional use of force, including deadly force.

I was not present at the scene of the incident which forms the basis of this lawsuit at the time that officer Leal found it necessary to shoot Mr. Allen. After a review of an investigation of the entire incident, as well as a separate internal affairs investigation of this incident, I have not been presented with any information that would show a derogation of the officers at the scene of this call from departmental regulations. However, if as alleged by the Plaintiff's in this case, Officer Leal used deadly force in the absence of a belief of a threat of death or serious bodily injury, such use of force would be in direct violation of departmental policy. This is not, in any way, to suggest that I believe that Officer Leal, or any of the other officers present at the scene of this incident, violated departmental policies or federal or state constitutional or statutory limitations regarding a use of force in attempting to effect an arrest because I do not personally believe that there is factual support for the version of events alleged by the Plaintiffs in this lawsuit, since it is unsupported by the accounts all of the witnesses and physical evidence. However, and without regard to whether the facts of the event itself occurred as alleged by the Plaintiffs in this case, I do mean to make clear that the Bellaire Police Department expressly prohibits a use of force, including deadly force, under the circumstances that the Plaintiffs, without support, allege occurred under the circumstances of this case. There is simply no basis for the assertion that the City of Bellaire has any policy which would cause, or even permit, a use of deadly force in the absence of a risk of death or serious bodily injury to the officer(s) or others.

3

Case 4:96-cv-00030  Document 89  Filed in TXSD on 05/09/97  Page 83 of 124

Further **Affiant** sayeth not.

RANDALL MACK

SUBSCRIBED AND SWORN TO BEFORE ME on this $9th$ day of _May_ , 1997.



FERALD D. SEBEK, SR.
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 3-6-98

NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS

4

# GENERAL ORDER GEN-100, USE OF FORCE

TABLE OF CONTENTS:

| SECTION | BEGINNING PAGE |
|---|---|
| 100.03 Definitions | 1 |
| 100.04 Application of Directive | 2 |
| 100.05 Use of Deadly Force and Firearms | 2 |
| 100.06 Use of Nondeadly Force and Nonlethal Weapons | 8 |
| 100.07 Post Use of Force | 10 |



Case 4:96-cv-00030  Document 89  Filed in TXSD on 05/09/97  Page 85 of 124

ClisPDF - www.fastio.com

| GENERAL ORDER: GEN-100 | PAGE: 1 of 10 |
|---|---|
| MANUAL: General Directives | SECTION: Police Officers |

| SUBJECT/EVENT: Use of Force | ISSUED BY: Chief J.H. Loftin |
|---|---|

DATE ISSUED: Nov 28, 1989
DATE REVISED: Mar 15, 1993
EFFECTIVE DATE: Jan 01, 1990

100.01   POLICY - The Bellaire Police Department recognizes and
         respects the value and special integrity of each human
         life.  In vesting police officers with the lawful
         authority to use force to protect the public welfare, a
         careful balancing of all human interests is required.
         Therefore, it is the policy of this Department that
         police officers shall use only that force necessary to
         effectively bring an incident under control, while
         protecting the lives of the officer and others.

100.02   PURPOSE - The purpose of this policy is to provide police
         officers with guidelines concerning the use of force, and
         to limit the discretion an officer may use when dealing
         with situations that require the use of force.  This
         directive is for departmental use only and does not apply
         to any criminal or civil proceeding.  The Department
         policy should not be construed as a creation of higher
         legal standard of safety or care in an evidentiary sense
         with respect to third party claims.  Violations of this
         directive will only form the basis for departmental
         administrative sanctions.

100.03   DEFINITIONS

A. ADMINISTRATIVE LEAVE - An authorized period of absence from
   duty with full pay and benefits designated to an officer under
   extenuating circumstances, upon the discretion of the Chief of
   Police.

B. AUTHORIZED WEAPON - A weapon which meets specifications of the
   Bellaire Police Department, and with which the officer has
   qualified (if firearm), received departmental or approved
   training on proper and safe usage, and which has been
   registered (excluding batons) with the Bellaire Police
   Department Armorer.

C. DEADLY FORCE - Force that is intended, or should be known by
   the actor, to cause death or serious bodily injury, or in the
   manner of its use or intended use is capable of causing, death
   or serious bodily injury.

D. FIREARMS INSTRUCTOR - An officer assigned by the Patrol
   Lieutenant upon the approval of the Chief of Police that is
   qualified in firearms training and inspection.

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 86 of 124

------------------------------------------------------------------

E. NONDEADLY FORCE - Force, when applied under the circumstances,
   is not reasonably capable of causing death or serious bodily
   injury.

F. PHYSICAL STRENGTH AND SKILL - Any physical actions by one or
   more officers (e.g., holding, restraining, pushing, pulling)
   including, but not limited to, special skills like boxing or
   karate, but do not include the use of deadly force or any
   authorized or other weapon.

G. PRIMARY HANDGUN - The principle handgun which shall be carried
   by all officers which must meet all requirements and
   specifications of this directive.

H. PROBABLE CAUSE - Circumstances then known to the officer that
   reflect facts and circumstances which are based upon
   information which would warrant any reasonably prudent police
   officer to believe that some thing unlawful has occurred or
   that some person has committed an illegal offense.

I. SECONDARY HANDGUN - The handgun which may be carried by
   officers in addition to the primary handgun.  The secondary
   handgun shall only be displayed or discharged in a situation
   which precludes the use of the primary handgun.

J. SERIOUS BODILY INJURY - Bodily injury that creates a
   substantial risk of death or causes death, serious permanent
   disfigurement, or protracted loss or impairment of the
   function of any bodily member or organ.


100.04  APPLICATION OF DIRECTIVE

A. APPLICATION - This directive does not attempt to govern
   officers while off-duty and engaged in a lawful sporting or
   recreational activity.


100.05  USE OF DEADLY FORCE AND FIREARMS

A. USE OF DEADLY FORCE - Police officers are authorized to use
   deadly force to protect the officer or others from what is
   reasonably believed to be an immediate threat of death or
   serious bodily injury.

B. IDENTIFICATION - Before using a firearm, officers shall
   identify themselves and state their intent to shoot, when
   feasible.

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 87 of 124

C. USE/EXHIBITION OF FIREARM - An officer may also discharge a firearm:

   (1)  During range practice.

   (2)  To destroy an animal that represents an immediate threat of death or serious bodily injury to a person.

Officers shall adhere to the following concerning firearms:

   (3)  Except for maintenance, storage, inspection, or during training, officers shall not draw or exhibit their firearm unless circumstances create reasonable suspicion to use the firearm in compliance with this directive.

   (4)  An officer shall not discharge a firearm as a warning or a threat.

   (5)  Extreme due care shall be utilized when an officer is confronted with a deadly force situation and it appears likely that an innocent person may be injured.

   (6)  Maintenance of firearms conducted at the Department shall only be performed in specific areas designated by the Patrol Lieutenant.

D. CARRYING OF WEAPONS - On-duty officers and officers wearing a Department uniform shall carry a primary handgun unless otherwise authorized by their supervisor or when doing so would violate a state or federal law.  While on-duty and off-duty, officers shall carry only those weapons, firearms, and ammunition authorized by or registered with the Bellaire Police Department.  In addition, officers shall adhere to all federal, state, and local laws pertaining to the carrying of weapons.

   (1)  Officers shall not carry a handgun without carrying a Department issued identification card.

   (2)  Off-duty officers shall carry a primary handgun in public places or areas within Harris County.  However, while participating in a sport or other similar activity (i.e., swimming, etc.) officers shall not be required to carry a firearm (another exception is listed below under paragraph 3).  When wearing civilian clothes, whether off-duty or on-duty, officers shall conceal their firearms from public view.  While off-duty, not wearing a Department uniform, and outside Harris County, officers shall not be required to carry a firearm.

   (3)  No officer shall carry a firearm in a public place or area when he is intoxicated.

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 88 of 124

-----------------------------------------------------------------

E. AUTHORIZATION - Before any officer is authorized to carry a
   weapon, copies of all directives related to the use of force
   and use of weapons shall be issued to the officer.  The Patrol
   Lieutenant shall be responsible for conducting an appropriate
   review of said directives with the officer to ensure
   understanding.  Furthermore, an officer must demonstrate
   proficiency with his primary handgun(s) to a Firearms
   Instructor before being authorized to carry said weapon.

F. FIREARMS SPECIFICATIONS

   (1)  MANUFACTURER - All primary handguns shall be of one of
        the following manufacturers unless specifically
        authorized in writing on an individual basis by the Chief
        of Police:

        a.   Beretta

        b.   Colt

        c.   Glock

        d.   Ruger

        e.   Sig Sauer

        f.   Smith & Wesson

   (2)  FIREARM CALIBER AND AMMUNITION - All shotguns shall be 12
        gauge with pump loading action.  All shotguns shall be
        loaded with 12 gauge 00 buck.  Additional 12 gauge rifled
        slugs may be carried, but shall only be used under the
        direction of a supervisor or if an officer has received
        authorized training.  All reloads of any type ammunition
        are prohibited.  Officers are prohibited from carrying or
        using any caliber of ammunition in or with their primary
        weapons with which they have not yet passed minimum
        qualification standards, except under emergency
        circumstances.  The following types of primary handgun
        calibers and ammunition are authorized to be carried by
        officers: .38, .357 magnum, 9mm, .40, 10mm, .41 magnum,
        .44 magnum, .45.  The Patrol Lieutenant shall post
        authorized manufacturers and specifications for each
        caliber.

ClickPDF - www.fastio.com

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 89 of 124

------------------------------------------------------------

(3)  BARREL LENGTH - All shotguns shall have a barrel length
     with a minimum of 18 inches and a maximum of 22 inches.
     Shotguns with folding stocks are acceptable.  Shotguns
     with pistol grips may be utilized on specific incidents
     (i.e., execution of arrest/search warrants) with the
     approval of an Administrative Officer.  Uniformed
     officers shall carry primary handguns with a minimum
     barrel length of 3 1/2 inches and a maximum barrel length
     of 6 1/2 inches.  Nonuniformed officers shall carry
     primary handguns with a minimum barrel length of 2 inches
     and maximum barrel length of 6 1/2 inches.

(4)  AMMUNITION CARRIERS - Officers are required to carry
     ammunition in addition to the ammunition carried within
     their primary handguns.

     a.  Uniformed officers shall carry a minimum of twelve
         (12) additional rounds of ammunition.  Speedloaders
         and holders, and clips and clipholders are
         authorized.

     b.  Nonuniformed officers shall carry additional
         ammunition.  If the primary weapon is a revolver,
         the officer shall carry additional rounds at a
         minimum, equivalent to the carrying capacity of the
         revolver.  If the primary weapon is a semi-automatic
         handgun, the officer shall carry at a minimum, an
         additional clip at full capacity.  The same
         ammunition carriers described in the above paragraph
         100.05 E.(4) a., may be used.

(5)  HOLSTERS - All primary handguns shall be carried within a
     holster.  All holsters shall be designed and maintained
     to hold the handgun securely to prevent accidental
     release or discharge of the handgun.

     All primary handguns utilized by uniformed officers shall
     be carried in holsters of open stock design and equipped
     with a thumb-break type release.

G. FIREARM PROFICIENCY

(1)  QUALIFICATION - The Patrol Lieutenant shall schedule
     regular qualification sessions for primary handguns, both
     for on-duty and off-duty, and specialized firearms.  The
     Patrol Lieutenant shall set minimum standards for
     qualification and all officers shall be required to meet
     or exceed these standards.  Officers shall have prior
     notification of the set minimum standards.  Officers
     shall be required to qualify with the same caliber of
     ammunition they carry for primary use.  Such
     qualification sessions shall be held at least once each
     calendar year.

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 90 of 124

(2) QUALIFICATION FAILURE - Officers who fail to receive a passing score with their on-duty primary handguns in accordance with Department testing procedures shall be immediately reassigned to nonenforcement duties for a maximum period of sixty (60) calendar days.  An officer who fails to achieve a passing firearms qualification score during that sixty (60) day period is subject to disciplinary action, up to and including dismissal from employment.  The sixty (60) day period may be extended an additional thirty (30) days, to a total of ninety (90) calendar days, at the discretion of the Chief of Police, if he determines that the additional thirty (30) days may enable the officer to regain proficiency with his on-duty primary weapon.  An officer who does requalify shall immediately be available for reassignment to regular duty.

An officer shall not be permitted to carry any off-duty primary handgun with which he has not been able to qualify during the previous twelve (12) months, or with which he has been unable to qualify during the most recent qualification session.

(3) REQUALIFICATION - An officer who has been on extended leave or suffered an illness or injury that could affect his use of firearms is required, upon the discretion of the Chief of Police, to requalify before returning to enforcement duties.

H. FIREARMS INSTRUCTOR - The Firearms Instructors shall be supervised by the Patrol Lieutenant.  The Patrol Lieutenant shall assign the number of Firearms Instructors necessary to assist in training, inspection and qualifications.

(1) FIREARMS TRAINING - It shall be the responsibility of the Firearms Instructors to provide instruction with firearm safety and maintenance.  This instruction shall include basic firearms function, safety, and use of firearms, both on-duty and off-duty, as well as information regarding ballistics of ammunition.  Firearms training shall also include instruction in federal law, state law, and departmental policy regarding the use of firearms.

Case 4:96-cv-00030  Document 89  Filed in TXSD on 05/09/97  Page 91 of 124

----------------------------------------------------------------

   (2)  FIREARMS INSPECTION - It shall be the responsibility of
        the Firearms Instructors to inspect all firearms utilized
        by officers.  All firearms carried by officers shall be
        inspected prior to being carried.  All firearms shall be
        inspected prior to all qualification sessions.  The
        Patrol Lieutenant shall maintain a permanent file
        containing records of firearms, qualifications and
        individual qualification scores.  Information regarding
        make, model, serial number, caliber, barrel length and
        modifications shall be recorded.  The Firearms
        Instructors shall be authorized to reject any firearm
        determined to be unsafe or unsuitable for use.  The
        Firearms Instructors are authorized to inspect officers'
        firearms at any time.

   (3)  QUALIFICATION COURSE - The Patrol Lieutenant shall be
        responsible for designing a firearms course to test and
        improve the skills of officers.  The course shall include
        instruction in firearms safety, reloading, combat
        confrontation, and shooting techniques designed to
        prepare officers for practical use.  The course shall be
        designed to test the physical ability as well as the
        markmanship of the officers.

I. WEAPON MODIFICATIONS - No officer shall change, modify, or
   alter an authorized weapon in any manner whatsoever without
   prior approval of a Firearms Instructor.  An officer that
   receives authorization to modify a weapon shall submit his
   weapon to a Firearms Instructor after completion of the
   modification for inspection and approval before being
   authorized to carry said weapon.  The Firearms Instructors
   shall not authorize a change, modification, or alteration to
   an authorized weapon that would be against the recommendation
   of the manufacturer of the weapon.  The following handgun
   modifications are specifically prohibited:

   (1)  Telescopic sights.

   (2)  Trigger shoes.

   (3)  Barrel porting.

   (4)  Decorative engraving other than from the manufacturer.

Case 4:96-cv-00030  Document 69  Filed in TXSD on 05/09/97  Page 92 of 124

------------------------------------------------------------------

100.06    USE OF NONDEADLY FORCE AND NONLETHAL WEAPONS

A.    USE OF FORCE - Officers shall use the least force necessary that
      shall best de-escalate the incident and bring the situation under
      control in a safe manner.  Before an officer may use any force
      against a person, the officer shall adhere to the following:

      (1)   Have probable cause to arrest or search that person or have
            reasonable suspicion to detain or search that person.

      (2)   Manifest his purpose to arrest, detain, or search that person
            and identify himself as a peace officer, unless the officer
            has probable cause to believe that the person already knows
            his purpose and identity or unless the officer can not
            reasonably make that information known to the person.

      (3)   Give the reason for the arrest, detention, or search, unless
            impractical under the circumstances.

B.    FORCE OPTIONS - To the extent necessary and reasonable, and in
      accordance with this directive, an officer shall only use physical
      strength and skill, authorized baton, authorized "stun" equipment
      such as the "TASER" gun, or authorized aerosol spray, to apply
      nondeadly force.  However, an officer may use any unauthorized
      weapon if extreme emergency conditions leaves the officer no other
      alternative to protect himself or others.

C.    USE OF BATON - An officer may use an authorized baton if he has
      received approved instruction in its use and has maintained
      current applicable certification.  An officer may use a baton to
      protect himself or another from assault, to arrest, detain, or
      search a person who unlawfully resists same, when lower levels of
      force have failed, or if circumstances warrant the immediate use
      of the baton as a barricade or to repel or control crowds.  A
      baton may also be used as a "come along" tool on resisting
      suspects.  All maneuvers used by officers shall be in accordance
      with accepted training.  When feasible, an officer shall adhere to
      the below when using a baton.

      (1)   Avoid striking a suspect above the shoulders except as a last
            resort to counter the risk of serious bodily injury or death.

      (2)   Avoid making blows capable of inflicting permanent injury.

      (3)   Direct blows towards the elbows, knees, and abdomen.

      (3)   Deliver only blows to incapacitate the subject temporarily.

CNoPDF - www.faspo.com

Case 4:96-cv-00030 Document 69 Filed in TXSD on 05/09/97 Page 93 of 124

--------------------------------------------------------------------

D.   USE OF TASER GUN - An officer may use an authorized Taser Gun if
     he has received approved instruction in its use and has maintained
     current applicable certification.  An officer may use a Taser Gun
     to protect himself or another from assault, of if there is a
     reasonable expectation that it will be unsafe for officers to
     approach within contact range in order to subdue the suspect
     pursuant to arrest or search.  All maneuvers used by officers
     shall be in accordance with accepted training.  When feasible, an
     officer shall adhere to the below when using a Taser Gun.

     (1)   Attempt to obtain sufficient back-up prior to using the Taser
           in order to control the suspect after the electrical shock is
           applied.

     (2)   Ensure no other officers or persons are standing near the
           suspect during the application.

     (3)   Attempt to avoid impacting a suspect's eyes.

     (4)   When tactically permissible, aim for the suspect's back.

     (5)   Activate the electric current only as long as necessary to
           subdue the suspect.

     (6)   Ensure that the suspect receives appropriate medical
           attention as soon as possible and not attempt to remove darts
           embedded in the suspect's skin.

E.   USE OF OLEORESIN CAPSICUM AEROSOL SPRAY - An officer may use
     authorized aerosol spray if he has received approved instruction
     in its use and has maintained current applicable certification.
     An officer may use aerosol spray to protect himself or another
     from assault, or to arrest, detain, or search a person who
     unlawfully resists same, when lower levels of force have failed.
     An officer may also use aerosol spray if circumstances warrant the
     immediate use of the spray to repel or control crowds, or if there
     is a reasonable expectation that it will be unsafe for officers to
     approach within contact range in order to subdue the suspect
     pursuant to arrest or search.  All maneuvers used by officers
     shall be in accordance with accepted training.  When feasible, an
     officer shall adhere to the below when using aerosol spray.

     (1)   Attempt to obtain sufficient back-up prior to using the spray
           in order to control the suspect after the spray is applied.

     (2)   Ensure no other officers or persons are standing near the
           suspect during the application.

     (3)   Apply the spray between two (2) and eight (8) feet from the
           suspect and direct the spray at the suspect's eyes.

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 94 of 124

----------------------------------------------------------------------

    (4)   Apply one second bursts only as long as necessary to subdue the suspect.

    (5)   After the suspect is under control, the officer shall ensure he receives decontamination efforts by flushing the suspect's eyes and affected areas with water.

    (6)   If a suspect takes longer than forty five (45) minutes to recover from the effects of the spray, then the officer shall ensure the suspect is treated by medical personnel.

100.07    POST USE OF FORCE

A.    MEDICAL ASSISTANCE - A suspect, who has been the recipient of the use of force, shall be treated by medical personnel upon request or apparent need, after said suspect is under control.

B.    ADMINISTRATIVE LEAVE - When an officer's use of force causes death, the officer shall be placed on administrative leave until completion of all internal investigative requirements, and until it is determined by a mental health professional that the officer is ready to return to duty.

C.    INVESTIGATION - When an officer's use of force or alleged use of force causes death, the Department shall conduct both an administrative and criminal investigation of the incident.  The Chief of Police shall assign qualified investigators to perform the investigations, and said investigators shall forward a complete report to the Chief of Police upon completion of the investigation.

    (1)   NOTIFICATION OF DISTRICT ATTORNEY OFFICE - The first arriving supervisor to the scene of the following incidents shall be responsible for notifying the appropriate District Attorney personnel:

        a.   Officer involved shooting of another person.

        b.   Officer's use of force or alleged use of force resulting in the death of another person.

D.    REQUIRED NOTIFICATION AND REPORTS - A Bellaire Police Department Offense Report shall be completed under any of the below listed circumstances.  In addition, under the same circumstances, the involved officer is responsible for immediately notifying an on-duty or "on-call" supervisor.  The immediate supervisor of an officer involved in the below listed circumstances shall ensure that a copy of the report is given to the Assistant Chief.

CMzPDF - www.fastio.com

Case 4:96-cv-00030  Document 89  Filed in TXSD on 05/09/97  Page 95 of 124

-------------------------------------------------------------------

    (1)  When an officer discharges a firearm outside of the firing range.

    (2)  When an officer's use of force or alleged use of force results in death or injury of another person.

    (3)  When an officer uses a weapon against another person.

Notified supervisors shall respond to the scene as soon as practical and shall comply with investigative procedures as required by the Department. In the event that the incident occurred outside of the Houston Metropolitan area, the supervisor shall notify an Administrative Officer, who may authorize the supervisor to not respond to the scene (i.e., an officer on vacation in Colorado defends himself by shooting an aggravated robbery suspect).

E.  ADMINISTRATIVE REVIEW - All reported use of force incidents and unauthorized discharge of firearms shall be reviewed by the Assistant Chief and Chief of Police to determine the following:

    (1)  If Department policies or directives were violated.

    (2)  If the relevant policy or directive was clearly understandable and effective to cover the situation.

    (3)  If Department training requires revision.

F.  POLICY AND/OR DIRECTIVE VIOLATIONS - All findings of policy and/or directive violations shall be reported to the Chief of Police for resolution and/or disciplinary action in accordance with departmental policy.

G.  RETENTION OF REPORTS - All use of force incident reports shall be retained as required by law by the Assistant Chief.

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| NOEL C. ALLEN, Individually | § | |
| and on behalf of the Estate of | § | |
| TRAVIS O'NEILL ALLEN, AND | § | |
| REBECCA O'NEILL ALLEN | § | |
| | § | |
| *v.* | § | **C.A. NO. H-96-0030** |
| | § | |
| MICHAEL LEAL, CARLE UPSHAW | § | |
| DANIEL SHELOR, BELLAIRE POLICE | § | |
| DEPARTMENT AND CITY OF | § | |
| BELLAIRE, TEXAS | § | |

## AFFIDAVIT OF EDUARDO BELLAS

BEFORE ME, the undersigned authority, on this day, personally appeared **EDUARDO BELLAS,** known to me to be the person whose name is subscribed below, who, upon being duly sworn under oath, did depose and state:

> My name is Eduardo Bellas. I am over the age of twenty-one (21), and in all other ways qualified and competent to make the statements contained within this Affidavit. Additionally, all of the statements contained within this Affidavit are made of my own personal knowledge.
>
> I served as the Deputy Chief Medical Examiner for Harris County, Texas, between 1993 and 1996. During 1996 I also served as the acting Chief Medical Examiner. Between 1975 and 1993 I served as the Assistant Medical Examiner for Harris County for a total of sixteen years. I received my M.D. degree from the University of Havana Medical School in 1956. Since 1973 I have been licensed to practice medicine in the State of Texas.
>
> I performed the autopsy of the deceased Travis O'Neill Allen and determined his cause and manner of death. As part of my duties as Deputy Chief Medical Examiner I ordered toxicological studies of Travis Allen's body fluids. This toxicology report indicated that the urine of Travis Allen at the time of his death contained two hallucinogenic drugs: cannabis metabolite and Lysergic Acid Diethylamide. The first drug is more commonly known as marihuana. The second drug is more commonly known as LSD.
>
> The effect of these two drugs are classified as psycho-active drugs. When they act independently it is clear that LSD is stronger and more intense. As a matter



of fact, of the drug list of hallucinogens, LSD is the leader. When they are present in the body at the same time they produce synergistic effects. Neither the LSD nor the marihuana (separate or together) usually causes death in humans, rather death is associated with a wide variety of injuries as a result of the alteration of the mental status and conduct abnormalities of the user.

The psychic effects of LSD are intense and vary with the individual. People with a previous history of depression, and those with suicidal tendencies are particularly liable (susceptible?) to hallucinogenic drugs. Further, the main target is the visual area: ondulating vision, blurred vision and hallucinations. Another symptom associated with the LSD is detachment of the ego.

In my opinion based upon reasonable medical probability, my years of experience, training, and education, the decedent Travis Allen was under the influence of these two drugs after breaking into the home of Mr. and Mrs. Deal and prior to being shot. At that time, Travis Allen was not in the best condition to have been able to properly perceive the reality of the events and circumstances occurring around him, including any actions or commands of the police officers involved in his death.

Further, based upon the recognized effects of LSD as set forth above, it is also my opinion based upon reasonable medical probability, my years of experience, training, and education, that the ingestion of the drugs marihuana and LSD could cause an individual, such as Travis Allen, to act in an extremely abnormal manner, as perceived by other individuals who come into contact with that person.

*Eduardo Bellas, M.D.*
EDUARDO BELLAS


SWORN TO before me, the undersigned notary public, on this the 13th day of December, 1996.

CINDY COLTRANE
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
JUNE 21, 2000

Notary Public in and for the State of Texas

2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| NOEL C. ALLEN, Individually | § | |
| and on behalf of the Estate of | § | |
| TRAVIS O'NEILL ALLEN, AND | § | |
| REBECCA O'NEILL ALLEN | § | |
| | § | |
| *v.* | § | **C.A. NO. H-96-0030** |
| | § | |
| MICHAEL LEAL, CARLE UPSHAW | § | |
| DANIEL SHELOR, BELLAIRE POLICE | § | |
| DEPARTMENT AND CITY OF | § | |
| BELLAIRE, TEXAS | § | |

## A F F I D A V I T

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF HARRIS | § |

**BEFORE ME**, the undersigned notary public, on this day personally appeared David M. Grossi, who being by me duly sworn on his oath, deposed and stated as follows:

My name is David M. Grossi. I am over the age of twenty-one and in all other ways qualified to make the statements contained herein. The statements are true and correct to the best of my knowledge and are based upon my training and experience, as reflected in the attached report as well as the documents and other evidence which I have reviewed, and which are detailed in the attached report.

The statements contained within my attached report, and particularly the opinions which I have offered are based upon recognized law enforcement training and procedures which have previously been approved by the Texas Commission on Law Enforcement Officers Standards on Education as well as other state and federal agencies.

It is my opinion that, under the circumstances presented, a reasonable police officer would and could believe that the use of deadly force by an officer in a situation such as that faced by Officer Leal, on July 15, 1995, was in accordance with constitutional limits governing use of force by police officers as well as nationally recognized police training and procedures.



I have been presented with no evidence or information which would lead me to believe that a reasonable police officer, faced with the situation confronted by Officer Leal, could not have come to the conclusion that Officer Leal's actions were inappropriate or impermissible.

My report, which is attached, more fully sets forth this opinion and the bases therefore.

Further Affiant sayeth not.


_David M. Grossi_____
DAVID M. GROSSI


SUBSCRIBED AND SWORN TO BEFORE ME on this _9th_ day of _May___, 1997.


DAWN CARROLL
Notary Public, State of Texas
My Commission Expires 03-28-2000

_Dawn Carroll_____
NOTARY PUBLIC IN AND FOR THE
STATE OF TEXAS


2



666 Dundee Road, Suite 1607    •    Northbrook, Illinois 60062-2760
800-323-0037    •    (847) 498-5680    •    FAX: (847) 498-6869

December 9, 1996

Mr. William S. Helfand, Esq.
Magenheim, Bateman, Robinson,
        Wrotenbery and Helfand, L.L.P.
1221 McKinney Street
3600 One Houston Center
Houston, Texas 77010

      Re:  Noel C. Allen, et al v. Micheal Leal, et al.

Dear Mr. Helfand:

Pursuant to your request, I hereby submit this report on the above captioned matter.  As a part
thereof and made a part hereto, please find my up-to-date curriculum vita which contains all my
published material and also a separate notification (pursuant to amended Federal Rule 26) of all
cases where I have given testimony, in either deposition or trial, within the last four years.

First, let me list all the materials I have reviewed in this matter:

1.     Deposition of Crpl. Michael Leal
       taken July 2, 1996,

2.     Deposition of Offr. Carle Upshaw
       taken July 3, 1996,

3.     Deposition of Offr. Daniel Shelor
       taken July 5, 1996,

4.     Bellaire (TX) Police Department
       Case Report #9508788 filed by
       Det. D.L. Oglesby,

5.     Bellaire (TX) Police Department
       Use of Force Policy

Allen
page 2

6.      Bellaire (TX) Police Department
        Crime Scene Drawing (3 pages),

7.      Sworn affidavit of Crpl. Michael Leal
        dated July 15, 1995,

8.      Sworn affidavit of Offr. Carle Upshaw
        dated July 15, 1995,

9.      Sworn affidavit of Offr. Daniel Shelor
        dated August 9, 1995,

10      Sixty-six (66) color photographs
        of the scene at 4407 Acacia, related
        physical evidence and autopsy of
        Travis O'Neill Allen,

11.     Autopsy Report #95-4975 on Travis
        O'Neill Allen prepared and submitted by
        Harris County (TX) ME Joseph Jachimczyk,

12.     Toxicology Report #95-4975 dated
        August 7, 1995 on Travis Allen

13.     Pasadena (TX) Police Department Firearms
        Report on Corporal Leal's Smith & Wesson
        .45 caliber pistol.

Furthermore, I have requested a site inspection of the scene at 4407 Acacia, Bellaire, TX. If any
further information is gleaned from this examination, I will submit an addendum to this report.

Next, let me state my opinion on the *conduct* of Corporal Michael Leal on July 15, 1995, my
opinions on the *appropriateness of his actions* and my *reasons* for formulating this opinion.

Facts:

On July 15, 1995 at approximately 1:35 am, officers of the Bellaire (TX) Police Department
responded to a call of a burglary-in-progress at 4407 Acacia. Three units responded to and arrived
at the scene.

CitPDF - www.fastio.com

Allen
page 3

Officer Daniel Shelor, was the primary unit assigned to this call, and Officer Carle Upshaw (in Bellaire PD unit #311) and Corporal Michael Leal (in Bellaire PD unit #319) responded as back-up. The call was answered within one minute of the dispatch. Upon their arrival, the residential audio alarm was still going off. Officer Shelor parked his marked police unit about two houses away and made his approach on foot. Upon their arrival, all three officers saw evidence of a burglary-in-progress. Observations of the front of the house confirmed that a forced entry had indeed been made. Windows were smashed out as well as broken plate glass on the front door. The two residents/occupants (Edgar and Carolyn Deal) had evacuated out one of the upstairs windows and had taken refuge on the roof of the house. The residents confirmed to Officer Upshaw that they lived there alone and no one else belonged in the house. Officer Upshaw advised the victims to remain on the roof. Officer Shelor and Corporal Leal assumed positions in front of the house, and Officer Upshaw was assigned (by Corporal Leal) to check out the rear.

Suddenly, the suspect (who was later identified as one Travis O'Neill Allen, a W-M, age 17) was observed attempting to crawl "on all fours" through the broken glass out the front of the house. Officer Shelor ordered the suspect to the ground, but rather than comply, Allen looked at Officer Shelor and retreated back into the house. Within a minute or two, Allen was again observed at the front of the house. He picked up a two-wheeled bicycle (which belonged to the victims and which had been stored in the front foyer area of the home) and threw it through the already broken window next to the front door. Again, verbal commands were given by the officers for the suspect to exit the house. The commands were met with negative compliance. Allen was then observed retreating back inside the house.

Officer Upshaw, upon observing the suspect in the south portion (rear area) of the house, ordered the suspect to come out of the house via a sliding glass door. Allen went over to the door, but rather than exiting, ran into the glass door bouncing off same. He then was seen running back towards the center of the house to the living room area.

Hearing the verbal commands coming from Officer Upshaw's location at the rear of the house, Corporal Leal left Officer Shelor at the front and responded to the rear to assist Officer Upshaw. By using flashlights for illumination, both officers could see the suspect, and observe that he had blood on his hands and arms, and also saw that a large window (apparently the entry point) had also been broken out. The suspect was observed hiding behind a wall in the living room area, and was not complying with verbal commands to exit the house. With the knowledge that the victims were only temporarily secured on the roof of the house, Corporal Leal and Officer Upshaw decided to enter the house. They were soon joined by Officer Shelor. Upon making their entry, the suspect was seen partially lying on the floor and was told not to move. Officer Upshaw holstered his service pistol and was starting to handcuff the suspect. However, noticing the large amount of blood on him, opted to wait until Officer Shelor secured rubber gloves.

CutePDF - www.cutepdf.com

Case 4:96-cv-00030  Document 89  Filed in TXSD on 05/09/97  Page 103 of 124

Corporal Leal covered the unsearched suspect with his service pistol, while Officer Upshaw attempted to ground stabilize him with his foot on the suspect's back area.

The suspect was continuing to resist stabilization and kept trying to get up. Officer Upshaw continued to use his feet on the suspect's back and Corporal Leal also placed his foot on the suspect's thigh/buttocks area in an attempt to keep the suspect under control while they awaited Officer Shelor's return with the gloves. Before Officer Shelor's return, Allen managed to get his hands under his body. Officer Upshaw and Corporal Leal saw the suspect struggle into a push-up position and reach into his waistband area with his right hand. With Officer Upshaw still applying stabilization to the suspect's back, Corporal Leal attempted to pull Allen's right hand out from the front of his waistband area by grabbing his arm. Corporal Leal was unable to gain control of the suspect's right hand due to the significant level of resistive tension manifested by the suspect. Suddenly, Allen managed to reach into his pants pocket with his right hand and was rolling over onto his left side. He fixed his gaze directly on Corporal Leal. As Allen was withdrawing his hand from his right pocket and continuing to look directly at Corporal Leal; Leal fearing the suspect may be retrieving a deadly weapon and that a lethal threat was immediate, fired two shots to stop Allen's aggressive action. Allen was then stabilized, handcuffed and Officer Shelor, a certified EMT, and who had just returned with the rubber gloves, immediately began attending to Allen. Allen subsequently died from the two gunshot wounds.


Background:

Travis O'Neill Allen, according to witness statements, had spent the better part of the evening of July 14, 1995 at an unsupervised party ingesting large quantities of hallucinogenic substances, including marijuana and LSD. He was engaging in bizarre, unusual behavior and was described as acting in a "paranoid" fashion. He had wandered around the surrounding neighborhood before he ran off from his associates at approximately 1:35 am on July 15, 1995. He arrived at the residence of Edgar and Carolyn Deal at 4407 Acacia, went to the rear of the house, took a 55-60 pound concrete cinder block from the landscaping and hurled it through a full length glass window at the south-east corner of the wooden deck of the residence. He entered the home through this smashed out window, and began breaking out the front windows of the residence. This conduct immediately prompted the residents to place an emergency 9-1-1 call to the Bellaire PD. He then negotiated the stairs and second floor hallway of the home and was heard coughing immediately outside the Deal's bedroom door. Fearing for their lives, the Deal's fled to the second story roof out their bedroom window. Allen, still inside the home, then picked up a two-wheeled bicycle that was in a foyer area near the front door, and launched it through the front door glass.

CutPDF - www.fastio.com

Allen
page 5

Corporal Leal was a seven year veteran of the Bellaire (TX) Police Department. He graduated
from the Fort Bend County (TX) Law Enforcement Academy in June of 1988, and was hired by
the Bellaire (TX) Police Department shortly thereafter in August of 1988. He successfully
completed their 4-month Field Training program. At the time of this incident, he was a corporal
(first-line supervisor) on the Bellaire (TX) Police Department and a TCLOSE certified police
officer. His in-service training from the time he began working for the Bellaire (TX) Police
Department up to the time of this incident included classroom instruction on Use of Force,
Interview and Interrogation, Tactical Command Management, CPR, DWI Recognition/Intoxilizer
training, and additional hands-on training in Emergency Vehicle Operations, Baton, Defensive
Tactics, and most significantly, Low-Light Firearms Training. He was working the 11:00 pm to
7:00 am shift on this particular day. He was carrying his personally owned, department authorized
Smith & Wesson .45 caliber DA/SA semi-automatic pistol, Model 4506. The ammunition was
department-issued Winchester 185 grain Silvertip rounds.


Opinions:

The tactical response and approach to this burglary-in-progress call was text book. Officer Shelor
parked his vehicle two houses away and made a stealth foot approach to the residence. Upon
arrival of his back-up officers (Corporal Leal and Officer Upshaw), an invisible deployment
perimeter was established. Corporal Leal and Officer Shelor deployed to the front of the house
and Officer Upshaw secured the rear. The dispatcher maintained telephonic contact with the
victims and coordinated an emergency evacuation to the roof of the house. Officer Upshaw
established visual and verbal contact with the victims and attempted to insure their safety during
this high-risk contact. However, even with the victims secured on the roof, this call continued to
remain a high-risk and potentially dangerous investigation with the two victims unable to totally
disengage to safety. The suspect continued to elude and resist arrest, throw heavy objects through
the windows and engage in a "cat and mouse" hide-and-seek game while inside the darken house.
Furthermore, it was not known if there were any additional suspects besides Allen inside the
house.

Repeated verbal commands were issued by all three officers during their response to this
in-progress felony and every effort was made to affect the arrest of this suspect through verbal
persuasion, all of which were ignored by Travis Allen. Upon seeing the suspect retreat to a center
location of the house and appear to secret himself behind a wall, and still aware that innocent
victims were not fully evacuated to safety, a tactical entry was obviously necessary. With the
suspect's location momentarily known, Corporal Leal and Officer Upshaw chose a tactically safe
entry point and made their approach to him. The suspect was located using flashlights, but would
still not respond to verbal commands to surrender. Tactically, Officer Shelor should have
maintained his position at the front of the residence. However, hearing the officers yelling loud
verbal commands to the suspect, he chose to join the other two and assume a position as an

Allen
page 6

additional cover officer. Repeated verbal commands were given by the officers and again ignored
by the suspect. Upon viewing the physical appearance of the suspect (hands and arms covered
with blood), Officer Shelor was sent to secure universal precautions (rubber gloves) before
handcuffing was attempted. With Corporal Leal assuming a cover officer position on the suspect,
and also scanning the immediate area for other potential threats, Officer Upshaw continued his
attempt at ground stabilzation of the suspect. Upon meeting physical resistance, he increased his
efforts to safely secure Allen on the ground. However, when the level of resistance began to
increase and the belief that Allen may be reaching for a weapon; neither officer could control Allen
with simple physical force, and they disengaged from their attempts at ground stabilization efforts.
Corporal Leal, despite the contamination risks, attempted manual control of the suspect's right arm
and hand.

Verbal commands were still being given and ignored and total compliance through ground
stabilization had not yet been achieved. The suspect had not been physically "arrested" yet.

With the knowledge and belief that Allen (who had not yet been visually or physically cleared,
"patted-down" or searched for weapons) may be reaching for a weapon and attempting to extract it
from his pocket, coupled with the fact that Allen had now visually acquired Corporal Leal as a
target, Leal fired two shots to stop the threatening, aggressive conduct of Allen. This defensive
use of deadly force was totally justified, completely necessary and objectively reasonable. The
reasons for these conclusions are as follows: The two gunshot wounds to the back showed
evidence of gunpowder stippling, indicating an intimate, close-range contact. The rounds entered
the suspect within 1" of each other and were located just to the right of the mid-line of upper right
back area. The suspect was found to be under the influence of two illegal hallucinogenics (LSD
and marijuana) plus the legal stimulant, caffeine. The physical evidence (numerous blood smears
both upstairs and down, broken windows, a bicycle thrown out the door, a 55-60 pound cinder
block as the entry method), supports the officers', witnesses' and victims' versions of the events.
Travis Allen, despite his size (5'9", 128 pounds) was a very strong individual. He lifted two adult
male police officers off the floor with his push-ups. He was a frequent user of hallucinogenic and
stimulant substances, including ecstasy, LSD, marijuana and alcohol. He was, in fact under the
influence of LSD, marijuana and caffeine on this date. He was exhibiting bizarre and
paranoid-type behavior. Clear, simple verbal commands were not working. Common physical
control techniques were not successful. It is not uncommon for standard pain-compliance
techniques and simple verbal commands to be ineffective or unsuccessful against habitual
substance abusers. The two shots were delivered from a distance of less than three feet, indicating
an intimate, close-range encounter. The bruising on the back supports the officers' description of
repeated attempts at ground stabilization. These officers attempted every possible lesser force
option to control this aggressive, drug-laced, super-human felon who had not yet been stabilized,
secured, handcuffed or searched.. Verbal commands were repeatedly *attempted, continued* and
*ignored* throughout the contact. Baton strikes require intimate range contact and and would have
been inappropriate since the suspect was already on the ground. Chemical sprays were not

Allen
page 7

a part of the force options available to these officers. Physical force alternatives were already being used and were not proving effective. When Allen made a sudden, furtive and threatening movement to his pocket and began to withdraw his hand, he left no other alternative to these officers except defensive deadly force.

Summary:

Police officers are under no legal obligation to recklessly risk their lives in order to control life-threatening, hostile or aggressive subjects. It would be unreasonable to require police officers to risk the transmission of deadly blood-borne pathogens and/or potentially fatal diseases, by requiring them to attempt physical control measures against heavily bleeding suspects. The US Supreme Court in Graham vs. Connor requires that police use of force be "objectively reasonable."

When considering all of the facts of this incident, (1) *the severity of the crime* (a felony crime-in-progress in the form of an occupied home invasion), (2) *the immediate threat to the safety of the principals* (two innocent citizens trapped on the roof of a second story residence at 1:35 am) and the two officers themselves, (3) a heavily bleeding suspect *attempting to escape* by crawling through broken glass and throwing heavy objects into and out of windows, (4) the repetitive and continued *active resistance* of the suspect (physical resistance as well as refusal of verbal commands), and (5) the *rapidly-evolving safety concerns* and attempts by an unsearched felony suspect to secret his hands and reach into his pockets, it is apparently clear that <u>any reasonable</u> police officer placed in the exact or similar set of circumstance that Corporal Leal found himself in, would have used the same level of force as Corporal Leal did. Travis Allen's conduct constituted an immediate and imminent threat which necessitated the immediate use of defensive deadly force. Corporal Leal's use of deadly force was reasonable since Corporal Leal had probable cause to believe that Travis Allen posed a significant threat of death or serious physical injury to not only himself, but to Officer Upshaw and the two innocent citizens trapped on the roof of their own home at 1:35 am. While reasonable police officers might have different opinions on whether Corporal Leal's conduct was reasonable, in my opinion, it is not true that no reasonable police officer could find Corporal Leal's conduct justified in light of Travis Allen's imminent threat of death or serious physical injury.

Further, it is clear that Corporal Leal's shooting of Travis Allen involved his discretionary duties while acting within the scope of his authority as a certified police officer and supervisory patrol officer for the City of Bellaire, Texas. Corporal Leal testified in his sworn deposition that part of his responsibilities as a police corporal include the field supervison of road patrol officers during the performance of their duties. Thus, the shooting of Travis Allen was within the scope of this authority as a City of Bellaire (TX) police officer. Further, it is clear that the conduct of Corporal

Allen
page 8

Michael Leal in response to this burglary-in-progress call and resultant shooting, all involved discretion in that his split-second decision to use deadly force involved personal deliberation, decision and judgment. Furthermore, for the reasons set forth above, including the immediate threat of death or serious physical injury to Corporal Leal and Officer Upshaw made by Travis Allen; Corporal Leal's conduct was in good faith since as set forth above, a reasonably prudent police officer under the same or similar circumstances, may have believed that his shooting of Travis Allen was lawful or justified.

Let me attempt to list the published documents, written material, and research manuals that I used to assist me in formulating my opinions. Some of the foregoing may also serve as potential exhibits to summarize or support my opinions at trial. Please bear in mind, this list is not intended to be all inclusive, for much of the information was gained collectively through over 5,000 hours of professional training, formal education and over 20 years of sworn full-time, professional police experience in patrol, investigative, administrative, training and tactical command management positions up through the ranks. However, the following is a representative list of some of the materials used which will serve to document my opinions.

Adams, Ronald J., Thomas McTernan, and Charles Remsberg,
Street Survival: Tactics for Armed Encounters (Northbrook, IL:
Calibre Press, 1981).

Commission on Accreditation for Law Enforcement Agencies, Inc.
Standards for Law Enforcement Agencies (Fairfax, VA:
Commission on Accreditation for Law Enforcement Agencies, Inc. 1983).

Geller, William A., and Michael S. Scott, Deadly Force: What We Know,
(Washington, DC:, Police Executive Research Forum, 1992).

Grossi, David M., "A Complete Firearms Training Program"
The Police Marksman (November/December, 1983).

_____, and Guy A. Rossi, "Progression of Force:
The Gray Area" The Police Marksman (November/December, 1983).

International Association of Chiefs of Police, Training Keys,
(Alexandria, VA: International Association of Chiefs of Police, var.).

Matulia, Kenneth J., A Balance of Forces (Gaithersburg, MD:
International Association of Chiefs of Police, 1985).

Case 4.96-cv-00030  Document 89  Filed in TXSD on 05/09/97  Page 108 of 124

Remsberg, Charles, The Tactical Edge, Surviving High Risk Patrol
(Northbrook, IL: Calibre Press, 1986).

United States Supreme Court, *Graham vs. Connor*, 109 S.Ct. 1965 (1989).

Use-of-Force Continuum, Calibre Press, Inc.
Street Surviuval Seminar Personal Resource Guide

Finally, pursuant to amended Federal Rule 26, attached hereto and made a part hereof, is my
standard fee schedule and invoice dated December 9, 1996 reflecting my total and complete
compensation for review of materials and work performed on this case, to date.


David M. Grossi, Senior Instructor
Calibre Press, Inc.
Street Survival Seminar

CMiPDF - www.fastio.com

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE SOUTHERN DISTRICT OF TEXAS
2              HOUSTON DIVISION

3    _____

4    NOEL C. ALLEN, ET AL.,              )
                                         )
5              Plaintiff,                )
                                         )
6         vs.                            )   C.A. NO. H-96-0030
                                         )
7    MICHAEL LEAL, ET AL.,               )
                                         )
8              Defendant.                )

9    _____

10        DEPOSITION UPON ORAL EXAMINATION OF

11                 MASSAD AYOOB

12               April 8, 1997
               Onalaska, Washington
13
     _____
14

15

16

17             Taken Before:

18            Carman Prante
         Certified Court Reporter
19                   of
         CAPITOL PACIFIC REPORTING
20        2100 SW Woodland Circle
            Chehalis, WA  98532
21           (360) 330-0262

22

23

24

25

1                              <u>APPEARANCES</u>

2    FOR THE PLAINTIFF:            MR. J. BLAKE HAYNES
                                   ATTORNEY AT LAW
3                                  RICHARD HAYNES & ASSOCIATES
                                   4300 SCOTLAND
4                                  HOUSTON TX  77007-7394

5
     FOR THE DEFENDANT:            MR. WILLIAM S. HELFAND
6                                  ATTORNEY AT LAW
                                   MAGENHEIM BATEMAN ROBINSON
7                                   WROTENBERY & HELFAND
                                   3600 ONE HOUSTON CENTER
8                                  1221 McKINNEY STREET
                                   HOUSTON, TX  77010
9
     ALSO PRESENT:                 MR. MARTY HAYES
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 111 of 124

1   policies prohibit the use of deadly force except in those

2   circumstances where an officer reasonably perceives an

3   immediate threat of death or bodily injury to themself or

4   someone else?

5  A   If I recall correctly they do.  I believe they may also

6      have addressed fleeing felons, but that is not the issue

7      here.

8  Q   We're not talking about fleeing felons.  So the record's

9      clear, let me ask you the question again.  Isn't it correct

10     to say that the Bellaire Police Department's policies

11     regarding use of deadly force specifically prohibit

12     officers from using deadly force except in those

13     circumstances in which an officer reasonably perceives a

14     risk of death or bodily injury to himself or others that

15     are present?

16 A   That's my understanding.

17 Q   Did you observe any policies of the Bellaire Police

18     Department which indicated to you that they would have -

19     that the policies would have suggested to a police officer

20     a more permissive use of deadly force than you would

21     normally expect from any other law enforcement agency?

22 A   No.

23 Q   Did you review the training that Officer Leal had gone

24     through?

25 A   I did.

1   Q   And are you familiar with the training requirements of the

2       Texas Commission of law enforcement officers standards on

3       education?

4   A   Only roughly.

5   Q   All right.  Did you determine that Officer Leal had engaged

6       in more training than was required by state law, less

7       training or the same amount?

8   A   More.  He was a highly trained officer.

9   Q   All right.  Did you observe that Officer Leal had, in fact,

10      completed in addition to whatever basic training that he

11      had on a constitutional limitations on use of force that

12      Officer Leal had additional training which would have

13      touched upon use of force and the propriety of use of force

14      by police officers?

15  A   Yes.

16  Q   All right.  Did you review anything which indicated to you

17      that the Bellaire Police Department or either

18      Officer Upshaw or Officer Leal had not complied with any

19      minimum training requirements with respect to these

20      officers?

21  A   I'm not sure I understand the question.  You mean that were

22      they undertrained and had not been trained --

23  Q   Yes, sir.  Did you find anything that indicated that?

24  A   I did not.

25  Q   All right.  Did you find anything which indicated that the

MASSAD AYOOB - by Mr. Helfand

1   City of Bellaire knew or should have known that
2   Officer Leal or Officer Upshaw needed more training but
3   elected not to provide it to them?

4   A   No.

5   Q   Did you find any training which you believe any reasonable
6       police officer should have had but which Officers Upshaw or
7       Leal did not have?

8   A   No.

9   Q   Did you find any information - I understand you also
10      reviewed the personnel files of Officers Upshaw and Leal;
11      is that correct?

12  A   I did.

13  Q   Did you find anything within their personnel files which
14      would indicate to you that either Officer Upshaw or
15      Officer Leal possessed dangerous propensities that would
16      indicate to a reasonable person that they were likely to
17      kill someone without just cause?

18  A   No.

19  Q   Did you find anything within the personnel files which
20      indicated that either Officer Upshaw or Officer Leal would
21      have been or should have been to a reasonable police
22      supervisor recognized as someone who might violate the
23      constitutional rights of an individual with whom they came
24      in contact?

25  A   No.

1    Q    And as I understand it, you also reviewed the department's

2         internal affairs investigative files regarding use of force

3         over the past ten years; am I correct?

4    A    The whole investigative file, is that what you're saying?

5    Q    As I understand it.

6    A    If they sent it, I read it.  Where is that?

7    Q    Under 8-A under outline, internal affairs files produced by

8         the Bellaire Police Department.

9    A    I recall them sending me something.  I wasn't aware that it

10        was, you know, all internal affairs files.

11   Q    Okay.

12             MR. HAYNES: For clarity of the record, we didn't

13        get all of the files.  Quite a few had been purged by the

14        City of Bellaire.  So . . .

15   Q    (BY MR. HELFAND) What you got were any sustained

16        complaints, so it doesn't matter what Mr. Haynes and I

17        think about it.  What I understand though is any - as far

18        as you understand, any internal affairs files that the

19        plaintiff's attorneys had you reviewed; is that correct?

20   A    Anything I was furnished, I reviewed.

21   Q    Okay.  Correct.  And you know - as far as you know they

22        didn't withhold any internal affairs investigative files

23        from you, did they, the plaintiff's attorneys?

24   A    I would hope not.

25   Q    Okay.  Great.  And did you happen to notice, by the way,

1    that Officer Leal has never been the subject of a sustained

2    complaint in connection with his work at the Bellaire

3    Police Department?

4  A    I did.

5  Q    And did you happen to notice that's true with respect to

6    Officer Upshaw as well?

7  A    I didn't see anything on Upshaw.

8  Q    Great.  Did you - did you look - anything that you looked

9    at or did you talk to anyone about did you find anywhere

10    that the Bellaire Police Department has an established

11    policy of or engages in the general practice of deliberate

12    and purposeful abuse of persons within their jurisdictional

13    limits?

14  A    I seen nothing to indicate that.

15  Q    In fact, did you happen to notice that among the internal

16    affairs files that were produced that there were internal

17    affairs investigations of police officers relating to

18    conduct that those officers were engaged in off duty?

19  A    There may have been.  I don't recall anything specific with

20    respect to this case.

21  Q    All right.  Would you agree with me that it is the

22    responsible department which scrutinizes the actions of its

23    officers both on and off duty?

24  A    It would appear to be.

25  Q    And it is a responsible department that acts when an

1  officer acts inappropriately regardless of whether they're

2  on or off duty?

3  A  Would you rephrase that?  Are you phrasing hypothetically a

4  department that does --

5  Q  Yes.

6  A  -- so is responsible?  You're asking me is Bellaire?

7  Q  Would you agree that any responsible department would

8  follow-up on complaints that arise with respect to their

9  officers regarding the officer's conduct both on and off

10  duty?

11  A  Yes, I would agree with that.

12  Q  You would expect a department which is careful about the

13  supervision of its officers to do that?

14  A  I would.

15  Q  All right.  Did you happen to notice as well that the

16  police department had actually initiated its own

17  investigation when facts came to light in connection with

18  the handling of a prisoner raised questions regarding a

19  officer's handling of a prisoner in one of the IA files?

20  A  I don't recall that jumping out at me.  But if it had

21  something to do with the files, I did.

22  Q  If you were presented with a hypothetical police department

23  which had initiated its own investigation where an officer

24  had suspected mistreatment of a prisoner, would you

25  consider that to be a department which was acting

MASSAD AYOOB - by Mr. Helfand

1   Q  Okay. That created a situation that preceded the decision

2      of Officer Leal to shoot; am I right?

3   A  That's correct. That's why I said chain of events.

4   Q  Okay. But - but a separate occurrence after that then led

5      to Officer Leal's decision to shoot, do we agree?

6   A  Yes.

7   Q  Interceding events?

8   A  Correct.

9   Q  And as we've discussed, there's nothing about the Bellaire

10     Police Department policy, is there - tell me if there is -

11     that would have in any way suggested to Officer Leal that

12     he could do what he's accused of doing in that case and

13     that is shoot without sufficient provocation --

14   A  No.

15   Q  -- is that correct?

16   A  That's correct.

17   Q  Okay. And do we agree that there is nothing in the records

18     of the Bellaire Police Department which would substantiate

19     the contention that Officer Leal had dangerous propensities

20     prior to this incident that could have been detected by the

21     Bellaire Police Department?

22   A  That's correct.

23   Q  And do we agree that there is nothing in the record which

24     would substantiate the contention that the Bellaire Police

25     Department had deliberately disregarded a known need for

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 118 of 124

1    training?

2  A  You could argue that with the blood borne pathogens so far

3     as the use of force training.  Unless someone could show

4     that Upshaw was expressly trained to stand between the

5     kid's shoulder blades to restrain him, I don't see anything

6     that shows the department trained them to indirectly use

7     force.

8  Q  Okay.  And that actually was not my question.  My question

9     was:  Did you identify anywhere in the record that the

10    Bellaire Police Department knew of a need for training of

11    these officers and disregarded that need?

12 A  That they knew of such training?

13 Q  Yes.

14 A  No.  There was no indication of that.

15 Q  In other words, did you identify anywhere where the

16    Bellaire Police Department was deliberately indifferent to

17    a known need for training?

18 A  No, I have not seen that.

19 Q  All right.  Let's talk for a few minutes about

20    Officer Upshaw.  Did you identify any information which

21    indicated to you that Officer Upshaw knew that Officer Leal

22    was going to discharge his weapon at any time before

23    Officer Leal actually did so?

24 A  No.

25 Q  In fact, did you observe in Officer Upshaw's testimony as

1    well as the reports which he provided Officer Upshaw's

2    statements that he was not even aware of the fact that the

3    gun had been discharged until he had actually been told

4    that Officer Leal had shot at sometime after that point?

5 A  I don't recall when he said he was aware.  He said he was

6    not aware of the shots being fired at that time.

7 Q  All right.  Is that - are you aware of situations in which

8    that occurs where one police officer shoots and another

9    doesn't even recognize that the shots had been fired?

10 A  Yes.

11 Q  That's not so uncommon as to be unheard of in these types

12    of situations, is it?

13 A  No, it is not.

14 Q  And is it correct for me to say that's due to the fact that

15    officers are often very - oftentimes very focused on what

16    they are doing and what the suspect is doing to the extent

17    that they are excluding stimulus including sounds from

18    other police officers?

19 A  That would be a fair assessment.

20 Q  So do you find it unbelievable or incredible if

21    Officer Upshaw testifies that he didn't know that the gun

22    was shot by Leal until after Leal had fired?

23 A  No.

24 Q  Did you observe any - anything in the record which

25    indicates to you that Officer Upshaw knew Leal was going to

Case 4:96-cv-00030 Document 89 Filed in TXSD on 05/09/97 Page 120 of 124

1    shoot and was in a position to keep Leal from doing so but

2    elected not to?

3  A   No.

4  Q   And as I understand it, you do criticize Officer Upshaw's

5    decision to utilize one or both of his feet for the purpose

6    of attempting to keep Mr. Allen on the floor when he was

7    face down; is that correct?

8  A   Primarily the - the use of both feet and what is called a

9    red zone area, potentially deadly force area, the body

10    zone.

11  Q   The reason that I understand that you're critical of that -

12    and you tell me if I'm wrong - is that standing on an

13    individual in the location where Officer Upshaw did so can

14    cause death or serious bodily injury just by standing on a

15    person, right?

16  A   Among other things.

17  Q   All right.  And is that one of the reasons that you're

18    concerned about Officer Upshaw's tactics in that regard?

19  A   That is one reason.

20  Q   All right.  And - but we know in this case that although it

21    had the potential to do so, it did not cause death or

22    serious body injury to Mr. Allen, did it?

23  A   Not directly.

24  Q   All right.  Well, when you say not directly, it had no role

25    in his death, did it?

1    Rule 30 prohibits you from objecting.

2    Q   (BY MR. HELFAND) Now you can answer the question.

3    A   No.

4    Q   Okay.  In other words, you know Officer Leal says that he

5        thought that he was about - that he or Officer Upshaw were

6        about to be attacked by some type of deadly weapon, you

7        know that that's what Officer Leal thought was going to

8        happen?

9    A   That was his testimony, yes.

10   Q   All right.  Do you have any evidence which indicates that

11       Officer Leal did not really think that at the moment that

12       he shot?

13   A   No.  I have no evidence to speak to what was going through

14       his mind.  I'm not a mind reader.

15   Q   All right.  Do we agree that if Officer Leal did believe at

16       that moment that he or Officer Upshaw were in - at risk of

17       death serious bodily injury by Mr. Allen, do we agree that

18       it would be appropriate for Officer Leal to use deadly

19       force?

20   A   If he reasonably believes so, yes.

21   Q   All right.  Can you tell me that it would be unreasonable

22       based upon what was happening at the moment that

23       Officer Leal shot for Officer Leal to believe that?

24   A   We have the indications both from - from Leal's description

25       of his position and correlating that this would be the

1   for a weapon, what we would call continue a furtive

2   movement.  In the vacuum, the shooting is justified.  My

3   concerns, as you saw in the report, were activities and

4   elements that led up there to the - predictably what

5   provoked a violent physical reaction.

6   Q   Okay.  And I just want to make sure I understand. What

7       you're saying to me is what Officer Leal describes if, in

8       fact, that's what he perceived at the moment that he fired,

9       we agree it would be appropriate for him to use deadly

10      force; am I correct?

11  A   Within the window of the beginning of the movement to the

12      shots fired by Leal?

13  Q   Yes, sir.

14  A   Yes.

15  Q   And what you are critical of are the things that the

16      officers did or didn't do at any time prior to when they

17      encountered Mr. Allen in the home and until such time as

18      Mr. Allen made whatever movement he made that caused

19      Officer Leal to shoot; is that correct?

20  A   I'm not sure I understand your question.  Did you say prior

21      to the entry wounds?

22  Q   No. I'm sorry.

23  A   Perhaps the court reporter can read it back.

24  Q   No.  That's okay.  I say stuff like that all of the time.

25      As I understand then, what you are critical of are some of

MASSAD AYOOB - by Mr. Helfand

1      My concerns, as you know, come at the moments before where

2      there was ample opportunity to prevent this escalation and

3      the opportunity was not taken.

4   Q   Okay. And I think that that's - I think I understand that.

5      Do you recall that Officer Leal attached some significance

6      to the fact that Mr. Allen was looking directly at him

7      immediately before beginning whatever movement caused

8      Officer Leal to believe it was necessary to shoot?

9   A   Yes.

10   Q   Do you attach any significance to that?

11   A   I said yes.

12   Q   And do you attach significance to that?

13   A   Yes.

14   Q   And what is significant about that in your mind from a law

15      enforcement perspective?

16   A   It would fit the profile of what we call a target stare.

17   Q   All right. So it would not be unreasonable in your

18      opinion - well, I shouldn't phrase questions in the

19      negative. Would it be reasonable in your opinion for an

20      officer who sees a stare like that to have a fear that they

21      were about to become a target?

22   A   Yes.

23   Q   And, in fact, acquiring the target would be an important

24      element to using a weapon by anyone in an effective manner,

25      wouldn't it?

MASSAD AYOOB - by Mr. Helfand

C E R T I F I C A T E

I, CARMAN PRANTE, a duly authorized Notary Public in and for the State of Washington, residing at Elma, do hereby certify:

That the foregoing deposition of MASSAD AYOOB was taken before me on the 8th day of April, 1997, and thereafter transcribed by me by means of computer-aided transcription; that the deposition is a full, true and complete transcript of the testimony of said witness;

That the witness, before examination was by me duly sworn to testify the truth, the whole truth and nothing but the truth, and that the witness reserved signature;

That I am not a relative, employee, attorney or counsel of any party to this action or relative or employee of any such attorney or counsel, and I am not financially interested in the said action or the outcome thereof;

That upon completion of signature, I shall securely seal the original deposition transcript and promptly serve the same upon Mr. William Helfand, counsel for the Defendants.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my official seal this 14th day of April, 1997.

_____
CARMAN PRANTE
PRANTCD315CK