Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 1 of 161

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

NOEL C. ALLEN, Individually,          *
and on behalf of the Estate of        *
TRAVIS O'NEILL ALLEN, DECEASED,       *
and REBECCA O'NEILL ALLEN,            *
                                      *
        *Plaintiffs*                  *
                                      *
vs.                                   *
                                      *
MICHAEL LEAL,                         *
CARLE UPSHAW,                         *
BELLAIRE POLICE DEPARTMENT,           *
and the CITY OF BELLAIRE, TEXAS,      *
                                      *
        *Defendants*                  *

United States Court
Southern District of Texas
FILED

MAY 3 0 1997

Michael N. Milby, Clerk of Court
Mail - Screened by U.S. Marshal

CIVIL ACTION NO. H-96-0030

PLAINTIFFS' RESPONSE IN OPPOSITION TO THE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT AND THE MEMORANDUM OF LAW
IN SUPPORT OF THE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE DAVID HITTNER, UNITED STATES DISTRICT JUDGE:

COMES NOW, Plaintiffs NOEL C. ALLEN, Individually and on behalf of the Estate

of TRAVIS O'NEILL ALLEN, AND REBECCA O'NEILL ALLEN, who file this their

Response in Opposition to the Defendants' Motion for Summary Judgment and its accompanying

Memorandum of Law in Support of the Defendants' Motion for Summary Judgment, and in

support thereof, would respectfully show unto the Court as follows:

I.

On July 15, 1995, Travis O'Neill Allen was shot in the back and killed by Police Officer

Michael Leal while in the course and scope of his duties with the Bellaire Police Department.

Plaintiffs filed a civil rights lawsuit against the Defendants under the guidelines set by 42

U.S.C.A. § 1983.

## II.

Defendants' Motion for Summary Judgment, and its accompanying Memorandum of Law in Support of the Defendants' Motion for Summary Judgment was filed on May 10, 1997. Plaintiffs' response in opposition to same was filed in accordance with the provisions of FED.R.CIV.P. 56 and Local District Rule 6.

## III.

Defendants' motion for summary judgment is nothing more than a request for relief. Plaintiffs' submit that the substantive argument raised by the Defendants lies within their Memorandum of Law. In that connection, Plaintiffs hereby deny any and all allegations contained within their motion for summary judgment and request the Court to deny same. Henceforth, the Plaintiffs will only substantively respond to the Defendants' Memorandum of Law in Support of their motion.

### IV. Objections to Defendants' Summary Judgment Evidence

Plaintiffs object to the evidence of Dr. Edward Bellas on the grounds that defendants' failed to timely designate him as an expert witness and further in that plaintiffs had previously communicated with Dr. Bellas regarding his becoming an expert witness in these proceedings. This contact occurred prior to defendants' contact. Hence, any opinions which might be expressed by Dr. Bellas are in invasion of the attorney-client privilege and a violation of the party-communications' rule. The expert opinion which has been expressed by Dr. Bellas is the subject of a pending motion to strike for failure of the defendants to timely designate him as an expert witness.

CMPDF - www.fastio.com

V. Evidence in Support of the Plaintiffs' Response

In support of this response in opposition to the defendants' memorandum of law in support of their motion for summary judgment, plaintiffs have attached the following exhibits:

A.    Photographs

Exhibit "1"    Crime scene photograph showing the back porch and windows of the Deal Residence.

Exhibit "2"    Crime scene photograph of Travis Allen.

Exhibit "3"    Crime scene photograph showing the body of Travis Allen.

Exhibit "4"    Crime scene photograph showing the body of Travis Allen.

Exhibit "5"    Autopsy scene photograph showing the entry wounds on Travis Allen's back.

Exhibit "6"    Crime scene photograph showing the body of Travis Allen.

Exhibit "7"    Crime scene photograph showing position of cartridge casing and also bloodstain on side of couch.

Exhibit "8"    Crime scene photograph showing second cartridge casing under rug and blood stain relative to carpet and rug.

Exhibit "9"    Autopsy photograph of Travis Allen's left hand.

Exhibit "10"    Autopsy photograph of Travis Allen's right hand.


B.    Expert's reports

Exhibit "11"    The Expert Report of Dr. Sparks Veasey.

Exhibit "12"    The Expert Report of Dr. Irving C. Stone.

Exhibit "13"    The Expert Report of Mr. Massad Ayoob.

3

C.    Policy Manuals

        Exhibit "14"  The policy manuals of the Bellaire Police Department,
                      specifically, the policy statements regarding (a)
                      Communicable Disease Prevention; (b) Use of Force; and
                      (c) High Risk Operations.

        Exhibit "15"  The policy manuals for the Houston Police Department,
                      including (a) Use of Force, (b) Arrest and Apprehension,
                      and (c) Handcuffing Prisoners.

D.    Statements

        Exhibit "16"  Walk-around statement given by Officer Leal to
                      investigators immediately after the shooting.

        Exhibit "17"  Officer Michael Leal.

        Exhibit "18"  Officer Carle Upshaw.

        Exhibit "19"  Carolyn Deal.

E.    Depositions

        Exhibit "20"  Officer Michael Leal.

        Exhibit "21"  Officer Carle Upshaw.

        Exhibit "22"  Chief of Police Randall Mack.

        Exhibit "23"  Detective D. L. Oglesby.

        Exhibit "24"  Lieutenant Neill P. Brady.

        Exhibit "25"  Defendants' Police Operations Expert, David Grossi.

4

## VI. Response to Factual Allegations Raised by the Defendants

Plaintiffs are without sufficient information to either admit or deny the allegations contained within paragraph 3 of the defendants' memorandum of law in support of their motion for summary judgment. Hence, for pleading purposes, those allegations are denied. Plaintiffs submit that Travis Allen was not trying to harm the officers. Plaintiffs further add that the residents of 4407 Acacia, Carolyn and Edgar Deal, had exited onto the roof and had informed Officer Upshaw that no one else was supposed to be in their residence. In that connection, see Exhibit "16" (walk-around statement of Officer Leal, taken July 15, 1995, page 1, lines 17-18, "...we made sure the people (the Deals) got out...."); Exhibit "17" (statement of Officer Leal, page 1, line 22-23, "The dispatcher advised me that the residents of the house (the Deals) are leaving via the second story.")); Exhibit "18" (statement of Officer Upshaw, page 1, line 19-21, "I went to the rear of the house and observed the homeowners (the Deals) to be on the roof... I advised them to stay on the roof for the time being.").

Plaintiffs admit that Officer Upshaw saw Travis Allen in the rear of the Deal Residence, and that he instructed Travis Allen to come to a sliding glass door. Plaintiffs admit that Travis Allen attempted to open the sliding glass door. Plaintiffs deny that the sliding glass door was open. Plaintiffs deny that Travis Allen went to another part of the house. Plaintiffs deny that Travis Allen was ever out of the sight of Officers Leal and Upshaw. Plaintiffs deny the implied allegation that Travis Allen was attempting to hide from the officers and was not cooperative. Plaintiffs deny that Travis Allen failed to lower himself to the floor of the house before the officers entered the Deal Residence, and that he was failing to comply with their commands to surrender. Plaintiffs deny that Travis Allen refused to comply with the verbal commands of the

5

officers.   Plaintiffs admit the remaining allegations contained within paragraph 4 of the defendants' memorandum of law in support of their motion for summary judgment.  Plaintiffs further submit that Travis Allen was complying with the officers' instructions and was trying to surrender.  See Exhibit "17" (statement of Officer Leal, page 2, lines 17-18, "Eventually, the suspect lowered his body toward the floor, but not completely.... I entered the house, with Officer Upshaw behind me,...."); Exhibit "18" (statement of Officer Upshaw, page 2, lines 4-5, "The suspect appeared to lay down on the ground and at that point I entered the house behind Corporal M. Leal,...."). Plaintiffs further add that Officer Leal had an unrestricted view of the interior of the house from the side and back due to the presence of a large number of windows and at all times he could easily see Travis Allen in the house.  See Exhibit "17" (statement of Officer Leal, page 2, lines 8-10).

Plaintiffs deny the allegations contained in paragraph 5 of the defendants' memorandum of law in support of their motion for summary judgment.

Plaintiffs deny the allegations contained in paragraph 6 of the defendants' memorandum of law in support of their motion for summary judgment.

Plaintiffs deny the allegations contained in paragraph 7 of the defendants' memorandum of law in support of their motion for summary judgment.

The remainder of the defendants' memorandum of law in support of their motion for summary judgment is nothing more than a legal argument in support of the defendants' contentions.   To the extent that any allegations are raised within the remainder of the memorandum of law in support of the motion for summary judgment, whether factual, implied or otherwise, plaintiffs deny same and request the Court to deny the defendants' motion for

6

summary judgment and it accompanying memorandum of law in support of the motion in their combined entirety.

VII. ARGUMENT AND AUTHORITIES

**A.    Summary Judgment Law**

Summary Judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to summary judgment as a matter of law. FED. R. CIV. P. 56(c); *Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991). The moving party bears the burden of establishing there are no genuine issues of material fact. *Id.* There is a genuine issue where the record taken as a whole could lead a rational trier of fact to find for the non-movant. *See Matshita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To determine whether there are any genuine issues of material fact, the court must first consult the applicable law to ascertain what factual issues are material. *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Fields v. City of South Houston*, 922 F.2d at 1187. A fact is "material" if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must then review the evidence bearing on those issues, viewing the facts and inferences in the light most favorable to the non-movant. *Fields v. City of Houston*, 922 F.2d at 1187. There are genuine issues of material fact which preclude summary judgment as a matter of law. The defendants' have not met their burden of establishing lack of genuine issues.

**B.    Plaintiffs' 42 U.S.C.A. § 1983 Claims**

In order to prevail upon a claim under § 1983, the plaintiffs must show (1) an injury; which (2) resulted directly and only from a use of force that was clearly excessive to the need;

7

CHAPDF - www.fastio.com

and (3) the excessiveness of which was objectively unreasonable. *Johnson v. Morel*, 876 F.2d 477, 480 (5th Cir. 1989).

## 1. An Injury To Plaintiffs Occurred.

The Plaintiffs suffered an injury; Travis Allen was shot twice in the back, thereby killing him. The "injury" requirement of an excessive force claim has been met. *Cf.*, *Hale v. Townly*, 45 F.3d 914, 918 (5th Cir. 1995) (bleeding cuts and swelling have been held to be legally "significant injuries") (citing *Olvier v. Collins*, 914 F.2d 56, 59 (5th Cir. 1990)).

## 2. The Injury Resulted Directly and Only From The Use of Force That Clearly Was Excessive To The Need.

### A. Excessive Force Used by Officer Leal.

The silver bullet which slays the officers' rendition of the facts is the physical evidence left at the homicide scene. That evidence reveals Travis Allen was laying flat on the floor, face down, when he was shot in the back, twice, at extremely close range.

Dr. Sparks Veasey, plaintiffs' forensic expert, stated in his report:

The tracks of the bullets ... extend from the decedent's back to front, slightly upward, and slightly to the left. I would estimate the trajectories to be approximately 10 - 15 degrees to the left with respect to the sagittal plane.

\* \* \*

The bullet tracks are inconsistent with the individual having been on his left side at the time he sustained the two wounds. The entry wounds in the back demonstrate no significant eccentricity of the marginal abrasions (no ovoid configuration of the wounds). If Corporal Leal were to the decedent's right and below the level of the entry points and the decedent had rolled onto his left side, the area of the entrance wounds would have been essentially obscured from Corporal Leal's vision, and if the individual were only partially on his left side, one would expect the wounds would be oblong in character (having an eccentric marginal abrasion). The track of both bullets are an estimated 10- 15 degrees to the left as previously noted, and this degree of right to left trajectory would be more consistent with the decedent being flat on the floor at the time the gunshot wounds were sustained. The wounds are inconsistent with the decedent having significantly rolled to his left at the time the shots were fired.

8

See Exhibit "11" (expert report of Dr. Sparks Veasey, page 3). Dr. Veasey also said

that based upon the pattern of stippling on the clothes and body, Travis Allen was shot at close

range, approximately 18 inches, plus or minus three inches. *Id.* This conclusion was supported

by Plaintiffs' consulting ballistics' expert, Dr. Irving C. Stone, who stated the following:

> Comparing the powder pattern on the shirt and the stippling patten described in
> the autopsy protocol, as well as seen in photographs of the back of the decedent,
> it is concluded that the range of discharge that would duplicate the pattern with
> this S&W pistol and W-W STHP ammunition is **eighteen inches, plus or minus
> about three inches.**
>
>                 \* \* \*
>
> It is further concluded that the uneven expansion of the two STHP bullets is
> consistent with these projectiles passing into the body at an angle other than 90
> degrees (straight in), probably about 15 degrees, to account for the passage from
> rear to front, right to left and slightly upwards.

See Exhibit "12" (expert report of Dr. Irving C. Stone, page 2) (emphasis in original).

Plaintiffs' police operations expert, Mr. Massad Ayoob likewise concluded Travis Allen

was laying flat on the floor when shot. In his expert report, dated March 13, 1997, he stated

that:

> *1)     The wounds on Travis Allen's body as shown in the autopsy pictures are
> not consistent with a man who was turning onto his left side when shot.* The
> frontal portion of the body shows two marks consistent with the resting position
> of the expanded Silvertip bullets that almost exited, but did not exit, the body.
> These injuries are normally bluish in color, due to bruising and blood
> accumulation beneath the skin. However, in this case they are red in color and
> appear abraded. This would be consistent with the skin on the frontal portion of
> the body being compressed between the nearly spent bullets and a hard surface
> in contact with the frontal portion of the body. This in turn indicates that Travis
> Allen would have been in a chest down position, the front of his torso in full
> contact with the floor beneath him, when he sustained these two gunshot wounds.

Exhibit "13" (expert report of Massad Ayoob, page 1, subparagraph 1). In other words,

the floor prevented the bullets from exiting Travis Allen's body. Clearly, this raises an issue

of material fact and brings the credibility of the officers in serious question. Rather than appearing to resist arrest, the physical evidence strongly suggests that Travis Allen was face down on the floor when he was summarily executed by Officer Leal.

The officers state that at all relevant times, Travis Allen was either in the prone or pushup position, face down on the ground. This tends to corroborate the Plaintiffs' contentions that Travis Allen was face down on the floor when he was killed, and is further supported by Exhibits "4" and "5", crime scene photographs, which tend to support the findings of the Plaintiffs' experts. Exhibit "4" shows Travis Allen's backside after he was shot. The size and shape of the entry wounds reflect a circular shape. Further, the powder burns on the shirt accumulate around the wounds themselves, with a slight right to left pattern. This evidence strongly indicates that the muzzle of Officer Leal's gun at the moment of discharge was slightly to the right and behind the wounds reflected on Travis Allen's back, and the shots were fired from a distance of about 18 inches, plus or minus 3 inches. Exhibit "5" also shows Travis Allen's backside. As noted by Dr. Veasey, the entry wounds are plainly visible, and are round, not ovoid. According to Officer Leal, Travis Allen rolled onto his left side and visually acquired the officer thereby prompting the discharge of his firearm. It would have been physically impossible for that event to occur given the circular nature of the entry wounds. If Travis Allen had rolled over to his left side and visually acquired Officer Leal, who was standing to his right and behind him, Travis Allen's back would no longer have been in Officer Leal's view. The bullets would have to had to have entered Travis Allen's right side or, if they had entered his back, then at a severe angle leaving an ovoid pattern to the entry wounds. Inasmuch as Det. Oglesby failed to make any measurements, or take any surveys of the

10

homicide scene, there is no physical evidence whatsoever which substantiates Officer Leal's tainted version of the shooting.

Detective Oglesby testified in deposition that Officer Leal stated to him that he leaned over the couch improving his position at the moment of firing his weapon. Exhibit "23" (deposition testimony of Detective Oglesby, page 150, lines 2-5). A review of the photographic evidence shows that Travis Allen was very close to the couch when he was shot, bearing out Detective Oglesby's statement. Exhibit "3" is a crime scene photograph taken shortly after Travis Allen was killed. The position of the large bloodstain to the right of Travis Allen's head, and the spewing pattern of blood across the carpet and the oriental rug, fix the position of Travis Allen at the moment he was killed. It is clear from a review of this evidence that Travis Allen was positioned quite close to the white couch. In order for Travis Allen to "visually acquire" Officer Leal, Allen would have had to have substantially turned on his left side, either perpendicular or past perpendicular to the floor. In that event, Officer Leal could not possibly have been either to the right or behind Travis Allen in order for his shots to match up with the entry wounds. He would have had to have been to Travis Allen's left, in a position already taken by Officer Upshaw. Therefore, once again, the physical evidence does not support Officer Leal's version of the events of July 15, 1995. In fact, it would have been physically impossible for Travis Allen to have rolled over on his left side, "visually acquire" Officer Leal, and be shot where he was shot with Officer Leal standing below and to his right. The laws of physics do not allow for the bullet to have travelled in an "S" shape pattern and hit Travis Allen from the left side. Given the physical restraints which were evident, Officer Leal's version is erroneous and puts his credibility into serious question.

11

Exhibits "6", "7" and "8" further support plaintiffs' factual assertions. Exhibit "6" also helps fix the position of Travis Allen's body at the moment he was shot. Blood stains can be seen near the sliding glass door, but there are no bloodstains in the open area between the stairs by the sliding door and Travis Allen's head. This contradicts the officers' assertions that at the time Travis Allen turned and "visually acquired" Officer Leal, he had his left hand extended in front of him on the floor for leverage. If Travis Allen had extended his left hand in such a fashion, bloodstains would be there to prove it. They are not. Also, in Exhibit "7", there is a substantial stain against the side of the white couch. Travis Allen's head was in contact with or very close to the couch at the moment he was shot, not turned back at an angle to "visually acquire" Officer Leal. Exhibit "7" also shows the position of a cartridge ejected from Officer Leal's weapon. The Smith & Wesson firearm utilized by Officer Leal ejected its casings to the right, and the position of the cartridge supports the fact that Officer Leal was on the couch above Travis Allen when he fired the weapon, not standing behind him or to the right at the time of shooting. Finally, Exhibit "8" shows the path of Travis Allen's blood across the floor carpet and onto the oriental rug, and also a large stain which represents the location of Travis Allen's head at the moment he was shot.

The evidence provided herewith supports plaintiffs' contentions that Officer Leal was leaning over the couch, or kneeling on the couch, at the time he discharged two shots from his gun into Travis Allen. The physical evidence completely rebuffs the testimony of Officer Leal and brings his credibility seriously into question. The evidence reflects that it would have been physically impossible for Travis Allen to have "rolled over" on to his left side and "visually acquired" Officer Leal. Instead, Travis Allen was laying flat against the floor, on his stomach,

and chest, when he was killed. Clearly, a genuine issue of material fact exists which precludes summary judgment from being granted in favor of the defendants.

## B. Excessive Force Used by Officer Upshaw.

Officer Upshaw's clumsy attempts to "subdue" Travis Allen after Allen had been subdued by the officers was, in the words of Massad Ayoob, "more akin to surfing." Exhibit "13" (expert report of Massad Ayoob, page 1). As the officers approached Travis Allen, they told him to get face down on floor. Travis Allen complied with their commands and lay down on the floor. While in full compliance with their commands, and with the full knowledge that Travis Allen was bloody, Officer Upshaw holstered his weapon and reached over to handcuff him. However, instead of handcuffing Travis Allen, as he was supposed to do, Officer Upshaw hesitated. The stated reason for his failure to handcuff Travis Allen was his fear of the blood, which he allegedly saw for the first time inside the Deal Residence. See Exhibit "18" (statement of Officer Upshaw, page 2, "I was attempting to handcuff the suspect when I noticed that he was covered with blood. I called for some latex gloves on the radio.") That does not seem plausible given the officers' prior statements. Officer Leal stated that he noticed Travis Allen was very bloody before the officers entered the Deal Residence. Further, Officer Upshaw was about a foot away from Travis Allen when he previously directed him to move the sliding glass door at the back of the house. Given the fact that Travis Allen was in full view of the officer, it doesn't seem possible that Officer Upshaw would have forgotten that Travis Allen was bloody before he reached over to handcuff him. If he was afraid of the blood, he should have had his gloves on before entering the Deal Residence. There was no hurry. The Deals were on the roof out of harm's way. Travis Allen was already on the floor and he was going no where. There was

13

no need to rush the residence and subdue the helpless victim, unless a wild west attitude prevails in the City of Bellaire. Officer Upshaw had plenty of time to get his gloves on before handcuffing Travis Allen.

Unfortunately for Travis Allen, Officer Upshaw failed to secure him during this window of opportunity. The reason cited by Officer Upshaw for his failure to complete the handcuffing of Travis Allen was his alleged noticing for the first time that Travis Allen was bloody. *Id.* As shown hereinabove, this explanation is simply ludicrous inasmuch as both officers saw Travis Allen through the windows; they had their flashlights shining on him, Travis Allen was standing at the door trying to open it, a foot away from Officer Upshaw, and Officer Leal, just twenty feet away, saw Allen and noted that he was bloody. Exhibit "17' (statement of Officer Leal, page 2 "I saw Officer Upshaw's flashlight shining through the rear windows of the house. The majority of the side and rear of the house is windows and my view into the interior of the residence was unrestricted.... I saw a white male inside the residence and I immediately noticed that he was very bloody. He appeared to be cut on his arms and hands."; Exhibit "21" (deposition of Officer Upshaw, page 291, Officer Upshaw tried to open glass door, page 293-294, Officer Upshaw commanded Allen to come to the door); see also exhibits "9" and "10".

At all times relevant to this proceeding Travis Allen was in compliance with the officers' commands. Defendants even admit, in their Memorandum, that when Officer Shelor went to fetch latex gloves, the officers "were hopeful that the suspect would not make any further attempts to resist, ...." Defendants' Memorandum at page 5, line 1). After Officer Upshaw ceased his attempt to handcuff Travis Allen, Officer Shelor was sent to retrieve latex gloves while Officer Leal held Travis Allen at bay with his service weapon.

14

According to Officer Upshaw, he stood on Travis Allen's spine, right in the nape of his back, at times with both feet, in an attempt to keep Travis Allen from doing "push-ups". It is quite possible that a 195 pound man, with hard rubber boots, standing on the back of a 128 pound boy, would seriously impair Travis Allen's ability to breathe. There was an industry accepted practice available for Officer Upshaw to restrain Travis Allen which would not have impaired his breathing. Unfortunately, this method was not followed by Officer Upshaw. Instead of leaning over Travis Allen, with his knee on Travis Allen's shoulder blades, Officer Upshaw chose to ride the wave of Travis Allen's back, all the way to the Gulf. This was an improper method of securing a suspect, pending the retrieval of latex gloves. The only thing Officer Upshaw was succeeding in doing was denying Travis Allen the right to breathe.

In her affidavit, Mrs. Carolyn Deal states she heard the officers cursing just prior to shooting Travis Allen. Exhibit "19" (affidavit of Carol Deal, page 2, lines 20-21). Travis Allen said nothing during the encounter, with the exception of grunting. How is that a menace to the officers' safety? One officer stood on Travis Allen's back, while the other officer leaned over the couch and pointed his gun at him, all the while cursing and confusing him even further.

When Officer Upshaw failed to apply the handcuffs on Travis Allen, the defendants' house of cards began to collapse. Massad Ayoob described Officer Leal's conduct thusly:

*2) The described techniques used by the officers to restrain Travis Allen, to wit standing on him with one or both feet, were illogical, impractical, and beneath the standard of care I would expect from a trained police defensive tactics (unarmed control and restraint of suspects) instructor* (referring to Officer Leal). Stabilizing the arms and shoulders of Allen could have been better accomplished by one or both officers kneeling on the suspect, particularly on his shoulder area, lowering the center of gravity of the officer(s) and affording much more control. In particular, the technique of standing on Allen's back with both feet is not

15

taught anywhere to my knowledge, and even to a layman would be obviously ineffective. Standing upright with both feet on a person's back is more akin to riding a surfboard than to amy method of stabilizing a resisting person that I am familiar with.

Exhibit "13" (expert report of Massad Ayoob, page 1).

Under these circumstances, it is clear that Officer Upshaw's use of force was excessive to the need. Travis Allen did not pose a threat. He had stopped resisting. He was laying on the floor, on his stomach and chest. Officer Upshaw stood on Travis Allen, with both feet, impairing his ability to breathe. Officers were cursing Travis Allen. Officers cannot provoke a response from a suspect who has yielded to their authority, and then claim they shot him out of fear for their lives. That is a constitutional deprivation. *See Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995) (reasonableness of defendants' actions depends both on whether officers were in danger at moment they used force and whether defendants' own reckless or deliberate conduct unreasonably created need to use such force)(citing *Bella v. Chamberlain*, 324 F.3d 1251, 1256 & n. 7 (19th Cir. 1994)("Obviously, events immediately connected with the actual seizure are taken into account in determining whether the seizure was reasonable.")(following *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 1871-72, 104 L.Ed.2d 443 (1989))).

### 3. The Excessiveness of the Force Was Objectively Unreasonable.

The crux of plaintiffs' claims turn on what Travis Allen was doing when he was shot, and the answer to the question of what Travis Allen was doing at that moment turns on whether the officers' version of the facts is a true representation of what happened, or whether the version based upon the physical evidence is a true representation of what happened. There are genuine issues of material fact on the question of whether excessive force was used by Officer

16

Leal. There are genuine issues of material fact on the question of whether Officer Upshaw, by standing on Travis Allen, bruising his back and impairing his ability to breathe, used excessive force. When the officers sent Officer Shelor for gloves, Travis Allen had stopped resisting. He was on the ground. He was neither a threat to the officers nor the Deal's who were already outside the house. His only fault was being at the wrong place at the wrong time, and having Butch Cassidy and the Sundance Kid hovering over him.

VIII.

Defendants' summary judgment reliance on the testimony of Mr. Ayoob is misplaced. During his deposition, Mr. Ayoob stated that at the precise moment Officer Leal shot Travis Allen, his action was reasonable and the amount of force was not excessive. However, this opinion is based upon Defendant's most favorable interpretation of the evidence, to wit, Travis Allen was not complying with the officers' commands to lay down, that his right hand was in his pocket reaching for something, and that Travis Allen had turned on his side and "visually acquired" Officer Leal. Further, Mr. Ayoob stated that this testimony was limited to only that second wherein Officer Leal pulled the trigger, and did not take into the consideration the officers' failures which led directly to the shooting. Consequently, the defendants' spin doctoring of Mr. Ayoob's opinion is inherently erroneous in that it does not take into account all of the facts and inferences which were favorable to the Plaintiff. Further, Mr. Ayoob's deposition doesn't go into the failings of the polices, practices and procedures of the Bellaire Police Department which either granted an excessive amount of discretion to its officers, or put the fear of God into the officers, thereby precluding them from carrying out their proper duties as police officers, which in turn led to the constitutional deprivation of the Plaintiffs' rights.

17

Moreover, as noted hereinabove, the physical evidence simply does not support the officers' version of the events which culminated in the killing of Travis Allen.

Defendants reliance on the findings of *Young v. City of Killeen, Texas*, 775 F.2d 1349 (5th Cir. 1985) and *Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988)(*en banc*) is also misplaced. In *Young*, the evidence was undisputed that the suspect was reaching for something under his car seat. Unlike that case, plaintiffs in the case at bar have physical evidence which proves otherwise; namely, Travis Allen was unarmed, face down on the ground, when he was twice shot in the back at close range while another officer had his foot in the nape of Travis Allen's back. *Sherrod* is likewise inapposite. As reflected in Officer Leal's deposition, he could see that Travis Allen was unarmed and there were no weapons in the immediate vicinity. Exhibit "20", page 113, lines 16 - 25. Thus, defendants' reliance on these two cases is without merit.

IX.

The facts in this proceeding establish that the City of Bellaire is liable. The evidence and inferences, viewed in the light most favorable to plaintiffs, establish that a constitutional deprivation occurred. The City's argument that sovereign immunity applies is inapplicable inasmuch as either its policies or procedures, and the customs and practices of its police force led to the constitutional deprivation of Plaintiffs' rights.

Execution of government policy or custom-- whether made by lawmakers or by those whose edicts or acts may fairly be said to represent official policy-- which inflicts an injury, subjects the government as an entity to responsibility under 42 U.S.C. § 1983. *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611, 638 (1978); *See Fields v. City of South Houston, Texas*, 922 F.2d 1183, 1191-1192 (5th Cir.

18

1991)(A municipality is liable under section 1983 for a deprivation of rights protected by the Constitution or federal laws that is inflicted pursuant to official policy).

The Fifth Circuit has defined "policy" as (1) a policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's law making officers or by an official to whom the lawmakers have delegated policy-making authority, or, (2) a persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy. *Scott v. Moore*, 85 F.3d 230, 233-234 (5th Cir. 1996*); Eugene v. Alief Independent School District*, 65 F.3d 1299, 1304 (5th Cir. 1995); *Johnson v. Moore*, 958 F.2d 92, 93 (5th Cir. 1992); *Palmer v. City of San Antonio, Texas*, 810 F.2d 514 (5th Cir. 1987); *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)(*en banc*).

## X.

Actual or constructive knowledge of such a custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority. *Palmer v. City of San Antonio, Texas*, 810 F.2d 514 (5th Cir. 1987); *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir. 1984)(en banc). An isolated incident is not sufficient to show that a custom exists. *Palmer v. City of San Antonio, Texas*, 810 F.2d 514 (5th Cir. 1987). The connection must be more than *de facto*, the policy or custom must be the moving force of the constitutional violation. *Palmer v. City of San Antonio, Texas*, 810 F.2d 514 (5th Cir. 1987). In order to overcome summary judgment, plaintiffs must (1) identify the policy or custom of which they complain, (2) connect the policy or custom to the government entity itself,

19

and (3) show that the particular injury was incurred because of the execution of that particular policy or custom. *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir.), (*en banc*), *cert denied*, 472 U.S. 1016 (1985).

## XI.

Plaintiffs complain of several policies, practices, or customs of the Bellaire Police Department, to wit:

### (A)    Communicable Disease Policy:  A Shadow of Fear

General Order GEN-075, Communicable Disease Prevention, states officers "<u>should assume</u> all persons could be potential carriers" of a communicable disease. Exhibit "14-a", page 1, Section 075.04(A)(emphasis added). The policy states that officers "<u>shall</u>" wear latex gloves when handling suspects with body fluids on them, and further encourages officers to wear gloves at all times when handling suspects. *Id.*, page 2, Section 075.04(B)(emphasis added). The policy later states officers "<u>shall not refuse</u> to <u>arrest</u> or <u>otherwise physically handle</u> any person who may have an airborne or communicable disease unless appropriate protective equipment is not available." *Id.*, page 3, Section 075.05(A)(emphasis added).

On its face the policy casts a shadow of fear over officers: the potential to contract AIDs; thus, Officers should assume <u>all</u> persons are potential carriers. Everyone. Period. No questions asked, no discretion permitted. Officers <u>shall</u> use disposable gloves when handling individuals contaminated with bodily fluids, such as blood. And, if gloves are not immediately available to officers, they may refuse to arrest or otherwise handle any person who may have a communicable disease. Any person is defined as <u>all of us</u>: everyone is a potential carrier.

20

General Order 075 deprives the constitutional rights of suspects to live long, and maybe happy lives in that the order impedes officers' ability to carry out their duties in the ordinary course of employment. The order puts the fear of God into police officers. As in the alleged circumstance of Officer Upshaw, it causes police officers to hesitate before they secure and handcuff suspects, thereby allowing a window of opportunity to pass, which, in the case of Travis Allen, led to tragic results. While General Order 075 puts fear into the heart of Bellaire Police Department officers, it conflicts with the duties of those very same officers; namely, arrest and apprehension of suspects. For example, Lieutenant Brady testified that the lack of latex gloves is no excuse in not apprehending and handcuffing a suspect. The Bellaire Police Department expects it officers to immediately handcuff and arrest suspects, regardless of whether the officers are carrying gloves on their person. See Exhibit "24" (deposition testimony of Lt. Brady, page 157, lines 1-25). This contention is corroborated by Plaintiffs' police operations expert, Massad Ayoob, who stated that:

> *3) Travis Allen should have been handcuffed immediately, for the safety of the officers as well as that of the subject Allen.* Allen's behavior had been irrational and violent prior to his being proned out, creating a high risk of him becoming a danger to himself or others, and handcuffing and search were necessary priorities. This is reflected in one document provided in discovery, the Houston PD guidelines, Arrest and Apprehension Section, under "Subject/event" Effecting An Arrest, Page II, item VII B, which states, "If there is reason to believe that an immediate threat of serious bodily injury or death or an immediate threat of the destruction of evidence, or escape exists, the following should be done: 1. Handcuff the prisoner securely enough to protect the officer, avoiding prisoner injury or pain. 2. Double lock the handcuffs whenever possible. 3. Conduct an immediate search (officer of either sex) to secure a weapon..." This would be typical of standard policy and procedure throughout the nation.
>
> The officers appear to have begun handcuffing, then hesitated and stopped until latex gloves could be secured. This indicates that at this time Travis Allen was

21

subdued and could have been safely handcuffed, searched, and transported. The failure to handcuff him during this window of opportunity helped set the stage for the fatal event that followed.

Mr. Ayoob further added:

*4) The immediate unavailability of latex gloves is a questionable excuse for the failure to handcuff Allen when the opportunity existed.* It is rapidly becoming standard custom and practice for uniformed police patrol officers to carry at least one pair of latex gloves in a pouch on their duty belt, for just such occasions. This custom and practice has not yet become as universal as the carrying of service sidearm or handcuffs. While it is not negligent per se in my opinion for an officer not to carry latex gloves on his or her person, the decision not to do so does not eliminate an officer's responsibility to perform his usual duties. In deciding not to purchase a glove pouch for financial reason or not to wear one for reasons of convenience, the officer tacitly accepts the greater risk of exposure to bloodborne pathogens if he or she is in a rescue situation or arrest situation that demands exposure to bodily fluids to carry out obvious duties. Is one to fail to apply direct pressure on the hemorrhaging wound of a child, because the child might be afflicted with a disease and the latex gloves are in the car? If the latex gloves had been on the person of Leal or Upshaw, it would appear that the handcuffing and restraint of Travis Allen could have immediately been effected, and the shooting averted.

Exhibit "13" (expert report of Massad Ayoob, pages 1-2). General Order 075 prevents Bellaire police officers from carrying out their duties in a safe manner, and can lead to tragic consequences. On the one hand, it takes away any sense of discretion by its officers. On the other, the officers are still under a duty to apprehend, arrest, secure and transport suspected criminals. If you are always in fear of contracting a communicable disease, you can't carry out your duties, and the policy is defective on its face; thereby creating a situation where an incident such as the one which befell Travis Allen will ultimately occur. The question is no longer if a wrongful shooting will occur because a police officer is afraid; rather, it became when. Unfortunately for Travis Allen, he fell into that trap.

22

General Order 075 is further defective in that no official policy exists which required the Police Department's officers to carry latex gloves on their person, as part of their regular duty equipment. The official policy is that officers carry protective equipment, including gloves, in their vehicles. Exhibit "14-a", pages 6-7, Section 075.07(B) and (B)(2)(officers responsible for ensuring their assigned vehicles are equipped with list supplies ... "disposable gloves such as latex gloves"). On its face, this would seem to contradict the purpose of the Gen Order 075, in that while Officers are to assume that all persons are carriers of communicable diseases -- implying that officers should fear for their safety -- the policy doesn't require officers to carry their gloves on at all times.

It is apparent that the custom and practice of officers of the Bellaire Police Department is to not carry gloves on their duty rigs. Nonetheless, GEN-075 puts the fear of God into the officers that they might get a communicable disease like AIDs, HIV, or Hepatitis if they come into contact with bodily fluids because, in the words of the policy, everyone (including presumably, fellow officers) is a potential carrier of such disease. As a result of the policy defect, and its attending custom of not carrying gloves, Officer Shelor was sent back to his patrol car to obtain latex gloves (even though he was a train E.M.T. and should have already had gloves on him), while Officer Upshaw stood on Travis Allen's back and Officer Leal attempted to hold Travis Allen at bay with threats of being shot. Why didn't the officers carry out their function as police officers, as noted by Lt. Brady and Mr. Ayoob, and handcuff Travis Allen when they had the chance? If they had done so, Travis Allen would be alive today. The answer is they didn't want Travis Allen's blood on them -- even though the officers saw he was

23

bloody before they went into the Deal residence (which strongly suggests that they could have waited before charging in so as to have their gloves on) -- soaking through their clothes and onto their unprotected skin. General Order 075 led to Travis Allen's death. It deprived him of his constitutionally guaranteed right to live in peace, and hopefully, prosperity.

### (B) Use of Deadly Force: "Stop! Or I'll Have To Shoot!".

The Bellaire Police Department's Use of Force Policy, General Order 100, is defective on its face. It allows officers unlimited discretion in the use of deadly force. It fails to adequately delineate the levels of force an officer may use. It does not tell an officer what appropriate levels of force exist for different circumstances. The official policy defines, and is binding only with respect to the use of verbal and then deadly force; the policy section regarding nondeadly force is ambiguous and not binding on officers. Although its avowed goal is to decrease the amount of discretion officers may use, in fact, the official policy increases that amount of discretion.

General Order GEN-100 [USE OF FORCE], policy comprises 11 pages. Section 100.01 states "... it is the policy of this Department that police officers shall use only that force necessary to effectively bring an incident under control, while protecting the lives of the officer and others." Exhibit "14-b". The purpose of the policy is to "provide police officers with guidelines concerning the use of force, and to limit the discretion that an officer may use when dealing with situations that require the use of force." Exhibit "14-b", Section 100.02.

How is it, then, that of these 11 pages, officers are not provided with any definition of the levels of force available, and the circumstances under which it is appropriate to use them? The policy, right up front, on the second page, authorizes the use of deadly force:

24

CUXPDF - www.fastio.com

A. Police officers are authorized to use deadly force to protect the officer or others from what is reasonably believed to be an immediate threat of death or serious bodily injury.

B. Before using a firearm, officers shall identify themselves and state their intent to shoot, when feasible.

Exhibit "14-b", page 2, Section 100.05.

Regarding the use of nonlethal force, the policy merely states (on page 8!):

Officer shall use the least force necessary that shall best de-escalate the incident and bring the situation under control in a safe manner.

Exhibit "14-b", page 8, Section 100.06, Paragraph A. Paragraph A goes on to state that before using force, an officer must identify himself as an officer, manifest his purpose to arrest, detain, or search a person, and give the reason for the arrest, detention, or search. In other words, before an officer does anything, he must use verbal communication, *e.g.* 'verbal force.' However, the policy is defective in that the course of conduct routinely taken by an officer after the use of verbal force proves unsuccessful is to shoot the assailant. For example, in his deposition, Officer Leal stated:

Question:     It's a practice of people using that form of intimidation - "Stop. Don't move, or I'll shoot"; is that correct?

Answer:       That pretty correct, yes, sir.

Question:     Is there any written policy that says that's what y'all are to do?

Answer:       No.

questions continued on page 173

Question:     But you did say it's kind of developed as a custom among your officers and the officers in general; is that correct?

25

Answer:       Yes, sir, I've heard every officer say it.

See Exhibit "20", deposition of Michael Leal, pages 172 and 173.

Chief of Police Randall C. Mack echoed a similar tone. He was asked whether he had ever threatened to shoot anybody, to which he stated, "Yes". When probed further, Chief Mack was asked whether he had drawn his weapon in a non-life threatening situation and threatened to shoot the suspect. Chief Mack said "Yes". See Exhibit "22", deposition of Chief of Police Randall C. Mack, pages 118 and 119. It is clear from these passages that the "stop or I'll shoot" practice of the Bellaire Police Department permeates the department's rank and file from its chief of police down to its field officers. It has, in fact, become a custom. The point is there is no delineation in the levels of force which can be applied in certain situations. There are only two levels, verbal (Stop or I'll shoot!), and deadly (they shoot!).

The policy is further defective in that other means of force are not made available to Bellaire Police Department Officers. In that connection, General Order 100 states,

> To the extent necessary and reasonable, and in accordance with this directive, an officer shall only use physical strength and skill, authorized baton, authorized "stun" equipment such as the "TASER" gun, or authorized aerosol spray, to apply nondeadly force.

Exhibit "14-b", page 8, Section 100.06, Paragraph B [FORCE OPTIONS](Paragraph B also specifies that an officer *may* use an unauthorized weapon in an extreme emergency). The problem is that each of the nonlethal weapons listed above-- baton, TASER, and aerosol-- are not made available to officers, and an officer is not required to use them; he *may* use such items. Exhibit "14-b", pages 8-9, Section 100.06, Paragraph C ("...officer *may use* an authorized baton..."); Paragraph D ("...officer *may use* an authorized Taser Gun..."); Paragraph E

26

("...officer *may use* authorized aerosol spray..."). Thus, although an officer may use these devices, they are not made available to them and they are not required to use them.

A comparison of the Bellaire Police Department's Use of Force policy and that of the Houston Police Department is helpful in understanding the deficiencies which plague the Bellaire Police Department's policy. The HPD policy states:

> Police officers are authorized to use only that amount of force necessary to effect an arrest or for the protection of himself and others.

Exhibit "15", page 1, Section II. It also says:

> The type of force used, when the situation dictates, can be as follows:
>
> A.    Verbal persuasion.
>
> B.    Unarmed defense techniques.
>
> C.    Police baton, see "Use of Police Baton" (200/2.23).
>
> D.    Battery Operated Defensive Device (Taser).
>
> E.    Deadly Force.

Exhibit "15", page 1, Section III. And it further states:

> Minimum force may be used but is not limited to the following events:
>
> A.    Arresting an offender.
>
> B.    Overcome unlawful resistance.
>
> C.    Prevent escape of a prisoner.
>
> D.    Defending yourself or others.
>
> E.    Quell a violent disturbance.

Exhibit "15", page 2, Section IV.

HPD's policy is only two pages long; but it (1) presents the different levels of force possible in a confrontation, and (2) describes instances in which minimal force may be required. In HPD's policy the emphasis is on *minimal* force. Deadly force is given its proper place: **after** the first four options. Even then the section devoted to deadly force is one line long, unlike the City of Bellaire's which is eight pages long.

The Bellaire Policy Manual gives the use of deadly force a place of honor: <u>First</u>. On the other hand, HPD's policy does not jump into a lengthy discourse on the makes and models and caliber of weapons and ammunition officers can use. The HPD policy manuals include sections devoted to Arrest and Apprehension, as well as Handcuffing, Exhibit "15". The Bellaire Police Department Policy Manual contains no such material, which further creates a custom and practice in that officers employed by the Bellaire Police Department are allowed to determine their own methods for apprehending a suspect, thereby recreating the spirit of The Wild West.

The Bellaire Police Department's Policy on Use of Force is actually policy on the types of firearms and ammunition which officers can carry, what qualification is required, what types of nonlethal weapons are approved, and what qualifications are necessary for officers to use those nonlethal weapons. It pays lip service to the use of force. As such, it is defective on its face, leaving it up to officers in the field to develop policy through custom and practice.

**(C)    Arrest and Apprehension: Custom**.

Bellaire Police Department custom permits officers unlimited discretion in the arrest and apprehension of citizens, including handcuffing prisoners. In fact, there is no handcuffing policy promulgated by the City of Bellaire, despite the fact that it is standard procedure in the nation for police departments to have such policies. Massad Ayoob points to the Houston Police

28

Department's Arrest and Apprehension Policy, Effecting and Arrest, as typical of standard policy and procedure throughout the nation. See Exhibit "13", expert report of Massad Ayoob, page 1.

Bellaire's failure to have such a policy in place, particularly in light of its Contagious Diseases Policy, contributed to the death of Travis Allen. It permitted officers unlimited discretion on how to go about handcuffing prisoners, how long to wait, how to keep a prisoner subdued until they decided to handcuff, and so forth. In Travis Allen's case, he was subdued and could have been safely handcuffed at a very early stage. Exhibit "14" (expert report of Massad Ayoob, page 1, subparagraph 3 (failure to handcuff during window of opportunity helped set stage for fatal event that followed).

### (D) Intoxicated or Otherwise Impaired Individuals: Custom.

The Bellaire Police Department custom permits officers unlimited discretion in the apprehension and arrest of intoxicated or otherwise impaired individuals. There is no policy for dealing with individuals such a Travis Allen who, as noted in the walk-around statement of Officer Leal, was impaired. Although the department owns a Taser device, and that device was in the patrol car of the shift supervisor, there is no policy requiring officers to wait before apprehending an obviously impaired or irrational suspect and call for the Taser. In Travis Allen's case, there was no longer any danger to the residents of the house; they were on the roof. Officers were outdoors, and could plainly see Travis Allen inside. They could have called for the Taser before entering the house. They chose not to do so. They knew he was impaired, yet they killed him anyway.

29

Because there was no policy regarding the handling of impaired suspects, there arose a custom and practice: use force to subdue the suspect, whatever it takes.  Contrary to Bellaire Police Department's policy governing High Risk Operations (see Exhibit "14-c"), which governs rational decision making within a hostage situation, all reason is abandoned and no mention is made on what an officer is to due when confronted with an obviously impaired individual, even though it is a circumstance which is foreseeable with respect to daily police activities.  Why call a supervisor and wait for a TASER to arrive in a non-deadly situation when Officer Leal, a team leader for the department's tactical team, can direct a marine assault against the Deal Residence?!   Only one TASER exists in the Bellaire Police Department's inventory, and essentially, it isn't available as an option for field officers.  Failure to call for the Taser deprived officers of one critical force option to subdue Travis Allen and helped set the stage for the fatal event that occurred.

## XII.  Conclusion

Defendants have failed in their burden of proof.  They have failed to show that there is a lack of genuine issues of material fact which warrant summary judgment being granted in their favor.  On the contrary, the physical evidence of the homicide scene clearly refute the testimony of the attending officers and puts their credibility and motives into question.  The City of Bellaire is no less liable in that it created an environment where an incident such as the one which befell Travis Allen was bound to occur.  These parties need to be held accountable for their actions.  A 17 year old boy is dead, shot twice in the back, because the defendants appointed themselves judges, juries and executioners.  This type of behavior can no longer be tolerated in our society.  Plaintiffs request the Court to deny the motion for summary judgment.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray for the Court to deny the

Defendants' Motion for Summary Judgment and its Attending Memorandum of Law in Support

of same; and for such other and further relief as this Court deems just.

Respectfully submitted this 30th day of May, 1997.

RICHARD HAYNES & ASSOCIATES, P.C.

By: _____

Graydon Wilson
State Bar No. 00786357
J. Blake Haynes
State Bar No. 09285900
Joseph L. Lanza
State Bar No. 00784447
4300 Scotland Street
Houston, Texas  77007
(713) 868-1111 [telephone]
(713) 863-9934 [facsimile]

COUNSEL FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing Plaintiffs' Response in Opposition to the Defendants' Motion for Summary Judgment and the attending Memorandum of Law in Support of the Motion for Summary Judgment was served by first class United States mail, postage prepaid, to Counsel for the Defendants, William S. Helfand, Magenheim, Bateman, Robinson, Wrotenbery & Helfand, L.L.P., 3600 One Houston Center, 1221 McKinney Street, Houston, Texas 77010, on this the 30th day of May, 1997.

J. Blake Haynes

c:\wp51\DWG\Allen\Response\summjudg

1

CM/PDF - www.fastio.com



CMJPDF - www.fastio.com

CVirtPDF - www.fastio.com



CVLPDF - www.fastio.com



4



5

CVtPDF - www.fastio.com



CMPDF - www.fastio.com

6

CutePDF - www.fastio.com



CtxPDF – www.fastio.com

**7**

CIVPDF - www.fastio.com



8

CVisPDF – www.fastio.com



CVIsPDF - www.fastio.com



10



1

CutePDF - www.fastio.com

1

March 14, 1997

Graydon Wilson
Attorney at Law
Richard Haynes and Associates, P.C.
4300 Scotland
Houston, Texas 77007-7394

RE: Noel C. Allen, et al vs Michael Leal et al

Dear Mr. Wilson,

As you know, I was contacted by your office related to the above referenced case. I have been supplied with numerous articles of evidence in this case. Material which I have been supplied includes:

1. The deposition and exhibits of Detective D. L. Oglesby
2. The deposition and exhibits of Lieutenant Neal Brady
3. The deposition and exhibits of Chief of Police Randall C. Mack
4. The deposition and exhibits of Officer Michael Leal
5. The deposition and exhibits of Officer Carle Upshaw
6. The deposition and exhibits of Officer Daniel Shelor
7. The transcript of the July 15, 1995 walk-around interview of Michael Leal
8. The July 15 statement of Carolyn Ryan Deal
9. The July 15 statement of Edgar Deal
10. The July 15 statement of Michael Leal
11. The July 15 statement of Carle Upshaw
12. The August 9 statement of Daniel Shelor
13. The August 2 affidavit of Daniel Shelor
14. The August 3 affidavit of Carle Upshaw
15. The August 3 affidavit of Michael Leal
16. The August 10 statement of Dona Hamilton
17. The August 11 statement of Roger Hamilton
18. The August 15 statement of Michael Allen Morgan
19. The July 16 statement of Michael Allen Morgan
20. The July 15 statement of Allison Sarah Reed
21. The July 15 statement of Jessica McCraken
22. The July 15 statement of Stephany Martin
23. The July 15 statement of Michael Burns
24. The July 17 statement of Nathan Patt
25. The July 18 statement of Amber Avalos


EXHIBIT

26. The August 22 statement of Ben Steinberg
27. The March 5 affidavit of Robert K. Lyon
28. A transcript of the Bellaire Police Department's incoming July 15, 1995 "911" call from the Deals
29. The July 15, 1995 radio log for the Bellaire Police Department
30. The transcript of the Bellaire Police Department's July 15, 1995 dispatched calls
31. An autopsy report prepared by Dr. Bellas
32. A firearm report prepared by Robert Lyon
33. The Bellaire Police Department's offense report prepared by Detective Oglesby
34. The Bellaire Police Department's Internal Affairs report prepared by Lt. Neal Brady
35. The December 9, 1996 report prepared by David Grossi
36. Photographs of the homicide scene taken by a representative of the Harris County Medical Examiner
37. Photographs of the victim at the time of autopsy
38. Photographs of the homicide scene
39. Photographs taken by Detective Oglesby at approximately the time of the autopsy
40. A video tape of a walk-around
41. A video tape removed from Officer Shelor's patrol car
42. An audio tape of "911" calls
43. An audio tape of dispatched calls
44. Internal Affairs' files produced by the Bellaire Police Department
45. Copies of newspaper articles
46. Letters produced by the Harris County District Attorney's office
47. Black and white copies of photographs taken by the Bellaire Police Department
48. Death certificate of Travis Allen
49. Diagrams of police scene
50. The personnel file of Michael Leal
51. Computer printouts concerning background checks on Travis Oneal Allen

I was specifically asked to address the forensic findings in this case. It is my understanding that on July 15, 1995, three officers were dispatched to a burglary in progress at a location in Bellaire. Upon the arrival of the officers, broken windows were observed. An individual subsequently identified as Travis Allen was observed crawling at the front of the house. Travis Allen subsequently went back into the house. While Travis Allen was in the house, and prior to entry of the officers into the house, Travis Allen was observed to have blood on his person.

Subsequently, Travis Allen was confronted in the house, and told not to move from a position in which he was apparently on all fours on the floor.

Officer Upshaw subsequently moved to Travis Allen's left side, and Corporal Leal was near a couch in a position below and to the right of the decedent's torso. Officer Upshaw placed his foot on the decedent's back. Travis Allen reportedly placed his right hand in the waistband of his pants. Further, Corporal Leal attempted to remove Travis Allen's hand, but was unsuccessful. The decedent reportedly then rolled onto his left side, and looked at Corporal Leal, at which time Corporal Leal shot the decedent twice in the back.

The tracks of the bullets, as is evident from the medical examiner photographs as well as the autopsy report, extend from the decedent's back to front, slightly upward, and slightly right to left. I would estimate the trajectories to be approximately 10-15 degrees to the left with respect to the sagittal plane. Both of the bullets, according to the autopsy report, caused severe injuries, either of which would have rendered the individual immediately incapacitated, and would have been expected to subsequently result in death. It is my opinion that the decedent would have a brief cognizance of pain related to the sustaining of either of the two wounds. Based upon the reported damage of the spinal cord, clearly, the decedent would have been unable to have purposefully moved his lower extremities.

The bullet tracks are inconsistent with the individual having been on his left side at the time he sustained the two wounds. The entry wounds in the back demonstrate no significant eccentricity of the marginal abrasions (no ovoid configuration of the wounds). If Corporal Leal were to the decedent's right and below the level of the entry points and the decedent had rolled onto his left side, the area of the entrance wounds would have been essentially obscured from Corporal Leal's vision, and if the individual were only partially on his left side, one would expect the wounds would be oblong in character (having an eccentric marginal abrasion). The track of both bullets are an estimated 10-15 degrees to the left as previously noted, and this degree of right to left trajectory would be more consistent with the decedent being flat on the floor at the time the gunshot wounds were sustained. The wounds are inconsistent with the decedent having significantly rolled to his left at the time the shots were fired.

There is stippling around the wounds, defining the wounds as intermediate in range. I requested a second range determination, and that was performed by Dr. I. C. Stone. His opinion, in keeping with my opinion, is that the wounds were closer than 2 feet. Dr. Stone has related that it is his opinion that the range is approximately 18 inches, plus or minus about three inches. The fact that the pattern of stippling is approximately four inches, as related in the autopsy report, and that the stippling passed through clothing suggests a distance that is less than that initially reported by the examiner from Pasadena.

4

I would be happy to review any additional information that may become available.

Sincerely,

Sparks Veasey, M.D.

CMsPDF - www.fastio.com

I. C. Stone, Ph.D.
2608 Royal Birkdale Drive
Plano, TX 75025-5068

March 13, 1997

Sparks P. Veasey, III, M.D.          Massad F. Ayoob
University of Texas Medical          Lethal Force Institute
    Branch-Galveston                 72 Broadway
509 C.S.B., Route 0747               Concord, NH 03301
Autopsy Service
Galveston, TX 77555-0747

          Re: *Noel C. Allen, et al vs. Michael Leal, et al:*
              Civil Action No. H-96-0300

Dear Sirs:

On March 12, 1997, I examined the T-shirt identified as being
worn by the decedent, Travis O. Allen, when he was shot by a
Bellaire Police officer in July, 1995. The T-shirt had two
defects within one inch of each other in the upper back. These
defects were covered with plastic with no evidence of chemical
testing for lead or nitrites. Microscopic examination revealed
that there is embedded gunpowder within a diameter of about five
inches of the pair of holes. The pattern is assymetric with more
powder on the right side than the left. Evidence is also present
of powder on the underside of the fabric, having penetrated the
fabric and explaining the powder stippling pattern described by
the autopsy surgeon on the decedent's back.

I also examined the two Winchester-Western, 45 Auto caliber
cartridge cases from the scene and two Silver-Tip Hollow Point
bullets removed at autopsy. It is noted that the two STHP bullets
only expanded on one side with the nose portion of the bullet
unexpanded on the other side. This is consistent with the bullets
passing into the body at an angle rather than perpendicular to
the plane of the body.

Along with counsel from the defendants and a Bellaire police
officer, test firing was conducted at a firing range in Houston
using the evidence 45 Auto caliber Smith & Wesson Model 4506-1,
s/n TVBI852 and Winchester-Western 45 Auto 185-gr STHP
cartridges. The targets were 100% cotton over carbon paper over
white paper and mounted on cardboard. Two shots were discharged
close together to each target and at an approximate angle of
about 15 degrees from right to left.

Page 2
March 13, 1997

**Conclusions**
It is important in assigning a range of discharge in this case to
take into consideration not only the powder pattern on the
decedent's shirt, but also that powder stippling occurred on the
body after penetrating the shirt.

Comparing the powder pattern on the shirt and the stippling
pattern described in the autopsy protocol, as well as seen in
photographs of the back of the decedent, it is concluded that the
range of discharge that would duplicate the pattern with this S&W
pistol and W-W STHP ammunition is **eighteen inches, plus or minus
about three inches.**

It is further concluded that the uneven expansion of the two STHP
bullets is consistent with these projectiles passing into the
body at an angle other than 90 degrees (straight in), probably
about 15 degrees, to account for the passage from rear to front,
right to left and slightly upwards.

                    Sincerely,

                    I. C. Stone, Ph.D.
                    Consultant in Forensic Sciences

97003lt1

13

March 13, 1997

TO: David Ghisalbert, Fax 713-863-9934

FROM: Massad Ayoob, fax 603 226 3554

SUBJECT: Report in re: *Allen v. Leal*

      After studying the voluminous discovery provided in re: *Noel C. Allen, et al v. Michael Leal, et al,* I would be prepared to testify to the following opinions at trial.

    1) *The wounds on Travis Allen's body as shown in the autopsy pictures are not consistent with a man who was turning onto his left side when shot.* The frontal portion of the body shows two marks consistent with the resting positions of the expanded Silvertip bullets that almost exited, but did not exit, the body. These injuries are normally bluish in color, due to bruising and blood accumulation beneath the skin. However, in this case they are red in color and appear abraded. This would be consistent with the skin on the frontal portion of the body being compressed between the nearly spent bullets and a hard surface in contact with the frontal portion of the body. This in turn indicates that Travis Allen would have been in a chest down position, the front of his torso in full contact with the floor beneath him, when he sustained these two gunshot wounds.

    2) *The described techniques used by the officers to restrain Travis Allen, to wit standing on him with one or both feet, were illogical, impractical, and beneath the standard of care I would expect from a trained police defensive tactics (unarmed control and restraint of suspects) instructor.* Stabilizing the arms and shoulders of Allen could have been better accomplished by one or both officers kneeling on the suspect, particularly on his shoulder area, lowering the center of gravity of the officer(s) and affording much more control. In particular, the technique of standing on Allen's back with both feet is not taught anywhere to my knowledge, and even to a layman would be obviously ineffective. Standing upright with both feet on a person's back is more akin to riding a surfboard than to any method of stabilizing a resisting person that I am familiar with.

    3) *Travis Allen should have been handcuffed immediately, for the safety of the officers as well as that of the subject Allen.* Allen's behavior had been irrational and violent prior to his being proned out, creating an obvious high risk of him becoming a danger to himself or others, and handcuffing and search were necessary priorities. This is reflected in one document provided in discovery, the Houston PD guidelines, Arrest and Apprehension Section, under "Subject/event" Effecting An Arrest, Page II, item VII B, which states, "If there is reason to believe that an immediate threat of serious bodily injury or death or an immediate threat of the destruction of evidence, or escape exists, the following should be done: 1. Handcuff the prisoner securely enough to protect the officer, avoiding prisoner injury or pain. 2. Double lock the handcuffs whenever possible. 3. Conduct an immediate search (officer of either sex) to secure a weapon..." This would be typical of standard policy and procedure throughout the nation.

      The officers appear to have begun handcuffing, then hesitated and stopped until latex gloves could be secured. This indicates that at this time Travis Allen was subdued and could have been safely handcuffed, searched, and transported. The failure to handcuff him during this window of opportunity helped set the stage for the fatal event that followed.

    4) *The immediate unavailability of latex gloves is a questionable excuse for the failure to handcuff Allen when the opportunity existed.* It is rapidly becoming standard custom and

-1997 10:45PM    FROM MASSAD AYOOB 6032263554                    P. 2

practice for uniformed police patrol officers to carry at least one pair of latex gloves in a pouch on their duty belt, for just such occasions. This custom and practice has not yet become as universal as the carrying of service sidearm or handcuffs.  While it is not negligent per se in my opinion for an officer not to carry latex gloves on his or her person, the decision not to do so does not eliminate an officer's responsibility to perform his usual duties.  In deciding not to purchase a glove pouch for financial reasons or not to wear one for reasons of convenience, the officer tacitly accepts the greater risk of exposure to blood-borne pathogens if he or she is in a rescue situation or arrest situation that demands exposure to bodily fluids to carry out obvious duties.  Is one to fail to apply direct pressure on the hemorrhaging wound of a child, because the child might be afflicted with a disease and the latex gloves are in the car?  If latex gloves had been on the person of Leal or Upshaw, it would appear that the handcuffing and restraint of Travis Allen could have immediately been effected, and the shooting averted.

Respectfully submitted,


Massad Ayoob

enc:  Schedule of Work and Fees thus far (Exhibit C).


*Mfa filecode Av.L*

14

GENERAL ORDER GEN-075, COMMUNICABLE DISEASE PREVENTION

TABLE OF CONTENTS:

SECTION                                                                    BEGINNING PAGE
075.03 Definitions ............................................... 1
075.04 General Prevention Procedures ............................. 1
075.05 Transport And Custody ..................................... 3
075.06 Disinfection Procedures ................................... 4
075.07 Supplies .................................................. 6
075.08 Line Of Duty Exposures To Diseases ........................ 7
075.09 Record Keeping ............................................ 9

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 66 of 161

| GENERAL ORDER: GEN-075 | PAGE: 1 of 9 |
|---|---|
| MANUAL: General Directives | SECTION: All Members |

| SUBJECT/EVENT: Communicable Disease Prevention | ISSUED BY: Chief J.H. Loftin |
|---|---|

DATE ISSUED: 03/31/92          RE STANDARD: N/A
DATE REVISED:
EFFECTIVE DATE: 04/15/92

075.01   POLICY - The Bellaire Police Department shall provide
         it's members with adequate supplies, equipment, and
         training in an attempt to safeguard against infection
         of communicable and airborne contagious diseases.

075.02   PURPOSE - The purpose of this policy is to educate the
         members of the Department concerning the nature and
         potential risks of communicable and airborne contagious
         diseases.  The Department shall provide safety
         procedures outlined herein that will assist in
         minimizing potential exposure.

075.03   DEFINITIONS

A.   AIRBORNE DISEASE - For the purpose of this directive,
     diseases that are highly contagious, such as Tuberculosis
     and Measles, that may be transmitted through the air by an
     infected individual.

B.   BODY FLUIDS - Human liquid and/or solid secretion including
     blood, saliva, urine, vomit, feces, semen, and vaginal
     fluid.  Note: Sweat is not a body fluid for the purposes of
     this directive.

C.   COMMUNICABLE DISEASE - For the purpose of this directive,
     those infectious illnesses, including but not limited to
     Human Immunodeficiency Virus (HIV), Acquired Immune
     Deficiency Syndrome (AIDS), Hepatitis-B Virus (HBV), etc.,
     that are transmitted through contact with the body fluids of
     an infected individual.

075.04   GENERAL PREVENTION PROCEDURES

A.   POTENTIAL CARRIERS - In order to minimize potential exposure
     to communicable and airborne diseases, members should assume
     that all persons could be potential carriers of a said
     diseases.  Deceased persons can transmit communicable
     diseases.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 67 of 161

B.  GLOVES - Disposable gloves such as latex gloves shall be worn when handling any persons, clothing, equipment, or articles with body fluids on them.  Officers are encouraged to wear disposable gloves when handling all suspects.

C.  MOUTHPIECES - Plastic mouthpieces or other barrier/resuscitation devices should be used if members have to perform CPR or mouth-to-mouth resuscitation on an individual prior to the arrival of EMS personnel.

D.  CLOTHING - Masks, protective eyewear, and additional outer protective clothing should be worn when an officer has reason to believe that body fluids may be splashed on him. Masks and protective eyewear should also be worn when dealing with persons that are actively coughing, vomiting, or suspected of carrying an airborne or communicable disease.

E.  SHARP OBJECTS - All sharp instruments such as knives, razor blades, needles, etc., shall be handled with extraordinary care, and should be considered contaminated items.

    (1)  Officers should not place their hands in areas where sharp instruments might be hidden.  An initial visual search of the area should be conducted, using a flashlight where necessary.  A suspect may also be asked to remove such objects from his person.

    (2)  Leather or heavy canvas gloves should be worn when searching for and handling sharp instruments.

    (3)  Needles shall not be recapped, bent, broken, removed from a disposable syringe, or otherwise manipulated by hand.  Needles shall be packaged in the applicable containers when being collected by officers.

F.  CONSUMPTION/CONTACT - Members shall not eat, smoke, drink, or apply makeup around body fluid spills.  Members should avoid hand-to-mouth, hand-to-nose, hand-to-ear, and hand-to-eye contact when they are exposed to body fluid spills.

G.  EVIDENCE - Any evidence contaminated with body fluids shall be conspiciously marked as such when packaged by the collecting officer.  The officer packaging the evidence shall ensure it is packaged in such a manner (i.e., zip-lock bags) that seepage through the containers will not occur.

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 68 of 161

H.   REPORTING TO WORK - Members with open cuts and abrasions
     shall cover their wounds with bandages before reporting for
     duty assignments.  Members who incur an open cut or abrasion
     while working shall bandage their wounds as soon as
     possible.


075.05   TRANSPORT AND CUSTODY

A.   HANDLING VICTIMS - Officers shall not refuse to arrest or
     otherwise physically handle any person who may have an
     airborne or communicable disease unless appropriate
     protective equipment is not available.  Members should not
     put their fingers in or near another person's mouth.


B.   SEPARATE TRANSPORTATION - A person with body fluids on his
     person shall be transported in a separate vehicle from other
     individuals.  In addition, a person that has stated he has
     an airborne or communicable disease shall be transported
     separately.


C.   NOTIFICATION - Members are required to notify other members
     or persons who may come in contact with a person in custody
     (or being handled) that has body fluids present on his
     person.  The same applies to members when a person has
     stated that he has an airborne or communicable disease.


D.   SEPARATE CELLS - Suspects taken into custody with open
     unscabbed wounds, weeping lesions that can not be covered,
     or who have stated that they have an airborne or
     communicable disease shall be placed in an individual cell
     with no other prisoners.  The arresting officer shall post
     the "Caution - Do Not Enter" sign in front of his/hers cell
     door to inform any other members or persons who enter the
     jail area.

     When the "Caution - Do Not Enter" sign has been posted, it
     shall not be removed until the prisoner has been removed.
     In addition, if there is any reason to believe that body
     fluids are present in the cell, then the sign shall not be
     removed until said cell has been disinfected.  The 1st Shift
     Patrol Supervisor shall be responsible for ensuring that the
     cell has been properly disinfected.

E.    PRISONER INCIDENT REPORT - The arresting officer of a
      suspect who has open unscabbed wounds, weeping lesions that
      can not be covered, or who has stated that he has an
      airborne or communicable disease, shall document such on the
      Prisoner Incident Report.

F.    MEDICAL SERVICE - Persons in the custody of the Department
      shall be afforded prompt access to medical service,
      evaluation or testing, when significant medical conditions
      exist or assaults are claimed.  Members shall comply by
      promptly ensuring that EMS personnel are dispatched from the
      Fire Department.  Members shall promptly administer first
      aid techniques based on their knowledge and ability until
      the arrival of EMS personnel.

G.    CONFIDENTIAL INFORMATION - Members shall not release any
      medical information of a person in custody to the public or
      any nonmember without written consent from the person in
      custody - Exception: officers releasing prisoners with
      communicable diseases or body fluids on their persons, to
      outside law enforcement personnel shall inform said
      personnel.  Members are reminded to adhere to the media
      policy described in the City of Bellaire Employee Handbook.
      Members shall not release any medical information of a
      person in custody to any member that would not be expected
      to handle the person in custody (i.e., the arresting officer
      advising the Chief's secretary) without written consent from
      the person in custody.  It is understood that members
      working with departmental records shall view said medical
      information in the course of their duties.  Violation of
      this section may result both in criminal and civil
      liabilities.

075.06    DISINFECTION PROCEDURES

A.    EXPOSURE - Any skin surface of a member that comes in
      contact with body fluids shall be thoroughly washed with hot
      running water and soap as soon as possible for a minimum of
      fifteen (15) seconds before rinsing and drying.

      (1)   Disinfectant towelettes or other applicable
            disinfectants may be used where soap and water are not
            available.

      (2)   Disposable gloves should be rinsed before removal.  The
            hands and forearms should be washed as described above.

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 70 of 161

(3)  Hand lotion should be applied after disinfection to prevent chapping and to assist in sealing cracks and cuts in the skin.

(4)  Members should remove clothing and other gear that has been contaminated with body fluids as soon as possible. Contaminated clothing should be handled carefully such as with disposable gloves and placed into a plastic bag. Clothing should be laundered in a normal fashion with detergeant and hot water. Other equipment or clothing such as shoes, firearms, leather gear, etc., should be disinfected as soon as possible by following the procedures described in (5) below.

(5)  Arresting officers or members handling persons when body fluids are exposed are responsible for initiating disinfection procedures as soon as possible:

    a.  Body fluids shall be removed from the vehicle, chair, floor, radio, etc., with an absorbent cloth or substances while wearing disposable gloves such as latex gloves.

    b.  The affected area shall be disinfected by using a bleach solution (1 part bleach to 10 parts water). A final rinsing with water shall be applied. Disinfectant towelettes may be used in place of a bleach solution for articles such as firearms, radios, etc. Disinfectant solutions other than a bleach solution should be used on articles that may stain from the bleach such as carpet, etc.

    c.  All disposable equipment and cleaning materials utilized during disinfection procedures that could have made contact with body fluids shall be bagged, sealed, and clearly marked "contaminated" prior to disposal.

       Disposal of the contaminated container(s) shall be made at the Bellaire Fire Department. The Fire Department must be notified that a disposal is being made and the materials shall be deposited in a container designated for contaminated materials in compliance to the Fire Department procedures.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 71 of 161

075.07    SUPPLIES

A.    SUPERVISORS - Patrol Supervisors are responsible for
      ensuring that an adequate amount of communicable disease
      control supplies are maintained in the Booking Office area.
      The supplies shall be checked during jail checks on a daily
      basis and replenished when necessary.  In addition, Patrol
      Supervisors are responsible for dispensing communicable
      disease control supplies to Patrol Officers, Detectives,
      Warrant Officers, and Community Services Officers upon
      request. . Supplies maintained in the Booking Office area
      shall include the following:

      (1)  Clean outer protective clothing.

      (2)  Leather or heavy duty canvas gloves and disposable
           gloves such as latex gloves.

      (3)  Puncture resistant containers and sealable plastic
           bags.

      (4)  Goggles, masks, and barrier resuscitation equipment
           such as plastic mouthpieces.

      (5)  A bucket, bleach, and disinfecting solutions.

      (6)  First Aid Kit including bandages.

      (7)  Absorbent cleaning materials such as cloth or paper
           towels.

      (8)  Hand Lotion.

      (9)  "Caution - Do Not Enter" signs.

      (10) Instruction sheet explaining the use of the above
           supplies, equipment.


B.    POLICE OFFICERS - Patrol Officers, Senior Patrol Officers,
      Sergeants, Warrant Officers, Crime Prevention Officers, and
      Detectives are responsible for ensuring their assigned
      vehicles are adequately equipped with the below supplies.
      If their assigned vehicles are not adequately equipped they
      shall contact the Patrol Shift Supervisor to obtain said
      supplies.

      (1)  At least two (2) clean sets of protective clothing in
           Patrol cars and at least one set in all other assigned
           vehicles.

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 72 of 161

(2)  Disposable gloves such as latex gloves and a pair of
     leather or heavy canvas gloves.

(3)  Puncture resistant containers.

(4)  Plastic garbage bags and sealable plastic bags.

(5)  At least one pair of goggles, masks, and barrier
     resuscitation equipment such as plastic mouthpieces.

(6)  Disposable disinfectant towelettes.

(7)  First Aid Kit with bandages.

(8)  Absorbent cleaning materials such as cloth or paper
     towels.

(9)  Instruction sheet explaining the use of the above
     supplies, equipment.

Motorcycles utilized by the Patrol Division shall be
equipped with a minimum of disposable gloves and disposable
disinfectant towelettes as described above.

075.08    LINE OF DUTY EXPOSURES TO DISEASES

A.  PHYSICAL CONTACT – Any member who has had physical contact
    with body fluids of another person while in the line of duty
    shall be considered to have been exposed to communicable
    disease. For the purposes of this directive "physical
    contact" shall mean but not be limited to: 1) contact of
    another person's body fluids on a member's mucous membrane
    or open skin such as an unscabbed wound, or; 2) a member's
    skin is broken by a bite from a person, or; 3) a member's
    skin is punctured by an used needle or other sharp
    instrument such as a knife or razor blade. The following
    procedures shall be adhered upon "physical contact" by a
    member:

    (1)  Medical attention shall be administered to the member
         if necessary.

    (2)  A supervisor shall be contacted and the appropriate
         City of Bellaire employee injury forms shall be
         completed.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 73 of 161

(3)   Contingent on the determination of Texas Workers
      Compensation, the city shall ensure that clinical and
      serological testing of the member for evidence of
      infection shall be accomplished in a timely manner.

      Contingent on the determination of Texas Workers
      Compensation, the city shall ensure that continued
      testing of the member for evidence of infection and
      provision of psychological counseling as determined
      necessary by the health care officials is accomplished.

(4)   Any person responsible for potentially exposing a
      member to a communicable disease shall be encouraged to
      undergo testing to determine if the person (source) has
      a communicable disease.  The Department shall fund the
      testing if the person agrees in writing prior to the
      testing to permit the Department disclosure of the test
      results.

A member may have a City of Bellaire injury form completed
by a supervisor any time he believes he may have been
exposed to an airborne or communicable disease.  Said member
may request clinical and serological testing.


B.    REQUIRED TESTING - A member may request the Texas Department
      of Health or the Harris County Health Department to order
      the testing of another person who may have exposed the
      member to a communicable disease under all of the following
      conditions:

      (1)   The exposure was in the course of the member's line of
            duty.

      (2)   The member believes that the exposure placed him at a
            risk of contracting a communicable disease.

      (3)   The member presents to the Bellaire Police Department
            and the Texas Department of Health or the Harris County
            Health Department a sworn affidavit within seventy two
            (72) hours that describes the reasons for the requests.

      A member may pursue criminal charges against a person who
      intentionally acts to expose him to a communicable disease.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 74 of 161

075.09    RECORD KEEPING

A.    DISCLOSURE OF TEST RESULTS - Unless disclosure to an
      appropriate city or Department personnel is authorized by
      the member or by state law, the member's test results shall
      remain confidential.

      If a disclosure is made, all members shall treat members who
      have contracted a communicable disease fairly, courteously,
      and with dignity.

B.    POSITIVE TEST RESULTS - Members who have a communicable
      disease may continue working as long as they maintain
      acceptable performance and do not pose a safety and health
      threat to themselves, the public, or other members.
      Decisions concerning a member's work status regarding health
      risks shall be based on the medical opinions and advice of
      health care officials employed by the city.  The Department
      may require a member to be examined by a physician employed
      by the city to determine if he is able to perform his duties
      without hazard to himself or others.

C.    RECORD KEEPING - The city shall maintain written records of
      all incidents involving employees who have had "physical
      contact" to a communicable disease while acting in the line
      of duty.  In addition, records of clinical and serological
      testing shall be maintained.  The records shall be
      maintained in conformance with applicable privacy laws.

GENERAL ORDER GEN-100, USE OF FORCE

TABLE OF CONTENTS:

| SECTION | BEGINNING PAGE |
|---|---|
| 100.03 Definitions | 1 |
| 100.04 Application of Directive | 2 |
| 100.05 Use of Deadly Force and Firearms | 2 |
| 100.06 Use of Nondeadly Force and Nonlethal Weapons | 8 |
| 100.07 Post Use of Force | 10 |

| GENERAL ORDER: GEN-100 | PAGE: 1 of 10 |
|---|---|
| MANUAL: General Directives | SECTION: Police Officers |

| SUBJECT/EVENT: Use of Force | ISSUED BY: Chief J.H. Loftin |
|---|---|

DATE ISSUED: Nov 28, 1989
DATE REVISED: Mar 15, 1993
EFFECTIVE DATE: Jan 01, 1990

100.01  POLICY - The Bellaire Police Department recognizes and
        respects the value and special integrity of each human
        life.  In vesting police officers with the lawful
        authority to use force to protect the public welfare, a
        careful balancing of all human interests is required.
        Therefore, it is the policy of this Department that
        police officers shall use only that force necessary to
        effectively bring an incident under control, while
        protecting the lives of the officer and others.

100.02  PURPOSE - The purpose of this policy is to provide police
        officers with guidelines concerning the use of force, and
        to limit the discretion an officer may use when dealing
        with situations that require the use of force.  This
        directive is for departmental use only and does not apply
        to any criminal or civil proceeding.  The Department
        policy should not be construed as a creation of higher
        legal standard of safety or care in an evidentiary sense
        with respect to third party claims.  Violations of this
        directive will only form the basis for departmental
        administrative sanctions.

100.03  DEFINITIONS

A. ADMINISTRATIVE LEAVE - An authorized period of absence from
   duty with full pay and benefits designated to an officer under
   extenuating circumstances, upon the discretion of the Chief of
   Police.

B. AUTHORIZED WEAPON - A weapon which meets specifications of the
   Bellaire Police Department, and with which the officer has
   qualified (if firearm), received departmental or approved
   training on proper and safe usage, and which has been
   registered (excluding batons) with the Bellaire Police
   Department Armorer.

C. DEADLY FORCE - Force that is intended, or should be known by
   the actor, to cause death or serious bodily injury, or in the
   manner of its use or intended use is capable of causing, death
   or serious bodily injury.

D. FIREARMS INSTRUCTOR - An officer assigned by the Patrol
   Lieutenant upon the approval of the Chief of Police that is
   qualified in firearms training and inspection.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 77 of 161

-----------------------------------------------------------------

E. NONDEADLY FORCE - Force, when applied under the circumstances, is not reasonably capable of causing death or serious bodily injury.

F. PHYSICAL STRENGTH AND SKILL - Any physical actions by one or more officers (e.g., holding, restraining, pushing, pulling) including, but not limited to, special skills like boxing or karate, but do not include the use of deadly force or any authorized or other weapon.

G. PRIMARY HANDGUN - The principle handgun which shall be carried by all officers which must meet all requirements and specifications of this directive.

H. PROBABLE CAUSE - Circumstances then known to the officer that reflect facts and circumstances which are based upon information which would warrant any reasonably prudent police officer to believe that some thing unlawful has occurred or that some person has committed an illegal offense.

I. SECONDARY HANDGUN - The handgun which may be carried by officers in addition to the primary handgun. The secondary handgun shall only be displayed or discharged in a situation which precludes the use of the primary handgun.

J. SERIOUS BODILY INJURY - Bodily injury that creates a substantial risk of death or causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.


100.04   APPLICATION OF DIRECTIVE

A. APPLICATION - This directive does not attempt to govern officers while off-duty and engaged in a lawful sporting or recreational activity.


100.05   USE OF DEADLY FORCE AND FIREARMS

A. USE OF DEADLY FORCE - Police officers are authorized to use deadly force to protect the officer or others from what is reasonably believed to be an immediate threat of death or serious bodily injury.

B. IDENTIFICATION - Before using a firearm, officers shall identify themselves and state their intent to shoot, when feasible.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 78 of 161

------------------------------------------------------------

C. USE/EXHIBITION OF FIREARM - An officer may also discharge a
   firearm:

   (1)  During range practice.

   (2)  To destroy an animal that represents an immediate threat
        of death or serious bodily injury to a person.

   Officers shall adhere to the following concerning firearms:

   (3)  Except for maintenance, storage, inspection, or during
        training, officers shall not draw or exhibit their
        firearm unless circumstances create reasonable suspicion
        to use the firearm in compliance with this directive.

   (4)  An officer shall not discharge a firearm as a warning or
        a threat.

   (5)  Extreme due care shall be utilized when an officer is
        confronted with a deadly force situation and it appears
        likely that an innocent person may be injured.

   (6)  Maintenance of firearms conducted at the Department shall
        only be performed in specific areas designated by the
        Patrol Lieutenant.

D. CARRYING OF WEAPONS - On-duty officers and officers wearing a
   Department uniform shall carry a primary handgun unless
   otherwise authorized by their supervisor or when doing so
   would violate a state or federal law.  While on-duty and
   off-duty, officers shall carry only those weapons, firearms,
   and ammunition authorized by or registered with the Bellaire
   Police Department.  In addition, officers shall adhere to all
   federal, state, and local laws pertaining to the carrying of
   weapons.

   (1)  Officers shall not carry a handgun without carrying a
        Department issued identification card.

   (2)  Off-duty officers shall carry a primary handgun in public
        places or areas within Harris County.  However, while
        participating in a sport or other similar activity (i.e.,
        swimming, etc.) officers shall not be required to carry a
        firearm (another exception is listed below under
        paragraph 3).  When wearing civilian clothes, whether
        off-duty or on-duty, officers shall conceal their
        firearms from public view.  While off-duty, not wearing a
        Department uniform, and outside Harris County, officers
        shall not be required to carry a firearm.

   (3)  No officer shall carry a firearm in a public place or
        area when he is intoxicated.

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 79 of 161

------------------------------------------------------------

E. AUTHORIZATION - Before any officer is authorized to carry a
   weapon, copies of all directives related to the use of force
   and use of weapons shall be issued to the officer.  The Patrol
   Lieutenant shall be responsible for conducting an appropriate
   review of said directives with the officer to ensure
   understanding.  Furthermore, an officer must demonstrate
   proficiency with his primary handgun(s) to a Firearms
   Instructor before being authorized to carry said weapon.

F. FIREARMS SPECIFICATIONS

   (1)  MANUFACTURER - All primary handguns shall be of one of
        the following manufacturers unless specifically
        authorized in writing on an individual basis by the Chief
        of Police:

        a.   Beretta

        b.   Colt

        c.   Glock

        d.   Ruger

        e.   Sig Sauer

        f.   Smith & Wesson

   (2)  FIREARM CALIBER AND AMMUNITION - All shotguns shall be 12
        gauge with pump loading action.  All shotguns shall be
        loaded with 12 gauge 00 buck.  Additional 12 gauge rifled
        slugs may be carried, but shall only be used under the
        direction of a supervisor or if an officer has received
        authorized training.  All reloads of any type ammunition
        are prohibited.  Officers are prohibited from carrying or
        using any caliber of ammunition in or with their primary
        weapons with which they have not yet passed minimum
        qualification standards, except under emergency
        circumstances.  The following types of primary handgun
        calibers and ammunition are authorized to be carried by
        officers: .38, .357 magnum, 9mm, .40, 10mm, .41 magnum,
        .44 magnum, .45.  The Patrol Lieutenant shall post
        authorized manufacturers and specifications for each
        caliber.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 80 of 161

-----------------------------------------------------------------

(3) BARREL LENGTH - All shotguns shall have a barrel length
    with a minimum of 18 inches and a maximum of 22 inches.
    Shotguns with folding stocks are acceptable.  Shotguns
    with pistol grips may be utilized on specific incidents
    (i.e., execution of arrest/search warrants) with the
    approval of an Administrative Officer.  Uniformed
    officers shall carry primary handguns with a minimum
    barrel length of 3 1/2 inches and a maximum barrel length
    of 6 1/2 inches.  Nonuniformed officers shall carry
    primary handguns with a minimum barrel length of 2 inches
    and maximum barrel length of 6 1/2 inches.

(4) AMMUNITION CARRIERS - Officers are required to carry
    ammunition in addition to the ammunition carried within
    their primary handguns.

    a.  Uniformed officers shall carry a minimum of twelve
        (12) additional rounds of ammunition.  Speedloaders
        and holders, and clips and clipholders are
        authorized.

    b.  Nonuniformed officers shall carry additional
        ammunition.  If the primary weapon is a revolver,
        the officer shall carry additional rounds at a
        minimum, equivalent to the carrying capacity of the
        revolver.  If the primary weapon is a semi-automatic
        handgun, the officer shall carry at a minimum, an
        additional clip at full capacity.  The same
        ammunition carriers described in the above paragraph
        100.05 E.(4) a., may be used.     -

(5) HOLSTERS - All primary handguns shall be carried within a
    holster.  All holsters shall be designed and maintained
    to hold the handgun securely to prevent accidental
    release or discharge of the handgun.

    All primary handguns utilized by uniformed officers shall
    be carried in holsters of open stock design and equipped
    with a thumb-break type release.

G. FIREARM PROFICIENCY

(1) QUALIFICATION - The Patrol Lieutenant shall schedule
    regular qualification sessions for primary handguns, both
    for on-duty and off-duty, and specialized firearms.  The
    Patrol Lieutenant shall set minimum standards for
    qualification and all officers shall be required to meet
    or exceed these standards.  Officers shall have prior
    notification of the set minimum standards.  Officers
    shall be required to qualify with the same caliber of
    ammunition they carry for primary use.  Such
    qualification sessions shall be held at least once each
    calendar year.

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 81 of 161

------------------------------------------------------------

    (2)   QUALIFICATION FAILURE - Officers who fail to receive a passing score with their on-duty primary handguns in accordance with Department testing procedures shall be immediately reassigned to nonenforcement duties for a maximum period of sixty (60) calendar days.  An officer who fails to achieve a passing firearms qualification score during that sixty (60) day period is subject to disciplinary action, up to and including dismissal from employment.  The sixty (60) day period may be extended an additional thirty (30) days, to a total of ninety (90) calendar days, at the discretion of the Chief of Police, if he determines that the additional thirty (30) days may enable the officer to regain proficiency with his on-duty primary weapon.  An officer who does requalify shall immediately be available for reassignment to regular duty.

           An officer shall not be permitted to carry any off-duty primary handgun with which he has not been able to qualify during the previous twelve (12) months, or with which he has been unable to qualify during the most recent qualification session.

    (3)   REQUALIFICATION - An officer who has been on extended leave or suffered an illness or injury that could affect his use of firearms is required, upon the discretion of the Chief of Police, to requalify before returning to enforcement duties.

H. FIREARMS INSTRUCTOR - The Firearms Instructors shall be supervised by the Patrol Lieutenant.  The Patrol Lieutenant shall assign the number of Firearms Instructors necessary to assist in training, inspection and qualifications.

    (1)   FIREARMS TRAINING - It shall be the responsibility of the Firearms Instructors to provide instruction with firearm safety and maintenance.  This instruction shall include basic firearms function, safety, and use of firearms, both on-duty and off-duty, as well as information regarding ballistics of ammunition.  Firearms training shall also include instruction in federal law, state law, and departmental policy regarding the use of firearms.

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 82 of 161

------------------------------------------------------------------------

100.06    USE OF NONDEADLY FORCE AND NONLETHAL WEAPONS

A.   USE OF FORCE - Officers shall use the least force necessary that
     shall best de-escalate the incident and bring the situation under
     control in a safe manner.  Before an officer may use any force
     against a person, the officer shall adhere to the following:

     (1)  Have probable cause to arrest or search that person or have
          reasonable suspicion to detain or search that person.

     (2)  Manifest his purpose to arrest, detain, or search that person
          and identify himself as a peace officer, unless the officer
          has probable cause to believe that the person already knows
          his purpose and identity or unless the officer can not
          reasonably make that information known to the person.

     (3)  Give the reason for the arrest, detention, or search, unless
          impractical under the circumstances.

B.   FORCE OPTIONS - To the extent necessary and reasonable, and in
     accordance with this directive, an officer shall only use physical
     strength and skill, authorized baton, authorized "stun" equipment
     such as the "TASER" gun, or authorized aerosol spray, to apply
     nondeadly force.  However, an officer may use any unauthorized
     weapon if extreme emergency conditions leaves the officer no other
     alternative to protect himself or others.

     USE OF BATON - An officer may use an authorized baton if he has
     received approved instruction in its use and has maintained
     current applicable certification.  An officer may use a baton to
     protect himself or another from assault, to arrest, detain, or
     search a person who unlawfully resists same, when lower levels of
     force have failed, or if circumstances warrant the immediate use
     of the baton as a barricade or to repel or control crowds.  A
     baton may also be used as a "come along" tool on resisting
     suspects.  All maneuvers used by officers shall be in accordance
     with accepted training.  When feasible, an officer shall adhere to
     the below when using a baton.

     (1)  Avoid striking a suspect above the shoulders except as a last
          resort to counter the risk of serious bodily injury or death.

     (2)  Avoid making blows capable of inflicting permanent injury

     (3)  Direct blows towards the elbows, knees, and abdomen.

     (3)  Deliver only blows to incapacitate the subject temporarily.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 83 of 161

-----------------------------------------------------------

   (2)  FIREARMS INSPECTION - It shall be the responsibility of
        the Firearms Instructors to inspect all firearms utilized
        by officers.  All firearms carried by officers shall be
        inspected prior to being carried.  All firearms shall be
        inspected prior to all qualification sessions.  The
        Patrol Lieutenant shall maintain a permanent file
        containing records of firearms, qualifications and
        individual qualification scores.  Information regarding
        make, model, serial number, caliber, barrel length and
        modifications shall be recorded.  The Firearms
        Instructors shall be authorized to reject any firearm
        determined to be unsafe or unsuitable for use.  The
        Firearms Instructors are authorized to inspect officers'
        firearms at any time.

   (3)  QUALIFICATION COURSE - The Patrol Lieutenant shall be
        responsible for designing a firearms course to test and
        improve the skills of officers.  The course shall include
        instruction in firearms safety, reloading, combat
        confrontation, and shooting techniques designed to
        prepare officers for practical use.  The course shall be
        designed to test the physical ability as well as the
        marksmanship of the officers.

I. WEAPON MODIFICATIONS - No officer shall change, modify, or
   alter an authorized weapon in any manner whatsoever without
   prior approval of a Firearms Instructor.  An officer that
   receives authorization to modify a weapon shall submit his
   weapon to a Firearms Instructor after completion of the
   modification for inspection and approval before being
   authorized to carry said weapon.  The Firearms Instructors
   shall not authorize a change, modification, or alteration to
   an authorized weapon that would be against the recommendation
   of the manufacturer of the weapon.  The following handgun
   modifications are specifically prohibited:

   (1)  Telescopic sights.

   (2)  Trigger shoes.

   (3)  Barrel porting.

   (4)  Decorative engraving other than from the manufacturer.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 84 of 161

------------------------------------------------------------

D.   USE OF TASER GUN - An officer may use an authorized Taser Gun if
     he has received approved instruction in its use and has maintained
     current applicable certification.  An officer may use a Taser Gun
     to protect himself or another from assault, of if there is a
     reasonable expectation that it will be unsafe for officers to
     approach within contact range in order to subdue the suspect
     pursuant to arrest or search.  All maneuvers used by officers
     shall be in accordance with accepted training.  When feasible, an
     officer shall adhere to the below when using a Taser Gun.

     (1)  Attempt to obtain sufficient back-up prior to using the Taser
          in order to control the suspect after the electrical shock is
          applied.

     (2)  Ensure no other officers or persons are standing near the
          suspect during the application.

     (3)  Attempt to avoid impacting a suspect's eyes.

     (4)  When tactically permissible, aim for the suspect's back.

     (5)  Activate the electric current only as long as necessary to
          subdue the suspect.

     (6)  Ensure that the suspect receives appropriate medical
          attention as soon as possible and not attempt to remove darts
          embedded in the suspect's skin.

E.   USE OF OLEORESIN CAPSICUM AEROSOL SPRAY - An officer may use
     authorized aerosol spray if he has received approved instruction
     in its use and has maintained current applicable certification.
     An officer may use aerosol spray to protect himself or another
     from assault, or to arrest, detain, or search a person who
     unlawfully resists same, when lower levels of force have failed.
     An officer may also use aerosol spray if circumstances warrant the
     immediate use of the spray to repel or control crowds, or if there
     is a reasonable expectation that it will be unsafe for officers to
     approach within contact range in order to subdue the suspect
     pursuant to arrest or search.  All maneuvers used by officers
     shall be in accordance with accepted training.  When feasible, an
     officer shall adhere to the below when using aerosol spray.

     (1)  Attempt to obtain sufficient back-up prior to using the spray
          in order to control the suspect after the spray is applied.

     (2)  Ensure no other officers or persons are standing near the
          suspect during the application.

     (3)  Apply the spray between two (2) and eight (8) feet from the
          suspect and direct the spray at the suspect's eyes.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 85 of 161

-----------------------------------------------------------------------

    (4)  Apply one second bursts only as long as necessary to subdue
        the suspect.

    (5)  After the suspect is under control, the officer shall ensure
        he receives decontamination efforts by flushing the suspect's
        eyes and affected areas with water.

    (6)  If a suspect takes longer than forty five (45) minutes to
        recover from the effects of the spray, then the officer shall
        ensure the suspect is treated by medical personnel.

## 100.07   POST USE OF FORCE

A.  MEDICAL ASSISTANCE - A suspect, who has been the recipient of the
    use of force, shall be treated by medical personnel upon request
    or apparent need, after said suspect is under control.

B.  ADMINISTRATIVE LEAVE - When an officer's use of force causes
    death, the officer shall be placed on administrative leave until
    completion of all internal investigative requirements, and until
    it is determined by a mental health professional that the officer
    is ready to return to duty.

C.  INVESTIGATION - When an officer's use of force or alleged use of
    force causes death, the Department shall conduct both an
    administrative and criminal investigation of the incident.  The
    Chief of Police shall assign qualified investigators to perform
    the investigations, and said investigators shall forward a
    complete report to the Chief of Police upon completion of the
    investigation.

    (1)  NOTIFICATION OF DISTRICT ATTORNEY OFFICE - The first arriving
        supervisor to the scene of the following incidents shall be
        responsible for notifying the appropriate District Attorney
        personnel:

        a.  Officer involved shooting of another person.

        b.  Officer's use of force or alleged use of force resulting
           in the death of another person.

D.  REQUIRED NOTIFICATION AND REPORTS - A Bellaire Police Department
    Offense Report shall be completed under any of the below listed
    circumstances.  In addition, under the same circumstances, the
    involved officer is responsible for immediately notifying an on-
    duty or "on-call" supervisor.  The immediate supervisor of an
    officer involved in the below listed circumstances shall ensure
    that a copy of the report is given to the Assistant Chief.

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 86 of 161

-------------------------------------------------------------------

    (1)  When an officer discharges a firearm outside of the firing
        range.

    (2)  When an officer's use of force or alleged use of force
        results in death or injury of another person.

    (3)  When an officer uses a weapon against another person.

Notified supervisors shall respond to the scene as soon as
practical and shall comply with investigative procedures as
required by the Department.  In the event that the incident
occurred outside of the Houston Metropolitan area, the supervisor
shall notify an Administrative Officer, who may authorize the
supervisor to not respond to the scene (i.e., an officer on
vacation in Colorado defends himself by shooting an aggravated
robbery suspect).

E.   ADMINISTRATIVE REVIEW - All reported use of force incidents and
    unauthorized discharge of firearms shall be reviewed by the
    Assistant Chief and Chief of Police to determine the following:

    (1)  If Department policies or directives were violated.

    (2)  If the relevant policy or directive was clearly
        understandable and effective to cover the situation.

    (3)  If Department training requires revision.

F.   POLICY AND/OR DIRECTIVE VIOLATIONS - All findings of policy and/or
    directive violations shall be reported to the Chief of Police for
    resolution and/or disciplinary action in accordance with
    departmental policy.

G.   RETENTION OF REPORTS - All use of force incident reports shall be
    retained as required by law by the Assistant Chief.

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 87 of 161

BELLAIRE SHOOTING JULY 15, 1995
WALK THROUGH INTERVIEW WITH MIKE LEAL (ML)

??:  OH, YOU GOT TO ANNOUNCE IT FIRST.

??:  YEAH.

??:  YOU HAVE TO ANNOUNCE IT IF YOU ARE.

??:  IF YOUR GOING TO RECORD ANOTHER OFFICER.

??:  RIGHT.

??:  BASICALLY WHAT I DO IS...(INAUDIBLE).

??:  MIKE WE'RE RECORDING, SO YOU KNOW.

??:  YEAH, IT'S GOING TO BE RECORDED.

??:  OKAY, GENTLEMEN WE'RE READY.

??:  OKAY, LADIES.

??:  WANT TO LEAD THE WAY MIKE?

ML:  WHEN I ARRIVED, I SAW THE ONE UNIT WAS ALREADY PARKED OVER
     HERE.  UH-- I SAW OFFICER SHELOR HERE HE BLINKED HIS
     FLASHLIGHT RIGHT BEHIND THESE BUSHES RIGHT HERE. SO, I CAME
     UP TO OFFICER SHELOR, OFFICER UPSHAW ARRIVED.  AFTER HIS
     ARRIVAL I SENT HIM TO THE BACK. AFTER I SENT HIM TO THE BACK
     WE MADE SURE THE PEOPLE GOT OUT.  OKAY.  UH-- AFTER WE FOUND
     OUT BY UPSHAW, TELLING US THAT THEY WERE OUTSIDE.  I DON'T
     KNOW IF IT WAS A PATIO OR WHERE THEY WERE AT.  IN BACK I SAW
     THE WINDOW, THEY SAID THEY COULD STILL HEAR HIM.  SO I WANTED
     TO GET AWAY FROM THE HOUSE. I CAME TO THE CAR.  AND GOT TO THE
     CAR, SAW A FLASHLIGHT OR LIGHT ON THIS WINDOW RIGHT HERE,
     STANDING-- STAND UP.  AND I ASK UPSHAW AGAIN; ARE THEY SURE
     EVERYBODY'S OUT OF THE HOUSE.  AND HE RESPONDED ON THE RADIO,
     YEAH, EVERYBODY'S OUT OF THE HOUSE.  SO INSTEAD OF BEING LIKE

RIGHT HERE IN FRONT OF THE HOUSE.  I WENT TO THIS BIG TREE.

OFFICER SHELOR WAS STILL HERE.  I DIRECTED OFFICER SHELOR.  I

DON'T THINK I RADIOED FOR HIM TO GET BACK BEHIND THIS OTHER

TREE.  I TOLD UPSHAW TO STAY IN THE BACK TO FIND YOU A GOOD

SAFE-- A COVER POSITION SO HE COULD WATCH THE BACK OF THE

HOUSE AND THE SIDES OF THE HOUSE. NEXT THING I KNOW--

??    LET'S JUST-- LET'S GO AROUND TO WHERE YOU ARE.  I THINK--

ML:   OKAY.

??:   IT WILL BE BETTER FOR YOU.

ML:   I'M BEHIND THIS TREE. UH-- I'M TRYING TO LISTEN TO UPSHAW TO

SEE WHAT IN ALL'S GOING ON WITH HIM.  OFFICER SHELOR I THINK

IS (INAUDIBLE).  ALL OF A SUDDEN I SEE THIS BICYCLE COME OUT

OF THIS WINDOW.  UH-- RIGHT HERE AT THE DOOR.   FLYING OUT.

OFFICER SHELOR STARTS YELLING AT HIM.  I REALLY CAN'T SEE HIM

BECAUSE I'M BACK OVER HERE.  I SEE HIM JUST BRIEFLY WHEN HE

COMES OUT.  HE STARTS RUNNING BACK TOWARDS THE BACK OF THE

HOUSE.  THEN I HEAR OFFICER UPSHAW YELLING.  SHELOR STARTS

MOVING.  I TOLD SHELOR TO HOLD IT. YOU KNOW-- JUST HOLD THE

PARAMETER.  STAY BACK ON IT.  UH-- UPSHAW'S YELLING.  TRYING

TO GIVE HIM COMMANDS.  YELLING AT HIM.  THAT'S WHEN I DECIDE

TO GO UP --UH-- TO THE SIDE. I TELL HIM-- I CAN'T REMEMBER IF

I TOLD SHELOR ON THE RADIO OR-- OR JUST YELLED TO HIM TO STAY

UP HERE.  BECAUSE I WANTED TO KEEP THE PARAMETER SET.  WHEN I

HEAR UPSHAW GIVING HIM COMMANDS, I KIND OF FEEL THAT HE'S GOT

HIM SOMEWHERE IN THE BACK OF THE HOUSE.  I LEAVE THE TREE.  I

COME TO THIS GATE.

2

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 89 of 161

??:    (INAUDIBLE).

ML:    THE GATE IS CLOSED, I OPEN THE GATE.

??:    (INAUDIBLE). STOP AND WAIT FOR EVERYBODY TO CATCH UP AND GET
       WHERE EVER YOU WERE.

ML:    I GET ABOUT HERE, AND I COULD STILL HEAR OFFICER UPSHAW
       YELLING AT HIM.  UH--

??:    WHERE WAS PAUL AT THE TIME?

ML:    I CAN'T-- I DIDN'T HAVE A VISUAL ON PAUL.  HE WAS SOME PLACE
       IN THE BACK OF THE HOUSE.  ALL I COULD SEE WAS HIS FLASHLIGHT
       THROUGH THIS WINDOW.  IT KIND OF GLARED THROUGH THE HOUSE.  I
       KNEW HE WAS POSITIONED SOMEWHERE.

??:    HE WASN'T-- CARL WASN'T INSIDE; HE WAS STILL OUTSIDE?

ML:    CARL WAS OUTSIDE THE HOUSE.

??:    OKAY.

ML:    SO I COULD SEE THE FLASHLIGHT --UH-- OVER HERE. I DON'T HAVE
       A VISUAL ON THE GUY YET.  THE SUSPECT.  SO THEN I MOVE A
       LITTLE BIT MORE OVER HERE.  WHEN I GET HERE.  TO ABOUT THIS --
       UH-- AIR CONDITIONER.  I NOTICE THAT THIS WINDOW IS BROKEN
       OUT.  I CAN'T REMEMBER IF I COULD SEE UPSHAW OR NOT.  I COULD
       SEE THE GUY FROM THIS WINDOW BECAUSE IT'S ALL DARK INSIDE.
       (INAUDIBLE) FLASHLIGHT.  I COULD SEE THE WHITE IN THE OFFICE.
       HE'S ALL BLOODY.  UH-- STANDING AT ONE OF THE OTHER WINDOWS.
       NOT AT THIS WINDOW BUT AT THE OTHER SIDE. (INAUDIBLE).  ALSO,
       UPSHAW'S YELLING TO HIM.  YELLING TO HIM TO OPEN THE DOOR.
       ABOUT THAT TIME HE COMES AROUND TO --UH-- THIS LITTLE WHITE
       CORNER RIGHT HERE.  I GUESS WHERE YOU CAN SEE THE BLOOD.

                                    3

??:  CORNER WHERE THE BLOODS ON THE CORNER RIGHT THERE?

ML:  RIGHT BY THE CHAIR.

??:  YOU SHOWED IT TO ME.  RIGHT?

ML:  AND --UH-- HE LIKE-- GET'S BEHIND IT.  LIKE MAYBE THEY WON'T
     SEE HIM.  YOU KNOW-- OFFICER UPSHAW'S YELLING AT HIM.  I'M
     TRYING TO GIVE HIM COMMANDS.  HE'S STANDING THERE.  SOMETIMES
     HE ACTS LIKE HE'S GOING TO GO DOWN.  BUT HE COMES BACK BEHIND
     THE COLUMN.  I GET HERE AND I HEAR UPSHAW YELLING AT HIM.
     WELL I DECIDE I'M GOING TO YELL AT HIM INSTEAD OF YELLING
     (INAUDIBLE).  GET DOWN.  I CAN'T REMEMBER MY EXACT WORDS WAS
     LIKE-- GET DOWN ON THE GROUND.  JUST STAY ON THE GROUND.

??:  YOU WERE INSIDE AT THIS POINT?

ML:  NO, SIR.  I WAS STILL OUTSIDE.

??:  OKAY.

ML:  I'M STILL OUT HERE.  I THINK I GIVE HIM THOSE TWO COMMANDS.
     I GAVE THEM TO HIM TWICE. I JUST-- GET DOWN. GET DOWN ON THE
     GROUND AND LAY ON THE GROUND.  I CAN SEE WHERE HE LAYS DOWN.
     I CAN SEE THE BACK PART OF HIS LEGS.  (INAUDIBLE)  WHEN HE
     LAYS ON THE GROUND, OFFICER UPSHAW COMES AROUND HERE AND
     THAT'S WHEN WE MAKE ENTRY THROUGH-- WE KIND OF JUST GO THROUGH
     HERE.  AND THEN I GO AROUND THE TABLE.  OFFICER UPSHAW COMES
     IN BEHIND.

??:  WE CAN GO INSIDE.

??:  WHEN YOU COME AROUND THE TABLE-- LIKE WHEN YOUR COMING THROUGH
     THE WINDOW AS IF YOU--

??:  WHICH SIDE DO YOU COME AROUND?

                              4

ML:   I CAME AROUND.  AFTER I ENTERED --UH-- I DON'T LOOK BACK AT

      UPSHAW BECAUSE I'M SURE HE'S COMING BEHIND ME.  I COME AROUND

      THIS SIDE.  HE'S KINDA-- DOESN'T HAVE HIS ARMS FULLY EXTENDED.

      KINDA IN A PUSH UP AND HE JUST KEEPS ON LOOKING AT US.  YOU

      KNOW-- FIRST THING THAT ENTERED BY HEAD.  I ALREADY SAW THAT HE

      WAS ALL BLOODY.  I'M THINKING THAT HE'S ALL DOPED UP BECAUSE

      HE'S JUST-- HE'S JUST ACTING CRAZY.

??:   DID HE EVER SAY ANYTHING?

ML:   NO, SIR. NOT THAT I CAN REMEMBER.  I DON'T REMEMBER HIM SAYING

      ANYTHING.  HE'S NOT ACTUALLY JUST LAY DOWN.  HE'S KINDA LIKE--

      THE WHOLE TIME LOOKING AT US.  LIKE HE'S STILL GOING TO RUN.

      YOU KNOW-- I'M HOPING HE'S NOT GOING TO RUN.  YOU KNOW-- SO WE

      MOVE RIGHT AROUND HERE I BELIEVE.  LIKE RIGHT HERE SOMEPLACE.

      OFFICER UPSHAW'S HERE AND HE'S TRYING TO GET UP LIKE DOING A

      PUSH UP.  OFFICER UPSHAW EITHER PUTS ONE LEG AROUND HIS-- ON

      TOP OF HIS BUTT OR IN THE MIDDLE OF HIS BACK.  AND I'M KIND OF

      CORNERED RIGHT HERE, AND I'M TRYING TO --YOU KNOW-- GET A HOLD

      OF HIM.  THEN I SEE OFFICER UPSHAW HE'S-- HE UH-- I--

??:   HE WAS FACING-- HIS HEAD WAS TURNED OVER--

ML:   HE WAS THIS WAY.

??:   RIGHT.

ML:   YES, SIR.

??:   HE WAS STILL ON HIS STOMACH?

ML:   YES, SIR.

??:   OKAY.

ML:   HE KEEPS ON TRYING TO GET UP LIKE A PUSH UP.  AND HE'S NOT

                                    5

SAYING ANYTHING BUT LIKE GRUNTIN'.  LIKE HE'S REAL PISSED OFF
ABOUT SOMETHING.  HE'S-- HE'S TRYING TO GRUNT.  AT ONE POINT
THEN, HE GETS --UH-- I'M NOT SURE IF IT WAS BOTH HIS HANDS AT
THAT TIME OR ONE HAND AND COMES ALL THE WAY UNDER HIM.
UPSHAW'S YELLING AT HIM AND I'M ALSO TELLING HIM IN A REAL
LOUD VOICE.  LET US SEE YOUR HANDS.  YOU KNOW-- LET US SEE
YOUR HANDS.  I TELL HIM --UH-- AT ONE POINT I SAY LET ME SEE
YOUR HANDS YOUR GOING TO GET SHOT.  LET ME SEE YOUR HANDS.
AFTER-- I MEAN THIS IS HAPPENING REAL QUICK.

??:  RIGHT.

ML:  HE COMES BACK UP TO THE PUSH UP POSITION.  OFFICER UPSHAW,
LIKE-- I THINK HE'S BASICALLY STANDING ON HIM AND STABILIZING
HIMSELF WITH THE-- WITH THE TABLE.  I GUESS IF YOU LAY HIM
OVER, HIS LEG IS GOING TO BE A LITTLE CLOSER OVER HERE.  AND
I TRIED TO GET A FOOT ON HIM.  HE'S KINDA--HE'S PICKING UPSHAW
UP.  WHERE UPSHAW-- I DON'T KNOW HOW MUCH UPSHAW WEIGHS BUT
STANDING ON THIS GUY AND HE'S PICKING UPSHAW UP.  HE'S KEEPS
ON LOOKING BACK AT US.  STILL LIKE-- I DON'T KNOW IF IT'S A
GRUNT OR WHAT.  IT --YOU KNOW-- --JUST A-- --YOU KNOW-- THIS
NOISE YOU MAKE WHEN YOUR EXHAUSTED.  OR --YOU KNOW-- I DON'T
KNOW HOW TO EXPLAIN IT.  HE COMES AND LOOKS AT ME, BECAUSE I'M
STANDING HERE TO THE RIGHT.  HE GOES BACK DOWN.  HE KEEPS HIS
LEFT-- I THINK HIS LEFT ARM OUT RIGHT HERE.  AND THEN COMES
FIRST, UNDER HIS BODY AND GOES LIKE IN FRONT-- LIKE TOWARDS
HIS--  HIS FRONT UNDER-- I COULDN'T TELL IF HE'S GOING UNDER
HIS SHIRT OR OVER HIS SHIRT.  BECAUSE I THINK HIS SHIRT WAS--

6

WAS UNTUCKED. I REACHED DOWN. I SEE UPSHAW ALMOST LOOSES HIS BALANCE. HE'S STILL KINDA-- HE'S ROLLING. LIKE THIS WAY, LOOKING AT US. UPSHAW ALMOST LOOSES HIS BALANCE. I REACH DOWN. PART OF HIS ELBOW ISN'T BLOODY AND GRAB HIS ELBOW. LIKE-- I'M GOING TO TRY AND GET THIS ONE HAND OUT. BUT IT'S LIKE HE'S JUST-- HE'S JUST TIGHTEN UP. YOU KNOW-- WHERE I COULDN'T-- I DIDN'T HAVE ANY GOOD LEVERAGE. I DIDN'T WHAT TO END UP ROLLING OVER HIM. SO I LET GO. DIDN'T REALLY BACK UP. AND SO WHEN I GRABBED HIM, I KINDA STEPPED OVER HERE. I TOUCHED UPSHAW JUST TO GET MY BALANCE AND HE COULD GET HIS BALANCE. AS SOON AS HE CAME UP FROM HERE, HE WENT BACK INTO HIS POCKET. WHEN HE WENT TO HIS POCKET THAT'S WHEN I--

??: HIS RIGHT POCKET?

ML: YES, SIR. HIS RIGHT POCKET. AFTER HE WENT TO HIS POCKET, THAT'S WHEN I KIND OF MOVED OVER HERE. AND I'M STILL-- I DON'T KNOW HOW MANY TIMES I TOLD HIM. YOU KNOW-- LET US SEE YOUR HANDS. YOUR GOING TO GET SHOT. YOUR GOING TO GET SHOT. WHEN HE CAME UP-- WHEN HE STARTED-- WHEN HE REACHED IN HIS POCKET, IT WASN'T LIKE HE KEPT IT IN THERE. HE LIKE-- REACHED IN AND STARTED COMING OUT AND STARTED COMING OUT. THAT'S WHEN I KINDA LEANED OVER AND FIRED. I BELIEVE TWO SHOTS.

??: OKAY. SO HE-- YOU WERE ABOUT AT THIS POINT HERE IN THE FRONT OF THE SOFA.

ML: YES, SIR. IF I-- IF I HAD TO EXPLAIN EXACTLY, I WAS KINDA LIKE RIGHT HERE.

??; OKAY. THOSE ROUNDS WILL BE OVER THERE THEN.

7

```
??:    WE KEPT LOOKING BACK THIS WAY.  AT FIRST I THOUGHT YOU WERE
       OVER IN THIS AREA.  BUT--

??:    IN FACT THERE'S ONE OF THEM RIGHT THERE.

??:    OKAY.  THAT'S GOOD.

ML:    UH-- CAN I GO BACK?

??:    SURE.

ML:    AT ONE POINT, I REMEMBER SHELOR COMING INSIDE.  AND I GUESS
       SHELOR HEARD US --UH-- YOU KNOW-- THAT WE HAD CONFRONTED HIM.
       AND SAW THAT HE WAS ALL BLOODY, AND I TOLD SHELOR TO PUT YOUR
       GLOVES ON.  SHELOR IS A PARAMEDIC AND WHAT FIRST ENTERED MY
       MIND WAS THAT HE HAD GLOVES ON HIM.  OKAY.  I DIDN'T KNOW THAT
       SHELOR HAD WENT OUTSIDE TO GET GLOVES.  I THOUGHT HE HAD-- HE
       CARRIED A LITTLE THING THAT HAD RUBBER GLOVES ON IT AND STUFF.
       AND --UH-- BY THE TIME I-- THE SHOOTING HAD HAPPENED, I TURNED
       AROUND SHELOR WAS PUTTING ON HIS GLOVES.  YOU KNOW-- I BACKED
       UP, GOT EVERYBODY AWAY.  I TOLD SHELOR THAT HIS JOB WAS TO
       HANDCUFF THIS GUY.  I TOLD UPSHAW TO GO OVER THE COUCH AND TO
       KEEP HIM COVERED.  I TOLD SHELOR, I SAID IF ANYTHING HAPPENS
       JUST BACK UP CAUSE YOUR NOT GOING TO BE ARMED NOW.  TOLD HIM
       TO PUT HIS GUN UP.  AND I WAS STILL WORRIED ABOUT THE REST OF
       THE HOUSE BECAUSE WE HAD TO SEARCH THE REST OF THE HOUSE.

??:    HE WAS THE ONLY PERSON THAT YOU ALL EVER SAW?

ML:    YEAH.  AFTER WE GOT HIM HANDCUFFED, I TOLD SHELOR-- I KNEW
THAT     SHELOR WAS MET. OR --UH--

??:    EMT.

ML:    EMT.  I TOLD HIM GIVE-- YOU KNOW-- DO ANYTHING YOU HAVE TO DO
```

8

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 95 of 161

WITH HIM.  YOU KNOW-- DON'T WORRY ABOUT ANYTHING ELSE.  I
TOLD-- I THINK BOHANNON WAS ARRIVING OR UPSHAW, TO GET THE
PEOPLE OUT.  TO CLEAR THE HOUSE.  I BELIEVE BOHANNON AND
UPSHAW --UH-- THEY FINALLY FOUND THE STAIRS.  WENT UP AND GOT
THEM.  GOT THEM OUT.  I TOLD BOHANNON TO CHECK THE REST OF THE
HOUSE.

??:  OKAY.

BH:  WHERE WAS SHELOR WHEN THE SHOTS WERE FIRED; OR DO YOU KNOW?

ML:  I DON'T KNOW. I REMEMBER AFTER I FIRED AND GOT BACK HE WAS
HERE PUTTING THE GLOVES ON.  I DON'T KNOW IF HE WAS ACTUALLY
IN THE HOUSE, OR HOW LONG.  IT SEEMED LIKE IT WAS REAL QUICK.
IT STARTED SLOWING DOWN AFTER A WHILE.  (INAUDIBLE)

BH:  DID HE ACTUALLY PUT HIS HAND IN HIS POCKET OR DID HE PUT HIS
HAND IN THE DIRECTION OF HIS POCKET?

ML:  HE PUT HIS HAND IN HIS POCKET.

??:  WHAT WAS HE-- WHAT WAS HE LOOKING AT OR WHAT WAS HE DOING WHEN
HIS HAND WENT IN HIS POCKET?

ML:  HE WAS KIND OF TURNED.  LIKE WITH THIS HAND LIKE THIS.  I
GUESS HE WOULD BE ROLLING TO HIS LEFT.  BASICALLY LOOKING AT
ME. I DON'T THINK HE COULD LOOK AT CARL.  CAUSE CARL WAS
LOOSING HIS BALANCE.  LIKE ON TOP OF THE TABLE.  LIKE THIS
TRYING TO HOLD ON.  (INAUDIBLE).

BH:  YOU SAY HE TOOK HIS HAND OUT OF HIS POCKET?

ML:  NO, I NEVER SAW HIS HAND COME OUT OF HIS POCKET. (LONG
SILENCE....I DON'T KNOW WHAT ELSE.

??:  OKAY.

9

GENERAL ORDER GEN-180, HIGH RISK OPERATIONS

TABLE OF CONTENTS:

SECTION                                                      BEGINNING PAGE
    180.03 Definitions ................................................. 1
    180.04 Application of Directive .................................... 2
    180.05 Operation Planning ......................................... 2
    180.06 Execution of Operation ..................................... 4
    180.07 Culmination of Operation ................................... 6
    180.08 Training of Arrest Team .................................... 6

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 97 of 161

| GENERAL ORDER: GEN-180 | PAGE: 1 of 6 |
| MANUAL: General Directives | SECTION: Police Officers |

| SUBJECT: High Risk Operations | ISSUED BY: Chief J.H. Loftin |

DATE ISSUED: July 01, 1995
DATE REVISED:
EFFECTIVE DATE: July 10, 1995

180.01    POLICY - The Bellaire Police Department shall execute search
          warrants, arrest warrants, narcotic shows, and sting
          operations in a safe and prudent manner with respect to the
          welfare of its officers, the public, and the suspected
          offenders.

180.02    PURPOSE - The purpose of this policy is to establish clear
          and effective guidelines and procedures for officers
          executing search warrants, arrest warrants, narcotic shows,
          and sting operations.

180.03    DEFINITIONS

A.    ARREST TEAM - Officers assigned to a specific operation of
      executing a search warrant, arrest warrant, narcotic show, or
      sting operation (see definitions). Under most circumstances the
      Arrest Team shall be comprised of officers with specialized
      training of high risk operations. The Arrest Team may include
      peace officers from assisting outside law enforcement agencies.

B.    BUY/BUST - An undercover operation where an anticipated illegal
      transaction of narcotics either being purchased or sold by one or
      more offenders, and officers are prepared to arrest the
      offender(s) immediately after or during the offense.

C.    CASE AGENT - The officer assigned to the investigation or
      operation of executing a search warrant, arrest warrant, narcotic
      show, or sting operation (see definitions).

D.    OPERATIONAL PLAN - A form completed by the case agent depicting
      the pertinent details of the operation including a list of the
      Arrest Team, officers' vehicles, suspect and/or suspect vehicle
      descriptions, expected hazards, etc.

E.    NARCOTIC SHOW - An undercover operation where one or more officers
      and/or confidential informants display money or narcotics to the
      suspect(s), and an arrest is not anticipated until a later time.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 98 of 161

F.   STING - An operation where an anticipated offense is to occur and
     the officers intend to effect the arrest immediately after or
     during the offense.  Some examples include: 1) A pharmacist
     reports that a suspect is suppose to pick up a forged
     prescription; 2) A confidential informant advises that two
     suspects are suppose to burglarize a business; 3) Buy/Bust (see
     definition).

G.   TEAM LEADER - An officer assigned to delegate assignments and
     supervise the operation of executing a search or arrest warrant,
     narcotic show, buy/bust, sting, etc. (see definitions).


180.04    APPLICATION OF DIRECTIVE

A.   APPLICATION OF DIRECTIVE - This directive is intended to provide
     procedures and guidelines for officers executing search warrants,
     arrest warrants, sting operations, and narcotic shows.  However,
     under some circumstances of executing warrants this directive
     would not apply such as executing a search warrant at a homicide
     scene where the officers know that the scene is secure,
     unoccupied, or no safety precautions are necessary.  Another
     example where this directive is not applicable is the execution of
     an arrest warrant for a Class C misdemeanor offense when the
     officers know there is no expectation of danger (i.e., a Patrol
     Officer sets up on a known resident that has a Class C Misdemeanor
     traffic warrant and observes the resident leave in his vehicle).


180.05    OPERATION PLANNING

A.   OPERATION AUTHORIZATION - Authorization to conduct an operation of
     executing a search warrant, arrest warrant, narcotic show,
     buy/bust, or sting operation shall be obtained through the
     Administrative Lieutenant.  The Case Agent shall review the
     details of the investigation with the Administrative Lieutenant
     and will be responsible for completing an Operational Plan as
     described in this directive.  The Administrative Lieutenant shall
     designate a Team Leader to supervise the operation.  The
     Administrative Lieutenant shall meet with the Team Leader to
     review the operation and selection of Arrest Team members.

     In the event the Administrative Lieutenant is not available then
     another Administrative Officer shall administer his duties as
     described in this directive.

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 99 of 161

B.   SUPERVISORY DISCRETION - In the event an officer obtains a warrant
     to be executed and he believes that a minimum of safety
     precautions are necessary to effect the arrest and/or search, then
     some procedures as described in this directive may be circumvented
     at the discretion of the Administrative Lieutenant.  An example
     where minimum safety precautions would be necessary is where an
     officer has an arrest warrant for DWLS and the suspect has a
     nonviolent reputation and nonfelony criminal history, lives in
     Bellaire.  Under said circumstances, the Administrative Lieutenant
     may authorize several officers that may not have specialized high
     risk operation training along with a Team Leader to execute the
     warrant.

C.   APPLICATION OF OPERATIONAL PLAN - An Operational Plan shall be
     completed whenever possible prior to any execution of a search
     warrant, arrest warrant, narcotic show, buy/bust, or sting
     operation.  The Operational Plan is designed to inform all
     officers involved in said operations of the pertinent details in
     order to have a safe and effective operation.  In the event there
     is not adequate time to prepare a Operational Plan, an
     Administrative Officer must still be contacted to authorize the
     operation.

D.   CONTENTS OF OPERATIONAL PLAN - An Operational Plan shall consist
     of the following minimum information when applicable and feasible:

     (1)  Purpose or type of operation such as a narcotic search
          warrant, buy/bust, etc.

     (2)  List of officers involved including officers from outside
          agencies.  Notation of whether officers are uniformed or not.
          Descriptions or list of officers' vehicles to be used.

     (3)  Suspect information, including physical description, name,
          etc., vehicle description, pertinent arrest history and
          reputation, etc.

     (4)  Suspect weapon information and other possible hazards such as
          a guard dog, electric fence, etc.

     (5)  Location information where the operation is to take place
          such as the address, and a description of the building and
          immediate surrounding area.

     (6)  Description of confidential informants or innocent civilians
          that may be present such as a child who lives with a suspect
          where a narcotic search warrant is to be executed.

     (7)  Meeting location for the Arrest Team just before the
          operation takes place.

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 100 of 161

        (8)    Photographs, floor plan, and/or diagram of building or
               location and the immediate surrounding applicable area where
               the operation is to take place.

        (9)    "Bust" signal and danger signal.  There should be both a
               verbal and visual danger signal.

E.    DISSEMINATION OF RAID PLAN - Whenever possible, a copy of the
      Operational Plan shall be submitted to the Administrative
      Lieutenant before the operation is to take place.  The Team Leader
      shall be responsible for disseminating the Operational Plan to the
      Arrest Team before the operation begins.

      At the completion of the operation, the Team Leader shall complete
      the Operational Plan such as the charges filed, etc., and forward
      a copy to the Administrative Lieutenant.

F.    ARREST TEAM BRIEFING - The designated Team Leader shall be
      responsible for notifying Arrest Team members and scheduling a
      briefing.  The Team Leader shall conduct the briefing and review
      the Operational Plan, tactical approach, method of entry, delegate
      assignments, etc.  The Team Leader shall ensure that each Arrest
      Team member is fully apprised of the pertinent details so the
      operation takes place in a safe and effective manner.  The Team
      Leader shall ensure that each team member is properly equipped.
      Before the operation takes place, the Team Leader shall ensure
      that the warrant, if applicable, is current and the Communications
      Officers are apprised of the necessary information.


180.06    EXECUTION OF OPERATION

A.    SAFETY PRECAUTIONS - Safety of officers shall take precedence over
      the apprehension of suspects and seizure of evidence.  Arrest Team
      members shall adhere to the basic principles of officer safety and
      shall utilize cover and concealment whenever practical.  All
      Arrest Team members shall wear body armor, police identification
      (i.e., jackets), and radios when possible.  Exceptions shall only
      be authorized by the Team Leader under certain conditions such as
      a nonforced entry where the first officer is disguised as delivery
      person, etc.  Entry members should wear ballistic helmets when
      available.

Case 4:96-cv-00030  Document 92  Filed in TXSD on 05/30/97  Page 101 of 161

In the event that suspects discharge firearms, Arrest Team members should suspend their assignments concerning search and seizure of suspects and evidence. Members should immediately protect themselves and seek cover or concealment. Members on the outside of a building where suspects are discharging firearms should not return fire inside the building if there is any possibility that another member is inside the same building. However, a practical exception to firing inside the building would be when an officer needs to protect himself from direct gunfire. Injured members should be attended as necessary. Once it is determined that no other member is in danger, then officers should cease the operation and set up a perimeter for containment purposes if the armed suspect has not been apprehended. Specialized assistance such as the Houston Police Department S.W.A.T should be obtained.

In the event a suspect flees a building where an operation is taking place, then the pursuit of the suspect shall be the responsibility of the outside perimeter Arrest Team members as opposed to the entry members.

Arrest Team members assigned to the outside perimeter of a building or location shall remain outside until advised otherwise by the interior members.

Members working in an undercover capacity where it is expected that direct contact with a suspect shall occur will be monitored by at least one other member whenever feasible. Monitoring may be accomplished by eye contact, electronic video system, body microphone system, or when the undercover member is in such close proximity that conversation can be heard. However, the Team Leader may authorize exceptions under exigent circumstances.

B.    RESPONSIBILITIES - The Team Leader shall attempt to have at least one officer with EMT or advanced first aid training present with the Arrest Team during high risk operations and that said officer is properly equipped. When feasible, the Team Leader shall ensure that a site survey is completed just before the operation takes place. The Team Leader shall be responsible for ensuring that all assignments are completed such as the search, collection and preservation of evidence, and the securing and processing of prisoners. The Team Leader shall also ensure that all equipment not specifically assigned to individual members is returned to its proper location.

The Case Agent is responsible for ensuring that all paperwork is properly completed, warrants are returned or processed properly, evidence is properly marked and processed, and suspects are charged accordingly. An exception to this may apply if the Team Leader delegates some or all of the above to other members.

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 102 of 161

Arrest Team members are responsible for completing their
assignments in an effective and thorough manner.  Any questions
regarding assignments should be clarified with the Team Leader
when necessary.  Members shall adhere to departmental directives
with respect to the collection and preservation of evidence, use
of force, etc.

Under no circumstances shall a member smoke, ingest, inhale, or
otherwise consume illegal narcotics.  No member shall possess
illegal narcotics without the express authorization of the Team
Leader or Administrative Officer.

## 180.07    CULMINATION OF OPERATION

A.    CULMINATION - The Team Leader shall review the aspects of the
      operation with the Administrative Lieutenant once the operation is
      completed.  The Team Leader will critique the individual
      performance of the Arrest Team with each individual in a timely
      manner.  Said critique may be accomplished by means of a
      Performance Form, counseling, and/or training.

## 180.08    TRAINING OF ARREST TEAM

A.    TRAINING - The Administrative Lieutenant shall be responsible for
      the overall training of officers that are normally utilized as
      Arrest Teams.  Training shall include entry techniques, tactical
      approaches, defensive tactics, search and collection of evidence,
      firearms proficiency, etc.

      The Administrative Lieutenant shall ensure that several officers
      are adequately trained to perform the assignment of Team Leader.

CVitPDF - www.fastio.com





| | STANDARD OPERATING PROCEDURES<br>FIELD OPERATIONS COMMAND | | |
|---|---|---|---|
| CATEGORY:<br>PATROL | DATE ISSUED:<br>07/01/86 | EFFECTIVE DATE:<br>01/01/88 | PROCEDURE NUMBER:<br>200/2.22 |
| SECTION:<br>ARREST AND<br>APPREHENSION | DATE REVISED:<br>10/01/87 | REVISION NUMBER:<br>1 | PAGE NUMBER:<br>1 of 2 |
| SUBJECT/EVENT:<br>USE OF FORCE | | | |

RESPONSIBILITY: To use appropriate force in response to a threat to life or serious bodily injury, in protection of property, to effect an arrest, or to quell a disturbance.

## TASKS

I. Police officers are sometimes required to resort to the use of force in order to subdue or restrain a suspect/perpetrator. Individual officers must realize that along with this authority comes the responsibility to be wise and prudent, and the need for restraint in its application.

II. Police officers are authorized to use only that amount of force necessary to effect an arrest or for the protection of himself or others.

III. The type of force used, when the situation dictates, can be as follows:

    A. Verbal persuasion.

    B. Unarmed defense techniques.

    C. Police baton, see "Use of Police Baton" (200/2.23).

    D. Battery Operated Defense Device (Taser).

    E. Deadly Force.



REFERENCES:

Penal Code 9.31/ 9.32/ 9.33/ 9.34/ 9.51
General Order 600-17/ 600-21
Rules Manual 4.22
Commander's Directive
Accreditation Standard 41.1.22

Case 4:96-cv-00030   Document 92   Filed in TXSD on 05/30/97   Page 106 of 161

| SUBJECT/EVENT: | PROCEDURE NUMBER: | PAGE NUMBER |
|---|---|---|
| USE OF FORCE | 200/2.22 | 2 of 2 |

IV. Minimum force may be used but is not limited to the following events:

    A. Arresting an offender.

    B. Overcome unlawful resistance.

    C. Prevent escape of a prisoner.

    D. Defending yourself or others.

    E. Quell a violent disturbance.

V. A report must be made when an officer engages in a physical confrontation, regardless of the degree of the assaultive offense.

VI. Deadly force should be used in accordance with Texas State Law, and regulated by departmental Rules and General Orders..

VII. Warning shots are not permitted..

    A. The officer must justify and defend the use of warning shots to the department and any other inquiry if he discharges a warning shot based on the feeling that such action was the only means to deal with a substantial threat.

VIII. An officer involved in a shooting shall:

    A. Secure the perpetrator's weapon and make the arrest.

    B. Provide First Aid to the best of his ability.

    C. Request the dispatcher to send an ambulance and to contact concerned parties.

    D. Request his immediate supervisor and additional units to secure the scene.

    E. Detain all witnesses.

    F. Assist in the investigation.

        1. The officer has the right to request the presence of legal counsel at the scene before making a formal statement.

IX. The patrol supervisor shall:

    A. Respond with Taser and darts to all calls where officers request use of the Taser.





| | STANDARD OPERATING PROCEDURES |
| FIELD OPERATIONS COMMAND |

| CATEGORY: | DATE ISSUED: | EFFECTIVE DATE: | PROCEDURE NUMBER: |
|---|---|---|---|
| PATROL | 07/01/86 | 01/01/88 | 200/2.01 |

| SECTION: | DATE REVISED: | REVISION NUMBER: | PAGE NUMBER: |
|---|---|---|---|
| ARREST AND APPREHENSION | 10/01/87 | 1 | 1 of 3 |

| SUBJECT/EVENT: |
|---|
| EFFECTING AN ARREST |

RESPONSIBILITY:   To properly execute an arrest and inform the suspect of his rights and the cause for the arrest.

## TASKS

I. Officers making an arrest will use only that amount of force necessary to effect such arrest and protect themselves or others.

   A. The arresting officer assumes primary responsibility for the health, safety and welfare of his prisoner.

II. The arresting officer will inform the suspect that he is under arrest and name the charge or cause for arrest.

III. The arresting officer will give the suspect the Miranda warning at the time of the arrest, or as soon after the arrest as possible.

IV. The arresting officer shall ensure that the prisoner is expeditiously processed by delivering the suspect to a police facility as soon after the arrest as possible.

V. Whenever an officer observes any circumstances which he believes poses an immediate threat of serious injury or death to any prisoner in another officer's custody, he shall immediately do the following:



REFERENCES:

Penal Code 9.51/38.03/38.04
General Order 500-1 / 300-21 / 300-5
Rules Manual 2.8/4.22

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 108 of 161



A. Take custody of the prisoner from the other officer.

    1. The officer taking charge becomes responsible for the prisoner.

    2. The original officer has no further custody responsibility for the prisoner.

    3. The original officer retains responsibility for reporting and documenting the incident.

B. Take whatever action is necessary to protect the prisoner.

C. Notify a field supervisor.

D. Complete a written letter and route it through the chain of command.

VI. Officers shall not place or leave unattended in any location accessible to a prisoner or suspect any object or weapon capable of inflicting serious bodily injury or death.

VII. Prisoners will be searched by the arresting officer at the time of arrest, and by each officer in the chain of custody of the prisoner.



A. Whenever possible searches will be performed by an officer of the same sex as the prisoner.

B. If there is reason to believe that an immediate threat of serious bodily injury or death or an immediate threat of the destruction of evidence or escape exists, the following should be done:

    1. Handcuff the prisoner securely enough to protect the officer, avoiding prisoner injury or pain.

    2. Double lock the handcuffs whenever possible.

    3. Conduct an immediate search (officer of either sex) to secure a weapon, or to prevent the imminent destruction or loss of contraband. See "Searching a Prisoner" (200/2.03).

    4. Use discretion and sensitivity when searching any prisoner, especially a prisoner of the opposite sex. Have an impartial witness (preferably of the same sex as the prisoner) present when the search is conducted.

    5. Make a detailed report on the circumstances of the arrest and search.

VIII. Remove the following from the prisoner and dispose of appropriately:



A. Items which were unlawfully carried.

B. Items which are required as evidence.

C. Items which are lawfully carried but dangerous to life, potentially dangerous, or would aid in an escape.

D. Items which can be used to deface or damage property.

E. Items which are personal to the prisoner (except clothing), if prisoner is intoxicated or unconscious.

F. Items which appear to be medication should be approved by the jail doctor unless the prisoner is in clear physical need of personal prescription medication.

IX. When the officers have reason to believe the arrestee has a contagious disease the officers should:

A. Carry out their duties according to department policy, guidelines and training.

B. Use the appropriate department-furnished equipment to protect against infection.

C. Exercise special caution to prevent infection during the following activities:

   1. Prisoner arrest, search and transport activities

   2. Jail or lockup activities

   3. Crime scene investigations activities

   4. Body removal and accident investigation activities

   5. Evidence handling and laboratory techniques

   6. Decontamination of persons, facilities and vehicles, and disposal of contaminated materials.

   7. First aid and CPR procedures

D. Report any incidents of possible exposure as a result of performing your police duties as if it were an on-the-job injury (may file workmen's compensation claim in accordance with General Order 300-5).



| | STANDARD OPERATING PROCEDURES FIELD OPERATIONS COMMAND | | |
|---|---|---|---|
| CATEGORY:<br>PATROL | DATE ISSUED:<br>07/01/86 | EFFECTIVE DATE:<br>01/01/88 | PROCEDURE NUMBER:<br>200/2.02 |
| SECTION:<br>ARREST AND APPREHENSION | DATE REVISED:<br>10/01/87 | REVISION NUMBER:<br>1 | PAGE NUMBER:<br>1 of 2 |
| SUBJECT/EVENT:<br>HANDCUFFING PRISONERS | | | |

RESPONSIBILITY: To enhance the protection of officers and prisoners from physical harm.

## TASKS

I. If there is reason to believe that an immediate threat of serious bodily injury or death, and immediate threat of the destruction of evidence or escape exits, the following should be done:

   A. Handcuff the prisoner securely enough to protect the officer but not so tightly as to cause the prisoner injury or pain.

   B. Double lock the handcuffs, whenever possible.

   C. Conduct an immediate search (officer of either sex) to secure the weapon or to prevent the imminent destruction or loss of contraband.

   D. Use discretion and sensitivity when searching any prisoner, especially a prisoner of the opposite sex. Have an impartial witness (preferably of the same sex as the prisoner) present when the search is conducted.

   E. Make a detailed report on the circumstances of the arrest and search.

II. Suspects meeting the above criteria should be handcuffed with their hands behind their back.



REFERENCES:

General Order 500-1 / 500-20
Rules Manual 2.5
Accreditation Standard 71.3.1 / 71.3.2

Case 4:96-cv-00030   Document 92   Filed in TXSD on 05/30/97   Page 111 of 161

| SUBJECT/EVENT: | PROCEDURE NUMBER: | PAGE NUMBER: |
|---|---|---|
| HANDCUFFING PRISONERS | 200/2.02 | 2 of 2 |



III. Prisoners who have an injury or physical condition which prevents normal securing, should be handcuffed to their belt, etc.

IV. Secure a prisoner's hands and feet with restraining devices if they are violent to the extent that they may, or have attempted to, hurt themselves or cause damage to the police vehicle.

V. When transporting physically or mentally handicapped prisoners the use and type of restraining devices will depend on the nature of the disability, the practicality of using such restraints, as well as the discretion of the transporting officer(s). The previously listed factors should be considered in the decision to use handcuffs or other devices.

VI. Tightening the handcuffs to the extent the they impair the person's circulation will not be condoned.





CVtoPDF - www.fastio.com



CVicPDF - www.fastio.com



EXHIBIT
17

CVWPDF - www.fasso.com

# SWORN AFFIDAVIT

Case No. 9508788

Date: July 15, 1995

Time: 0500

Page 1 of 3

Before me , the undersigned authority, appeared Michael A. Leal. Who after being duly sworn on their oath deposes and says:

My name is Michael A. Leal and I am 30 years old having been born on 5/13/65.

I have been informed that under the Penal Code of the State of Texas, section 37.02: A person commits the offense of perjury if, with intent to deceive and with knowledge of the statements meanings; he makes a false statement under oath or swears to the truth of a false statement previously made; and the statement is required or authorized by law to be made under oath. Further, that under Section 37.03 a person commits aggravated perjury if they commit perjury as defined in Section 37.02 of this code, and the false statement is made during or in connection with an official proceeding and is material.

Beginning of Statement:

On July 15, 1995, I was assigned to unit number 319 with the Bellaire Police Department. As a corporal on the 11:00 p.m. to 7:00 a.m. shift I am charged with the supervision of at least three patrol officers during the duty hours. At approx. 0130 hrs. I responded to a burglary in progress at 4407 Acacia, in Bellaire, Texas. Upon arrival I observed Officer D. Shelor to have already arrived at the scene and was standing in front of the house at that address. I approached the residence and was told by Officer Shelor that a lot of glass had been broken out of the windows of the residence. The dispatcher advised me that the residents of the house are leaving via the second story. Officer T.C. Upshaw had arrived and I assigned him to the rear of the residence in order to secure that area. I observed a light as if from a flashlight inside the house and it appeared to be coming from the upstairs area. I confirmed that noone else is supposed to have been in the house and I then proceeded toward the east side of the residence.

As I moved across the front of the residence I stopped at a large tree in the front,



northeast, corner of the lot.  I heard glass breaking in the area of the front door of the house and I observed a bicycle crashing through glass, from the inside,  and land on the front porch.  I observed a white male inside the house and I heard Officer Shelor yelling at the male suspect.  I lost sight of the suspect and I began to hear a banging sound on the east side of the house.  I then hear Officer Upshaw, who was at the rear, southside, of the house yelling at the suspect.  Officer Upshaw began to yell commands at the suspect and I thought he would need assistance, so I began moving toward the rear of the house along the east side.  As I approached a large window I saw Officer Upshaw's flashlight shining through the rear windows of the house.  The majority of the side and rear of the house is windows and my view into the interior of the residence was unrestricted.  Just past an air conditioning unit I observed a large amount of glass on the ground and a broken rear window which extended to a wooden deck on the ground.  I saw a white male inside the residence and I immediately noticed that he was very bloody.  He appeared to be cut on his hands and arms.

The suspect ignores Officer Upshaw's constant commands and appeared to attempt to hide behind a portion of the wall inside the house.  The area of the house where the suspect was standing appeared to be a portion of the living room.  I began to yell commands toward the suspect with no apparent effect.  Eventually the suspect lowered his body toward the floor, but not completely.  He appeared to be complying, less than totally, in an effort to stall the proceedings. At one point I was unable to see the upper part of the suspect's body and I decided to enter the residence in order to gain access of the suspect.  I entered the house, with Officer Upshaw behind me, and continued to yell commands toward the suspect.  I was telling him to "lay down" and "don't move".  I stood to the right, west, of the suspect and stood next to a couch in the living area.  Officer Upshaw approached the suspect from the eastside, or the suspect's left.  The suspect was prone and facing the floor but was not laying on the floor.  He appeared to be in a pushup position and constantly attempted to rise up off the floor.  Officer Upshaw placed his foot on the suspect back in aneffort to keep him on the ground.  Officer Shelor entered the room and I asked him to put on some latex gloves ( He is an E.M.T. and usually caries gloves with him). Apparently he didn't have the gloves with him and he left the room to get some. Officer Upshaw appeared to be having  great difficulty keeping the suspect on the ground and was in fact almost standing on him with both feet.  The suspect began placing his hands under his body and we yelled

at him not to do this. I yelled for him to place his hands in front of him. He eventually placed his hands back in front of him and began attempting to pushup again. Officer was attempting to hold him down but was frequently loosing his balance and was leaning on a table next to the suspect as if to balance himself. The suspect reached down again, toward his waist, with his right hand. He appeared to be digging in his waist band and continued to do so despite my commands not to do so. I yelled commands toward the suspect in order toget him to stop reaching into his waist. I reached down and attempted to pull the suspects hand and arm away from his body and immediately noticed that the muscles were tight and flexed. Although I continued to command the suspect not to move he pulled his hand away from his waist and in the same movement reached into his right pocket. The suspect appeared to roll onto his left side and fixed his gaze on me. While continuing to stare at me he groped in his right pocket. The suspect seemed intent on fixing his gaze on me for the express purpose of whatever was going to happen when he removed his hand from his pocket. Although I continued to command him not to remove his hand from his pocket, the suspect began doing so. I saw the hand coming out of the pocket and, knowing the suspects prior acts, I feared that the suspect was removing a weapon from his clothing and was focused on my person. I fired at the suspect to stop him. I stepped back and away from the suspect. I ordered Officer Shelor to handcuff the suspect, who was now laying face forward on the floor. I told Officer Shelor to attend to the suspect's medical needs. Officer Upshaw and Officer Bohannon, who has arrived by this time, searched the house for additional suspects while I remained with Officer Shelor and the suspect.

**End of Statement**
I can read and write the English language and have read and fully understand each and every part of this statement. I do hereby swear that this statement is true and correct to the best of my knowledge. I have given this statement to Detective D.L. Oglesby of the Bellaire Police Department of my own free will.

MICHAEL LEAL

SWORN TO AND SUBSCRIBED BEFORE ME THIS 15TH, DAY OF JULY, 1995

NOTARY PUBLIC



JAMES A. HARRIS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 3-20-98

1



# SWORN AFFIDAVIT

Case No. 9508788

Date: July 15, 1995

Time: 0700

Page 1 of 3

Before me , the undersigned authority, appeared Carle Upshaw.  Who after being duly sworn on their oath deposes and says:

My name is Carle Upshaw and I am 27 years old having been born on 12/22/67.

I have been informed that under the Penal Code of the State of Texas, section 37.02: A person commits the offense of perjury if, with intent to deceive and with knowledge of the statements meanings;  he makes a false statement under oath or swears to the truth of a false statement previously made; and the statement is required or authorized by law to be made under oath. Further, that under Section 37.03 a person commits aggravated perjury if they commit perjury as defined in Section 37.02 of this code, and the false statement is made during or in connection with an official proceeding and is material.

Beginning of Statement:

On July 15, 1995 I was assigned to unit 311 of the Bellaire Police Department. At approx. 0130 I responded to a burglary in progress call at 4407 Acacia, in Bellaire, Texas.  Officer D. Shelor was the primary unit and I was checking by with him.  Upon arrival at the house I observed a window in the front door to be broken out.  I went to the rear of the house and observed the home owners to be on the roof, one male and one female. I advised them to stay on the roof for the time being. They told me that no one else belonged in the house. I heard the other officers who were at the location to be yelling at someone apparently inside the residence, to get on the ground. I was advised by the the other Officers that the suspect was back in the house I remained at the rear, south side of the residence. I moved toward the south east corner of the location and as I did so I observed a white male running toward the rear of the home. I drew my weapon and commanded the suspect to show me his hands.  The suspect moved in and out of my

*C. U.*

view through the rear of the house. I ordered the suspect toward a sliding glass door in an effort to have him open it and be taken into custody. The suspect then ran into the door at a fast pace as if he thought it was open. The suspect then attempted to open the door and turned and ran back into the center of the house. The suspect appeared to lay down on the ground and at that point I entered the house behind Corporal M. Leal, through a broken window which extended to the ground. I approached the suspect while holstering my weapon, as Corporal Leal had the suspect covered at gun point. I was attempting to handcuff the suspect when I noticed that he was covered with blood. I called for some latex gloves on the radio. The suspect continued to move his arms and hands around and attempted to get up off the floor. I placed my right foot on the suspect's back and attempted to hold him on the ground. This was unsuccessful and I placed both feet on his back in an effort to hold him on the ground. He was still able to lift me off the ground. The suspect continued to attempt to get up and moved his arms around. Both Corporal Leal and I continued to command him to place his arms out in front of him. The suspect reached under his body with his both hands. It appeared as if he was attempting to remove something from his clothing. Corporal Leal continued to yell at the suspect to show his hands. My foot remained on the suspect's back. The suspect began rolling onto his left side and was actually lifting my foot off of his back. I could not see his hands. I never really realized that a shot had been fired. Corporal Leal then told me to step back and I did so. I then unholstered my weapon in an effort to protect myself from the suspect's actions. I again called for some gloves. Officer Shelor then arrived with gloves. Officer Shelor then handcuffed the suspect. I heard Corporal Leal call for an ambulance. I then got the homeowners out of the house.

**End of Statement**

I can read and write the English language and have read and fully understand each and every part of this statement. I do hereby swear that this statement is true and correct to the best of my knowledge. I have given this statement to Detective D.L. Oglesby of the Bellaire Police Department of my own free will.


CARLE UPSHAW

Carle Upshaw

SWORN TO AND SUBSCRIBED BEFORE ME THIS 15TH DAY OF JULY, 1995

NOTARY PUBLIC



JAMES A. HARRIS
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 3-20-98

CVit/PDF - www.fastio.com

## BELLAIRE POLICE DEPARTMENT

# W I T N E S S   S T A T E M E N T

County of Harris                          State of Texas

Case No.: 9508788
Date:       July 15, 1995                 Time:  0645 Hrs.

Before me, the undersigned authority, this day, personally appeared
CAROLYN RYAN DEAL, believed by me to be a credible person, who
after being duly sworn upon his/her oath, did depose and say:

My name is Carolyn Ryan Deal and I am 50 years old having been born
on 03-22-45, in Bethesda, Maryland. I live at 4407 Acacia,
Bellaire, Texas 77401. My telephone number at home is 666-7527. I
am currently self-employed with my husband and we work out of our
home. The name of our business is Jack Deal Consultants.

I have been informed that under the PENAL CODE of the STATE OF
TEXAS, Section 37.02:  A person commits the offense of PERJURY if,
with the intent to deceive and with knowledge of the statements
meanings; he/she makes a false statement under oath or swears to
the truth of a false statement previously made; and the statement
is required or authorized by law to be made under oath.

I, Carolyn Ryan Deal, am making this statement regarding the
incident that occurred at our residence on Saturday morning, July
15, 1995, in the early morning hours. My husband went to bed before
I did as I fell asleep in front of the TV downstairs. I woke up at
about 11:15PM, Friday night, and turned off all the lights and went
up to bed with my husband. Our bedroom is in the west side of the
home closer to Newcastle St. I awoke to the sound of breaking
glass. I was later told that the time was about 1:30AM. I woke up
my husband and told him that I thought that someone was in the
house. My husband told me to lock the bedroom door and as I was
getting up to lock the door he was grabbing the phone and calling
911. As I got to the door I heard someone right outside the bedroom
door, which is on the second floor of the house, coughing. I locked
the bedroom door and went back to my bed. I heard my husband
talking with the Police and he repeated what I assume the police
were saying, that the Police were on their way. My husband then
told me to go unlock the door that goes out onto a flat roof from
our bedroom. When I opened the door I believe that I set off the
alarm.

I have read the above portion of this, my statement, and find it to
be true and correct to the best of my knowledge.

Signature

Notary Public

D. L. OGLESBY
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 7-30-97

Page 2 of Statement from Carolyn Ryan Deal

I had not set the alarm for sensor movement and I assume that is why the alarm did not go off when the glass was broken and someone entered the house. I went back to the bed as my husband was still talking to the police on the phone. At this time I heard loud footsteps in the house and it sounded like someone was going down the stairway. I think that I heard my husband repeating back to the police that the police were at the house. I then heard some loud banging at the front door. I am not sure if the police had already arrived or if I heard the loud banging first. My husband then told me that the police had told us to go out onto the roof. My husband also had gotten disconnected from 911 on one occassion and had to call the police back. It seemed like it took only about 90 seconds for the police to arrive from when my husband fist called the police. My husband and I went out onto the roof and the alarm was still going off and it was heard to hear much of anything at that point. I could see flashlights in the backyard. At some point the alarm stopped sounding and I could hear a lot of commotion in the house. I heard the police yelling at someone downstairs to "open the door", "come out" and to "drop it". I heard some cursing although I could not tell who was saying what. I then heard two shots and the commotion stopped and all I heard was some talking. The police then asked us to unlock the bedroom door and they would meet us at the top of the stairs. We did that and we went to a neighbors house to stay.

My husband and I were the only ones that were supposed to be in the house. We have a daughter who is away at school.
My impression was that whoever had broken into the house was not a rational person. This is because of all the noise that he was making as the person went through the house.


I have read this, my statement, consisting of 2 page/pages, and find it to be true and correct to the best of my knowledge as typed by Sgt. J.A. Harris.

I can read and write the English language and have read and fully understand each and every part of this statement. I have given this statement to Sgt. J.A. Harris of the Bellaire Police Department.

Signature

Subscribed and sworn to before me, the undersigned authority on Saturday, July 15, 1995

Notary Public

D. L. OGLESBY
NOTARY PUBLIC
STATE OF TEXAS
My Comm. Exp. 7-30-97

CutePDF - www.fastio.com

1      UNITED STATES DISTRICT COURT
2      FOR THE SOUTHERN DISTRICT OF TEXAS
              HOUSTON DIVISION

3

4   NOEL C. ALLEN,                        *
    INDIVIDUALLY AND ON BEHALF OF         *
    ESTATE OF TRAVIS O'NEILL ALLEN        *
5   AND REBECCA O'NEILL ALLEN             *      CIVIL ACTION
                                          *
6   VS.                                   *
                                          *      CASE NO. H-96-0030
7   MICHAEL LEAL,                         *
    CARLE UPSHAW,                         *
8   BELLAIRE POLICE DEPARTMENT AND        *
    CITY OF BELLAIRE, TEXAS               *

9

10

11

12

13                  DEPOSITION OF

14                  MICHAEL LEAL

15

16

17

18

19

20          On July 2, 1996, the oral deposition of the

21   Witness in the above-styled cause was taken at the

22   instance of the Plaintiffs in the offices of Hirsch,

23   Robinson, Sheiness & Glover; One Houston Center,

24   1221 McKinney Street, Suite 3600; Houston, Texas,

25   pursuant to Stipulations of Counsel contained herein.



BEAUMONT, TX
(409) 839-4407


CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

1       Those persons present were as follows:

2

3               MR. J. BLAKE HAYNES
                MR. GRAYDON WILSON
                Richard Haynes & Associates
4               4300 Scotland Street
                Houston, Texas   77007
5
                        Counsel for Plaintiffs,
6                       NOEL C. ALLEN AND
                        REBECCA O'NEILL ALLEN
7
                MS. LISA C. BINGHAM
8               Hirsch, Robinson, Sheiness & Glover
                One Houston Center
9               1221 McKinney Street, Suite 3600
                Houston, Texas   77010
10
                        Counsel for Defendants,
11                      MICHAEL LEAL, CARLE UPSHAW,
                        BELLAIRE POLICE DEPARTMENT
12                      AND CITY OF BELLAIRE, TEXAS

13              MS. CANDACE A. NICHOLS, CSR, RPR
                Charlotte Smith Reporting, Inc.
14              3730 Kirby Drive, Suite 909
                Houston, Texas   77098
15
IN ATTENDANCE:
16
                MR. NOEL C. ALLEN
17              MS. REBECCA O'NEILL ALLEN
                MR. CARLE UPSHAW
18

19

20

21

22

23

24

25

BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

1    A        No, sir, I don't think I am.

2    Q        Can you see Travis Allen inside?

3    A        I can see him at certain times.

4    Q        And what were you seeing him doing when you

5    could see him?  What was he doing?

6    A        The first time I saw him?

7    Q        Yes, sir.

8    A        Was when Officer Upshaw had his light

9    flashed into the house.  I knew which basic area he

10   was in.  The first time I saw him was ---

11   Q        If you would, write on that there.

12   A        The first time I saw him, he was, I guess -

13   he had crossed right around over here (Indicating).

14   He went back over here.  Then he came back and hid

15   right here on this corner.

16   Q        So, from No. 8, you can see Travis Allen

17   inside the living room when Mr. Upshaw's light shines

18   on him; is that correct?

19   A        Yes, sir.

20   Q        And did you see anything in his hands?

21   A        No, sir.

22   Q        Did you see whether he was injured or not?

23   Could you tell at that time?

24   A        I could tell he was bleeding.

25   Q        Where could you tell he was bleeding from?

BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

1    that one of the teams told her that they heard a

2    voice coming from inside the house saying "Stop.

3    Don't move, or I'll shoot."

4            Did that ever occur out there?

5    A       I'm not sure.

6    Q       Is that something that you might have said?

7    A       Yes, sir.

8    Q       You just can't recall?

9    A       I can't -- I can't recall everything that

10    was said.

11    Q       Have you ever made that statement before in

12    regard to any other person?

13    A       Yes, sir.

14    Q       How many times have you made that

15    statement?

16    A       I'm not sure.

17    Q       Would there be any type of records or any

18    type of a piece of paper that you could check that

19    would refresh your memory of an arrest where you

20    threatened to shoot somebody if they didn't quit

21    moving around?

22    A       I guess I would just use it for somebody

23    that's not quit moving around, sir.

24    Q       Well, I'm just asking how many times that

25    you might have said that.

1  A        Usually it's something good to use even if

2  you don't have your gun out when you are chasing

3  somebody; and sometimes if they have no involvement

4  with the police before, they usually stop.  So, it's

5  something that's commonly said.

6  Q        And by "commonly said," is that something

7  that your fellow officers say, too?

8  A        Yes, sir.

9  Q        So, it's a practice of people using that

10  form of intimidation - "Stop.  Don't move, or I'll

11  shoot"; is that correct?

12  A        That's pretty correct, yes, sir.

13  Q        Is there any written policy that says

14  that's what y'all are to do?

15  A        No.

16  Q        It's just an unwritten rule that you

17  officers have gone and developed as a means of trying

18  to control people?  Is that what you are testifying

19  to?

20  A        I wouldn't even say it's an unwritten

21  policy.  I mean, it's just not the Bellaire Police

22  Department and Houston Police Department.  It's

23  something that's done when your gun is still in your

24  holster when you are running after somebody.  I mean,

25  they are not looking at you when they are running

1    away; so, they usually stop.

2    Q        So, threatening to shoot somebody is a

3    pretty common occurrence for a police officer.  Is

4    that what you are saying?  Let's go specifically to

5    the Bellaire Police Department – the 35 officers that

6    you know.  Is that the phraseology that they use in

7    attempts to apprehend suspects, to intimidate them?

8    A        Some of them, yes, sir.  I can't say for

9    all of them.

10   Q        But you did say it's kind of developed as a

11   custom among your officers and the officers in

12   general; is that correct?

13   A        Yes, sir, I've heard every officer say it.

14   Q        After you shot Travis in the back two

15   times, what did you do next?

16   A        I had to lean forward to fire the two

17   shots.  When I came back with my left hand,

18   Officer Upshaw was to my left; and I brought him back

19   with me.

20   Q        And just to get back to the "Stop or I'll

21   shoot," your commanders are aware of that or they

22   just know that goes on?

23   A        I'm not sure if they are aware of it or

24   not.

25   Q        But if they were to ask, the officer would

BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

1    tell them that "That's what we say to them," would

2    you believe?

3    A       They've probably — might have heard it.  I

4    don't know.

5    Q       You think they might have said it

6    themselves?

7    A       I don't know.

8    Q       Possibly.  Okay.

9            What did Mr. Upshaw say after you shot

10    Travis in the back twice?

11    A       I'm not sure if he said anything right

12    after that.

13    Q       You shoot him twice.  You back up 1,

14    2 feet?

15    A       1 or 2 feet, yes, sir.

16    Q       What did you say to him after that?

17    A       I told Officer Upshaw to go towards the

18    corner of the house to - I've got to turn it around -

19    right over here (Indicating).  I told him to jump

20    over -- By then Officer Shelor, when we backed up,

21    was standing here.  I told Upshaw to jump over the

22    couch and to get in this corner to cover our backs

23    and everything towards this house for anybody else

24    who was in the house.

25    Q       So, you take two steps back and you shoot

BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

NOEL C. ALLEN,                        *
INDIVIDUALLY AND ON BEHALF OF  *
ESTATE OF TRAVIS O'NEILL ALLEN *
AND REBECCA O'NEILL ALLEN       *      CIVIL ACTION
                                       *
VS.                                    *
                                       *   CASE NO. H-96-0030
MICHAEL LEAL,                          *
CARLE UPSHAW,                          *
BELLAIRE POLICE DEPARTMENT AND *
CITY OF BELLAIRE, TEXAS          *
        *   *   *   *   *   *

THE STATE OF TEXAS:

COUNTY OF HARRIS:

        I, CANDACE A. NICHOLS, a Certified

Shorthand Reporter for the State of Texas, hereby

certify pursuant to the Texas Rules of Civil

Procedure and/or agreement of the parties present to

the following:

        That this deposition transcript is a true

record of the testimony given by MICHAEL LEAL, the

Witness named herein, on July 2, 1996, after said

Witness was duly sworn by me;

        That $_____is the charge for the

preparation of the completed deposition transcript

and any copies of exhibits, charged to

MR. GRAYDON WILSON, SBA No. 00786357;

        That the deposition transcript was not

BEAUMONT, TX
(409) 839-4407


CSR
INCORPORATED

HOUSTON, TX
(713) 523-6400

submitted to the Witness for examination and

signature, same having been waived by the Witness and

all parties present;

That the original deposition transcript,

together with copies of any and all exhibits, was

delivered on the *17th* day of *July*, 1996,

to MR. GRAYDON WILSON;

That pursuant to information made a part of

the record at the time said testimony was taken, the

following includes all parties of record:

MR. J. BLAKE HAYNES and MR. GRAYDON WILSON,
Attorneys for Plaintiffs,
NOEL C. ALLEN AND REBECCA O'NEILL ALLEN

MS. LISA C. BINGHAM, Attorney for Defendants,
MICHAEL LEAL, CARLE UPSHAW, BELLAIRE
POLICE DEPARTMENT AND CITY OF BELLAIRE,
TEXAS

SWORN TO AND SUBSCRIBED by me in Houston,

Texas, on this the *17th* day of *July*, 1996.

*Candace A. Nichols*

CANDACE A. NICHOLS, CSR, RPR

Certification No.:        4149
Expiration Date:          12-31-96
Business Address:         Charlotte Smith Reporting, Inc
                          3730 Kirby Drive, Suite 909
                          Houston, Texas  77098
Telephone:                (713) 523-5400

BEAUMONT, TX
(409) 839-4407


CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

2

CVsPDF - www.fasoo.com

1  UNITED STATES DISTRICT COURT
2  FOR THE SOUTHERN DISTRICT OF TEXAS
   HOUSTON DIVISION

3

4  NOEL C. ALLEN,                    *
   INDIVIDUALLY AND ON BEHALF OF     *
   ESTATE OF TRAVIS O'NEILL ALLEN    *
5  AND REBECCA O'NEILL ALLEN         *     CIVIL ACTION
                                     *
6  VS.                               *
                                     *     CASE NO. H-96-0030
7  MICHAEL LEAL,                     *
   CARLE UPSHAW,                     *
8  BELLAIRE POLICE DEPARTMENT AND    *
   CITY OF BELLAIRE, TEXAS           *

9

10

11

12

13                  DEPOSITION OF

14                  CARLE UPSHAW

15

16

17

18

19

20          On July 3, 1996, the oral deposition of the

21  Witness in the above-styled cause was taken at the

22  instance of the Plaintiffs in the offices of Hirsch,

23  Robinson, Sheiness & Glover; One Houston Center,

24  1221 McKinney Street, Suite 3600; Houston, Texas,

25  pursuant to Stipulations of Counsel contained herein.



BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

1          Those persons present were as follows:

2

3                    MR. J. BLAKE HAYNES
                     MR. GRAYDON WILSON
                     Richard Haynes & Associates
4                    4300 Scotland Street
                     Houston, Texas  77007
5
                              Counsel for Plaintiffs,
6                             NOEL C. ALLEN AND
                              REBECCA O'NEILL ALLEN
7
                     MS. LISA C. BINGHAM
8                    Hirsch, Robinson, Sheiness & Glover
                     One Houston Center
9                    1221 McKinney Street, Suite 3600
                     Houston, Texas  77010
10
                              Counsel for Defendants,
11                            MICHAEL LEAL, CARLE UPSHAW,
                              BELLAIRE POLICE DEPARTMENT
12                            AND CITY OF BELLAIRE, TEXAS

13                   MS. CANDACE A. NICHOLS, CSR, RPR
                     Charlotte Smith Reporting, Inc.
14                   3730 Kirby Drive, Suite 909
                     Houston, Texas  77098
15
      IN ATTENDANCE:
16
                     MR. NOEL C. ALLEN
17                   MS. REBECCA O'NEILL ALLEN
                     MR. MICHAEL LEAL
18

19

20

21

22

23

24

25

BEAUMONT, TX          CSR          HOUSTON, TX
(409) 839-4407     INCORPORATED    (713) 523-6400

1     A        I don't remember. I know I came up, and I

2    noticed that there's a sliding glass door. I wanted

3    to get over there and see if it was open or maybe

4    have the person inside the house come out that

5    sliding glass door.

6     Q        Now, that would be over on the eastern edge

7    of this protruding portion of the house?

8     A        Yeah, of the part -- Yeah.

9     Q        So, it's your testimony that you came

10    around over to this way? (Indicating)

11     A        I made it to the sliding glass door

12    somehow.

13     Q        Came past the corner?

14     A        I guess. I came to the sliding glass door.

15    I got there somehow, and I had to pass that corner.

16     Q        Did you get to the handle of the door

17    itself?

18     A        Yes, sir.

19     Q        What was the distance between you and the

20    glass of the door?

21     A        Arm's reach. I tried it to see if it would

22    open.

23     Q        I want to draw an arrow. And, again, let

24    me represent that the beginning point of my line with

25    an arrow is not intended to be an indication of the

BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-6400

1    Q       In that general area?

2    A       If the door was here (Indicating), it would

3    be on the right side of the door.  I don't know if

4    the door is right here or where.  It's somewhere on

5    this wall.

6    Q       Let me draw this arrow, then (Drawing on

7    diagram).

8             Now, as you came up to the door, you

9    testified that you came close enough to put your

10   hands on the handle?

11   A       Hand.

12   Q       One hand.  Which hand?

13   A       I don't recall.  It was probably more than

14   likely my left hand because my right hand is my

15   strong hand.

16   Q       And you are right-handed?

17   A       Yes, sir.

18   Q       And you would hold the gun in your right

19   hand?

20   A       Yes, sir.

21   Q       Would that mean that you reached across

22   your body?

23   A       I don't remember.  I can't remember no

24   detail like that.

25   Q       Now, when you came up to the door, were you

BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

1    able to see the person that was inside?

2    A        I don't remember if I could see him at that

3    point or not.  I might have started commanding him

4    towards the door - sliding door - from back here

5    (Indicating); and as he walked, I walked so I could

6    keep him in view at all times.  I don't remember

7    exactly if that's how it happened or if I could see

8    him from where he was at at times from over here or

9    what.  I don't remember.  Thinking about it now, I

10   probably wouldn't have walked over here.

11   Q        Unless you could see him?

12   A        Unless I could see him or he was walking

13   towards me or something because then I would lose

14   sight of what I would call my "threat" at that time.

15   Q        And keeping sight of your threat - is that

16   good police work?

17   A        I don't know if it's police work or

18   survival.

19   Q        Would that be something that you were

20   trained to do?

21   A        Yes, sir.

22   Q        As you were watching him, as you were

23   walking over ---

24   A        I ain't saying that's exactly what I did.

25   I said it might have been what I did, okay.

BEAUMONT, TX
(409) 839-4407


CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

1   resisting arrest?

2   A       Yes, sir.

3   Q       Did you begin to evaluate different methods

4   of overcoming his resistance?

5   A       The only method that I was trying to use at

6   the time was holding him down on the ground until we

7   got some gloves.  I had a fresh cut on my hand.  I

8   did not want to reach down and touch the fresh blood

9   on Travis.

10  Q       What about the use of a baton?  Did it

11  occur to you to strike him with a baton?

12  A       No, sir.

13  Q       Did it occur to you to kick him?

14  A       My foot was busy.  It was on his back

15  trying to hold him down; so, no.

16  Q       But kicking is something you could have

17  done?

18  A       Yes, sir.

19  Q       Why didn't you kick him?

20  A       Because my foot was trying to hold him

21  down.  I think -- As far as I know, I never did.  I

22  can't tell you I did or didn't.  But as far as I

23  know, I never kicked him.  My foot was busy trying to

24  hold him down on the ground.

25  Q       When you stepped back from Travis, did

BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

THE STATE OF TEXAS                    *

COUNTY OF HARRIS                      *

        I, CANDACE A. NICHOLS, a Certified

Shorthand Reporter for the State of Texas, hereby

certify pursuant to the Texas Rules of Civil

Procedure and/or agreement of the parties present to

the following:


        That this deposition transcript is a true

record of the testimony given by CARLE UPSHAW, the

Witness named herein, on July 3, 1996, after said

Witness was duly sworn by me;


        SWORN TO AND SUBSCRIBED by me in Houston,

Texas, on this the 21st day of July_____, 1996.


                        _Candace A. Nichols_
                        CANDACE A. NICHOLS, CSR, RPR

Certification No.:        4149
Expiration Date:          12-31-96
Business Address:         Charlotte Smith Reporting, Inc
                          3730 Kirby Drive, Suite 909
                          Houston, Texas  77098
Telephone:                (713) 523-5400

1          UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                    HOUSTON DIVISION

3                                              **RECEIVED**

NOEL C. ALLEN,                    *
4    INDIVIDUALLY AND ON BEHALF OF  *           JAN 1 4 1997
     ESTATE OF TRAVIS O'NEILL ALLEN *
5    AND REBECCA O'NEILL ALLEN       *         CIVIL ACTION
                                      *
6    VS.                             *
                                      *        CASE NO. H-96-0030
7    MICHAEL LEAL,                   *
     CARLE UPSHAW,                   *
8    BELLAIRE POLICE DEPARTMENT AND  *
     CITY OF BELLAIRE, TEXAS         *

9

10

11

12                    DEPOSITION OF

13                   RANDALL C. MACK

14

15

16

17

18

19          On January 8, 1997, at 10:15 a.m., the oral

20    deposition of the Witness in the above-styled cause

21    was taken at the instance of the Plaintiffs in the

22    offices of Magenheim, Bateman, Robinson,

23    Wrotenberry & Helfand; One Houston Center,

24    1221 McKinney Street, Suite 3600; Houston, Texas,

25    pursuant to Stipulations of Counsel contained herein.





BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 529-5400

1          Those persons present were as follows:

2

3                    MR. GRAYDON WILSON
                     MR. J. BLAKE HAYNES
4                    Richard Haynes & Associates
                     4300 Scotland Street
5                    Houston, Texas  77007

6                              Counsel for Plaintiffs,
                               NOEL C. ALLEN AND
7                              REBECCA O'NEILL ALLEN

8                    MR. WILLIAM S. HELFAND
                     Magenheim, Bateman, Robinson,
9                    Wrotenberry & Helfand
                     One Houston Center
10                   1221 McKinney Street, Suite 3600
                     Houston, Texas  77010

11                             Counsel for Defendants,
                               MICHAEL LEAL, CARLE UPSHAW,
12                             BELLAIRE POLICE DEPARTMENT
                               AND CITY OF BELLAIRE, TEXAS
13

14                   MS. CANDACE A. NICHOLS, CSR, RPR
                     Charlotte Smith Reporting, Inc.
15                   3730 Kirby Drive, Suite 909
                     Houston, Texas  77098

16 IN ATTENDANCE:

17                   MR. DAVID GHISALBERT
                     Paralegal
18                   Richard Haynes & Associates

19

20

21

22

23

24

25

BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

Case 4:96-cv-00030 Document 92 Filed in TXSD on 05/30/97 Page 148 of 161

118

1   sustained finding of excessive use of force?

2   A          I don't know if there was or was not

3   without referencing the records.

4   Q          That's something that you are not prepared

5   to testify about today?

6   A          I do not maintain those records.

7   Q          But is that an accurate statement?  You are

8   not prepared to testify about that today?

9   A          I testified to what I knew about your

10  question.

11  Q          But you don't know what the disposition is?

12  A          No, I don't maintain the records.  I do not

13  know the dispositions of the investigations.

14  Q          Do you know whether there has ever been any

15  changes in the policies of the Bellaire Police

16  Department or any practices or procedures of the

17  Bellaire Police Department resulting from a complaint

18  made by a public citizen?

19  A          I don't recall that, but that doesn't

20  preclude the possibility that it has occurred.

21  Q          That's something you are just simply not

22  prepared to testify about today?

23  A          Something I don't recall.

24  Q          Have you ever threatened to shoot anybody?

25  A          Under what circumstance are you referring

(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

1    to?

2    Q        Any circumstance.

3    A        Yes.

4    Q        Is that one occasion or more than one

5    occasion?

6    A        More than one occasion.

7    Q        On how many occasions?

8    A        I don't recall the numbers.

9    Q        Was that with gun drawn?

10   A        Sometimes.

11   Q        And were those life-threatening situations?

12   A        On occasion, yes.

13   Q        And some were not?

14   A        Yes.

15   Q        Is it a practice of the officers in the

16   Bellaire Police Department to threaten to shoot

17   people under situations that are not

18   life-threatening?

19   A        It depends on the circumstances of the

20   specific incident and their concern for their safety

21   or the safety for others.

22   Q        But my question is under circumstances ---

23   A        I can't answer a question for another

24   officer on what their preface is.  I'm not aware of

25   that.

155

1    THE STATE OF TEXAS:

2    COUNTY OF HARRIS:

3              I, CANDACE A. NICHOLS, a Certified

4    Shorthand Reporter, hereby certify that the foregoing

5    testimony was given before me after the Witness had

6    been first duly sworn.

7              I further certify that this deposition was

8    typed under my direction and is a complete and

9    correct transcript of the proceedings; and that it is

10   being filed with the Court in accordance with the

11   Stipulation of Counsel contained in this deposition.

12             I further certify that I am neither

13   attorney for, related to, nor employed by any of the

14   parties to the lawsuit in which this deposition was

15   taken.  Further, I am neither related to nor employed

16   by any attorney of record in this cause; nor do I

17   have a financial interest in the matter.

18             GIVEN UNDER MY HAND AND SEAL OF OFFICE this

19   13th day of January        , 1997.

20

21             _Candace A. Nichols_

22             CANDACE A. NICHOLS, CSR, RPR

23   Certification No.:    4149
     Expiration Date:     12-31-98
24   Business Address:    Charlotte Smith Reporting, Inc.
                          3730 Kirby Drive, Suite 909
25                        Houston, Texas 77098
     Telephone:           (713) 523-5400

CVinPDF - www.fasoo.com

2

1      UNITED STATES DISTRICT COURT
       FOR THE SOUTHERN DISTRICT OF TEXAS
2            HOUSTON DIVISION

3

NOEL C. ALLEN, et al,      *
4                          *
          Plaintiffs       *
5                          *
VS.                        *    CIVIL ACTION NO. H-96-0030
6                          *
MICHAEL LEAL, et al,       *
7                          *
          Defendants       *

8

9

10

11

12                  DEPOSITION OF

13                  D.L. OGLESBY

14

15

16

17

18

19          On March 5, 1997, at 9:50 a.m., the oral

20     deposition of the Witness in the above-styled cause

21     was taken at the instance of the Plaintiffs in the

22     offices of Magenheim, Bateman, Robinson,

23     Wrotenbery & Helfand; One Houston Center,

24     1221 McKinney Street, Suite 3600; Houston, Texas,

25     pursuant to Stipulations of Counsel contained herein.



```
 1          Those persons present were as follow:

 2              MR. J. BLAKE HAYNES
                MR. JOSEPH L. LANZA
 3              Richard Haynes & Associates, P.C.
                4300 Scotland
 4              Houston, Texas  77007-7394

 5                  Counsel for Plaintiffs

 6

 7              MS. MARLA MOORE
                Magenheim, Bateman, Robinson
                Wrotenbery & Helfand, L.L.P.
 8              3600 One Houston Center
                1221 McKinney Street
 9              Houston, Texas  77010

10                  Counsel for Defendants

11

12              MS. DEBRA R. SIWICKE, CSR
                Charlotte Smith Reporting, Inc.
                3730 Kirby Drive, Suite 909
13              Houston, Texas  77098

14

15

16

17

18

19

20

21

22

23

24

25
```

1    Q          Upshaw were standing behind Travis.

2    A          Oh, I thought you meant how Travis' feet

3    were.

4    Q          Well, are they straddling his feet; or is

5    one officer on the left side and one on the right?

6    A          No, Officer Upshaw was on Allen's left side

7    and Officer Leal had leaned over a sofa that was just

8    right there also.

9    Q          And you said he leaned over a sofa?

10   A          Yes.

11   Q          I want to ask you to look at Plaintiffs'

12   Exhibit No. 13.  It shows a white sofa to the right

13   of Travis' body.  Is that the sofa that he leaned

14   over?

15   A          Yes.

16   Q          And from your investigation in talking with

17   Officer Leal, is he somehow behind the sofa over

18   here?  Is that where he is?

19   A          It appeared to me that -- I don't think he

20   was directly behind the sofa.  He might be

21   semi-straddled where half of him was over here and

22   the other half was on this side.  I don't think he

23   was coming in from a direction where he was totally

24   covered by the sofa and just leaned completely over

25   it.

BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400

1  as you testified, to fire the shots.

2  A        I think he did have one knee possibly on

3  the sofa here or he could have even supported himself

4  with one hand on the arm rest here leaning over where

5  he didn't have to kneel on that.

6  Q        But it's your understanding of what he told

7  you and your investigation that - is he right-handed

8  or left-handed?

9  A        Right.

10  Q        And he came over the arm part of the couch

11  with his right hand; is that not correct?

12  A        Yes.

13  Q        So, at least some part of his body has to

14  go over the couch?

15  A        Yes.

16  Q        Or at least his arm.  So, his arm is facing

17  over the couch and he fires the two shots.

18          If we were to roll Travis back over, did

19  you say - what type of distance is that between the

20  edge of the raised carpet and that?

21  A        From the edge of the carpet to the ---

22  Q        Yes, sir.

23  A        Approximately 5, 6 inches.

24  Q        Say, if they didn't pull him over at all

25  and we were to roll Travis back over on his stomach -



```
1    THE STATE OF TEXAS   :
     COUNTY   OF   HARRIS  :
2

3              I, Debra R. Siwicke, a Certified

4    Shorthand Reporter for the State of Texas, hereby

5    certify that this deposition transcript is a true

6    record of the testimony given by the witness named

7    herein, after said witness was duly sworn/affirmed

8    by me.

9              I further certify that I am neither

10   attorney nor counsel for, related to, nor employed

11   by any of the parties to the action in which this

12   testimony was taken.  Further, I am not a relative

13   or employee of any attorney of record in this cause,

14   nor do I have financial interest in the action.

15              Further certification requirements

16   pursuant to the Rules will be certified to after

17   they have occurred.

18              SUBSCRIBED AND SWORN to on this the

19   7th day of March, 1997.

20                    Debra R. Siwicke
                      DEBRA R. SIWICKE
21

22   Certification No.:    3810
     Expiration Date:      12-31-98
23   Business Address:     Charlotte Smith Reporting, Inc.
                           3730 Kirby Drive, Suite 909
24                         Houston, Texas  77098

25   Telephone:            (713)  523-5400
```

BEAUMONT, TX
(409) 839-4407

CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400



UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

NOEL C. ALLEN, et al,      *
                          *
        Plaintiffs        *
                          *
VS.                       *      CIVIL ACTION NO. H-96-003?
                          *
MICHAEL LEAL, et al,      *
                          *
        Defendants        *

DEPOSITION   OF

NEAL BRADY

On March 6, 1997 at 9:45 a.m., the oral

deposition of the Witness in the above-styled cause

was taken at the instance of the Plaintiffs in the

offices of Magenheim, Bateman, Robinson,

Wrotenbery & Helfand, One Houston Center, 1221

McKinney Street, Suite 3600, Houston, Texas,

pursuant to Stipulation of Counsel contained herein

1          Those persons present were as follows:

2

                    MR. J. BLAKE HAYNES
3                   MR. JOSEPH L. LANZA
                    Richard Haynes & Associates
4                   4300 Scotland Street
                    Houston, Texas  77007
5
                              Counsel for Plaintiffs
6
                    MS. MARLA MOORE
7                   Magenheim, Bateman, Robinson,
                    Wrotenbery & Helfand
8                   One Houston Center
                    1221 McKinney Street, Suite 3600
9                   Houston, Texas  77010

10                            Counsel for Defendants

11                  MS. CANDACE A. NICHOLS, CSR, RPR
                    Charlotte Smith Reporting, Inc.
12                  3730 Kirby Drive, Suite 909
                    Houston, Texas  77098
13
IN ATTENDANCE:
14
                    MR. DAVID GHISALBERT
15                  Paralegal
                    Richard Haynes & Associates
16

17

18

19

20

21

22

23

24

25

1    A        Do they carry gloves on them?  I don't

2    know.  I don't know.

3    Q        As the head of the department, do you

4    think that would be ---

5    A        Head of the department?

6    Q        Or head of the raid team.

7    A        That they are wearing gloves or not?

8    Q        Whether they have gloves on them or not?

9    A        I could care less if they choose to have

10   gloves with them.  That's fine with me if they

11   do.

12   Q        If they choose not to wear gloves, do

13   you still expect them to perform their duties?

14   A        To perform their duties, yes, sir.

15   Q        And part of their duties is to arrest

16   people; correct?

17   A        Right.

18   Q        Is to handcuff people; correct?

19   A        Right.

20   Q        And if somebody is bloody and they

21   choose not to bring gloves, you expect them to

22   handcuff and arrest those persons?

23   A        Yes, but that doesn't mean they can't go

24   back to the car and get the gloves.

25   Q        And as far as you're concerned as head

239

THE STATE OF TEXAS:

COUNTY OF HARRIS:

I, CANDACE A. NICHOLS, a Certified Shorthand Reporter, hereby certify that the foregoing testimony was given before me after the Witness had been first duly sworn.

I further certify that this deposition was typed under my direction and is a complete and correct transcript of the proceedings; and that it is being filed with the Court in accordance with the Stipulation of Counsel contained in this deposition.

I further certify that I am neither attorney for, related to, nor employed by any of the parties to the lawsuit in which this deposition was taken.  Further, I am neither related to nor employed by any attorney of record in this cause; nor do I have a financial interest in the matter.

GIVEN UNDER MY HAND AND SEAL OF OFFICE this 6th day of _March_, 1997.

_Candace A. Nichols_

CANDACE A. NICHOLS, CSR, RPR

Certification No.:      4149
Expiration Date:        12-31-98
Business Address:       Charlotte Smith Reporting, Inc.
                        3730 Kirby Drive, Suite 909
                        Houston, Texas 77098
Telephone:              (713) 523-5400

BEAUMONT, TX
(409) 839-4407


CSR
INCORPORATED

HOUSTON, TX
(713) 523-5400